**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 1:19-CR-201 |
| GEORGE AREF NADER, | The Honorable Judge Brinkema |
| Defendant. | |

**MR. GEORGE NADER'S MEMORANDUM IN AID OF SENTENCING
AND OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ......................................................................................................1

BACKGROUND .....................................................................................................4

    I.     MR. NADER'S PERSONAL AND PROFESSIONAL HISTORY ......................4

        A.    Childhood and Immigration to the United States.......................................4

        B.    Mr. Nader Founds Middle East Insight ......................................................6

        C.    Mr. Nader's Efforts to Free Hostages in Lebanon ....................................9

        D.    Mr. Nader's Other Diplomatic Efforts ....................................................11

        E.    Mr. Nader's Home Life in Lebanon and the UAE...................................12

        F.    Mr. Nader Suffers from Several Serious Health Conditions ...................13

        G.    COVID-19 Poses Significant Danger for Mr. Nader ..............................14

        H.    Mr. Nader's Commitment to Not Re-Offend...........................................16

        I.    Mr. Nader Has Been Subjected To Harsh Pre-Trial Confinement

           Conditions ...............................................................................................19

    II.    THE EVENTS LEADING TO MR. NADER'S ARREST AND PLEA.............20

        A.    The Special Counsel Office's Investigation ............................................20

        B.    The WhatsApp Videos..............................................................................22

        C.    Mr. Nader Completes His Immunized ███████ and Is Then

           Charged and Arrested ..............................................................................25

        D.    The Offense Conduct Underlying Mr. Nader's Plea................................27

DISCUSSION.........................................................................................................29

III.    THE AGREED-UPON TEN YEAR SENTENCE IS APPROPRIATE

       UNDER THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) ........................29

       A.    The Nature and Characteristics of the Offense, and the History and

             Character of the Defendant Are Adequately Reflected in the

             Parties' Recommended Ten-Year Sentence...............................................30

       B.    The Purposes of Sentencing Are Served by the Parties'

             Recommended Ten-Year Sentence ..........................................................30

       C.    The PSR Incorrectly Calculates Mr. Nader's Guidelines Range ..............33

             1.    Application of the 2018 Guidelines Manual to Mr. Nader's

                   Conviction for Transportation of a Minor in 2000 Violates

                   the Ex Post Facto Clause...............................................................33

             2.    The PSR Improperly Applies Two Specific Offense

                   Characteristic Adjustments to Count 1 .........................................38

                   a.    The Court Should Not Increase Mr. Nader's

                         Guidelines Based on the Images Seized in 2018 and

                         2019. .............................................................................38

                   b.    The Section 2G2.2(b)(3)(F) Adjustment for

                         Distribution of Child Pornography Does Not Apply.........43

                   c.    Section 2G2.2(b)(7)(D) 5-Level Adjustment for

                         More Than 600 Images Does Not Apply..........................44

       D.    The Guidelines Range Fails to Identify the "Sufficient But Not

             Greater Than Necessary" Sentence .........................................................45

E.    Need to Avoid Unwarranted Sentencing Disparities Counsels in

Favor of the Recommended Ten-Year Sentence .....................................50

3.    Cases involving possession or receipt of child pornography ........50

4.    Cases involving transportation of a minor for illicit sexual

activity or sex trafficking of children...........................................52

REQUESTED JUDICIAL RECOMMENDATIONS...................................................54

CONCLUSION..................................................................................................54

Mr. George Nader respectfully submits his Memorandum in Aid of Sentencing and Objections to the Presentence Investigation Report.

Mr. Nader will appear before the Court for sentencing on June 26, 2020, having pled guilty to two offenses related to conduct from the years 2000 and 2012.  He has pled guilty to one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4) and (b)(2), relating to conduct in 2012, and one count of transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2423(a) and 2426, relating to conduct in 2000.  The first of those counts carries a mandatory minimum sentence of ten years' imprisonment here.

The Government and Mr. Nader are jointly recommending that Mr. Nader be sentenced to the mandatory minimum of ten years.  As explained below, ten years is a "sufficient, but not greater than necessary" sentence in this case, in light of the many years that have passed since the conduct underlying his convictions; Mr. Nader's lifelong dedication to peace in the Middle East; Mr. Nader's age and poor health; and the extremely low risk that he will re-offend.

## **INTRODUCTION**

George Nader is a dual American and Lebanese citizen who has dedicated his life to working for peace and encouraging a better understanding of complex issues in the Middle East. In doing so, he has repeatedly subordinated his own well-being to his work furthering the interests of peace and the safety of others, including American citizens.

Mr. Nader fled the Lebanese civil war to the United States at age 15.  That experience, as well as the ongoing Middle Eastern conflicts from his formative years, shaped his life's work of serving as a bridge between his home region, the Middle East, and his adopted country, the United States.  At age 20, as detailed below, Mr. Nader started a magazine focusing on Middle

Eastern politics and economics that would become *Middle East Insight*.  That magazine was path-breaking and highly influential; it became essential reading for those with interests in the region, including diplomats.  *Middle East Insight* was at the heart of conversations regarding those issues for decades and was a vital forum for discussing the most important issues of the time.

Mr. Nader also worked on peace initiatives behind the scenes throughout the 1990s and 2000s.  Perhaps most significantly, he played an important role in the freeing of American hostages held by Hezbollah terrorists in the 1990s.  Prior to his 2019 arrest on the Complaint in this case, Mr. Nader was continuing his work for peace in the region, as an envoy between the United States and key figures in the Middle East.

Mr. Nader has also made some grave errors in his personal life, which now bring him before the Court for punishment.  The charges in this case involve disturbing conduct, albeit conduct that happened many years or even decades ago.  Importantly, Mr. Nader did not plead to—and does not stand convicted of—any of the conduct underlying his arrest in 2019.  Mr. Nader did not plead to that conduct because he is legally and factually innocent of knowingly transporting illegal images into the United States, as the Government originally alleged.

That being said, Mr. Nader is painfully aware that he committed serious offenses as a younger man, which inflicted real harm.  Under any possible sentence the Court can impose at this juncture, he will receive a substantial prison sentence as a consequence of those actions.  In this case, the Government and Mr. Nader have agreed that ten years is the appropriate sentence, taking into account all the facts and circumstances of this case, as well as the goals of sentencing.

There are many reasons why ten years is a sufficient sentence here.  First and foremost, Mr. Nader is now 61 years old and has *already demonstrated* that he can control the destructive

impulses that afflicted him as a younger man.  Mr. Nader's progress in his life is consistent with

the scientific consensus that recidivism—particularly in the area of sex offenses—decreases

dramatically with age.  Perhaps the most authoritative study of its kind found that, for individuals

like Mr. Nader in Criminal History Category I, only 6.9% of those aged 41-50 at the time of

sentencing re-offended.  *See* United States Sentencing Commission, *Measuring Recidivism:  The

Criminal History Computation of the Federal Sentencing Guidelines* (May 2004).[1]  For

individuals older than 50, much less individuals like Mr. Nader who are older than 60, the rate is

lower still.  *See id.*; *see also, e.g.*, *United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014)

("There is a statistically significant drop in recidivism for offenders aged 45 to 54 compared with

35 to 44 year-olds, and rates for those aged 55 and older are even lower.").

Second, and consistent with the above, Dr. Fred Berlin, a renowned Johns Hopkins

psychiatrist who specializes in treating and evaluating people charged with and convicted of

sexual offenses, clinically assessed Mr. Nader and has concluded that Mr. Nader's "future

prognosis is very good" due in part to the following factors:  (1) Mr. Nader's demonstrated

ability in recent years to control his behavior; (2) sexual recidivism rates for people over 60 are

very low; (3) Mr. Nader has no comorbid conditions such as drug and alcohol addiction or a

personality disorder; and, most importantly, (4) Mr. Nader is clearly "a man with considerable

psychological strengths that facilitate future success."  Ex. 1, Berlin Report (Feb. 22, 2020) at

14.[2]

---

[1] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last accessed June 9, 2020).

[2] Dr. Fred Berlin is the Associate Professor of Psychiatry and Behavioral Sciences at The Johns Hopkins University School of Medicine, the founder of The Johns Hopkins Sexual Disorders Clinic, and Director of the National Institute for the Study, Prevention, and Treatment of Sexual Trauma.

Finally, if Mr. Nader is sentenced to significant prison time beyond the parties' recommendation of ten years—which, for a 61-year-old with a history of cardiac disease, already approaches the functional equivalent of a life sentence—it will eliminate any incentive that future offenders have to plead guilty, as Mr. Nader has done.  Among other valuable rights Mr. Nader forfeited as the result of his guilty plea was the right to challenge the search and seizure of his phones and the controversial application of the plain view doctrine the Government would have had to invoke here.  Mr. Nader's plea deal, which included the Government's ten-year recommendation, also spared witnesses (including Minor Boy 1[3] the ordeal, and the Government the cost, of an extremely difficult trial for all involved.  The plea deal now also includes Mr. Nader's agreement to pay restitution in the amount of $150,000—a much higher amount than what courts have ordered under similar (and worse) circumstances.

For Mr. Nader and the aged conduct at issue here, the functional equivalent of a life sentence is far greater than what is necessary.  Instead, the Court should sentence Mr. Nader to the jointly recommended sentence of ten years' imprisonment, plus five years of supervised release.  This sentence is more than sufficient to meet all the goals of sentencing, including just punishment for Mr. Nader's offenses.

## **BACKGROUND**

## I.  **MR. NADER'S PERSONAL AND PROFESSIONAL HISTORY**

### A.  **Childhood and Immigration to the United States**

Mr. Nader was born in Lebanon in 1959, the oldest of his parents' three children.  Ex. 1 at 2; Presentence Report ("PSR") (ECF No. 185) ¶ 130.  Mr. Nader's sister Leila is about four years younger than him.  Ex. 1 at 2.  She lives in Lebanon with her husband and two children.

---

[3] Minor Boy 1 is being referred to as such here pursuant to this Court's protective order, but he is currently a 35-year-old man

*Id*.  Mr. Nader and Leila are very close and to this day speak often by phone.  *Id*.  Mr. Nader's

other sibling, his brother Tony, is about 8 years younger than him.  *Id*.  Tony is now married and

has three children, the youngest of whom is named George, after Mr. Nader.  *Id*.  While living in

Lebanon when he was about 14, Tony was maimed by an explosive that his friend found on the

ground and mistook for a toy, causing the loss of his left hand and left eye.  *Id*.  This event had a

profound impact on Mr. Nader and deepened his desire to work for peace in his homeland and

the greater Middle East.  Mr. Nader's brother and sister are his primary living family.  His father

passed way in 2000, at the age of 57, from a brain tumor.  PSR ¶ 130.  His mother passed away

in 2015 from heart disease.  *Id*.  Mr. Nader never married or had children.  He has, however, over

the years almost always owned one or more dogs; he cares dearly for his 11-year-old boxer,

Archie, who he greatly misses.  *See* Ex. 1 at 7.

       Mr. Nader's early life in Lebanon was relatively peaceful.  Mr. Nader's father owned a

small cement factory and a grocery store, worked as an accountant, and provided adequately for

the family.  Ex. 1 at 3-4; PSR ¶ 131.  His mother was a homemaker.  Ex. 1 at 2; PSR ¶ 132.  In

1975, however, civil war in Lebanon was looming and economic conditions were deteriorating.

Ex. 1 at 3; PSR ¶ 132.  So, Mr. Nader and his family fled to Parma, a suburb of Cleveland, Ohio.

Ex. 1 at 3; PSR ¶ 132.  Once in Ohio, the Naders lived with an aunt who had immigrated to the

United States the prior year.  Ex. 1 at 3; PSR ¶ 132.  When Mr. Nader arrived in the U.S. with his

family at the age of 15, he spoke no English beyond a simple "hello" or "how are you?"[4]  PSR

¶ 132.

       Despite having just fled a civil war in his homeland and notwithstanding his limited

English, teenaged George Nader assimilated quickly.  He enrolled in high school and wasted no

---

[4] *See* https://www.dailystar.com.lb/ArticlePrint.aspx?id=104987&mode=print (Dec. 16, 2000).

time mastering the language and becoming an active member of his community. A Student

Descriptive Summary letter written by the school counselor in November 1976 states that his

adjustment to school after arriving from Lebanon was "rapid" and his academic progress was

"most satisfactory." PSR ¶ 143. The letter described him as a "courteous, personable,

industrious, mature young man," *id.*, which is no surprise to anyone who truly knows George

Nader today.

In high school, Mr. Nader began the pattern of extremely hard work that would continue

throughout his life. When he was 16, he worked two jobs in addition to attending school full-

time. Ex. 1 at 4. Once the school day ended, he worked as a custodian at his high school,

cleaning classrooms from 2:00 to 6:00 p.m. *Id.* He would leave high school at 6:00 p.m. and go

to work at a local pizzeria, where he started as a dishwasher and eventually worked his way up to

making pizzas and salads. *Id.* Within just a couple years of his arrival in the U.S., Mr. Nader

(who had only known two phrases in English when he arrived) had started a club at his high

school that read works by Shakespeare and Victor Hugo. *Id.* He also wrote a newspaper by

hand that discussed literature and foreign affairs. *Id.* Though still just a teen, he aspired to

promote a better understanding of the Middle East among his new community in the United

States. *Id.*

Mr. Nader became a naturalized U.S. citizen in 1977. *Id.* at 1; *see also* PSR ¶ 133. He

graduated high school with highest honors. *See* Ex. 1 at 1.

### B. Mr. Nader Founds Middle East Insight

After graduating high school, Mr. Nader started college at Cleveland State. Ex. 1 at 5.

While there, he began building the foundation for the venture that would largely define the rest

of his life – *Middle East Insight*. *Id.*

While Mr. Nader was in college, a series of uprisings began in the Middle East. The civil war was raging in Lebanon and the Iranian Revolution was underway. Mr. Nader, who had always been (and continues to be) a voracious reader, was bothered by the superficial quality of American coverage of issues in the Middle East. As he would later tell a Lebanese newspaper in a 2000 interview, he "always knew [he] wanted to work in publishing and journalism" and had "collect[ed] every publication in Lebanon. While other kids were buying toys, [Mr. Nader] was buying newspapers and magazines."[5] So Mr. Nader decided to combine his love of journalism and his passion for the Middle East into a small magazine, *International Insight*, that he printed in the building of his former high school. Ex. 1, at 4; PSR ¶ 144. Mr. Nader also started attending think tank sessions in Washington, D.C. PSR ¶ 145. He would drive six-and-a-half hours back and forth to Washington from Ohio. While at the sessions, Mr. Nader began approaching the speakers and attendees, pinning down who was behind a given institution or organization, meeting with those people, and interviewing them for the magazine. *See id*.

Mr. Nader ultimately decided that he could make a greater impact working on the magazine than staying in school. When he was just 20, Mr. Nader left college to work on *International Insight* full time. Mr. Nader's first big break came when he interviewed Egyptian Vice President (and later President) Hosni Mubarak in 1981.[6] PSR ¶ 145. Mr. Nader "traveled to Egypt with the American ambassador to Egypt, Hermann Eilts, through whom he met and interviewed then-Vice President Mubarak." *Id*. Mr. Nader interviewed Vice President Mubarak on July 15, 1981. In October of 1981, President Anwar Sadat was assassinated and Vice President Mubarak became President. Mr. Nader's rare interview with Mubarak was published

---

[5] https://www.dailystar.com.lb/ArticlePrint.aspx?id=104987&mode=print (Dec. 16, 2000).

[6] https://www.washingtonpost.com/archive/opinions/1981/10/11/after-sadat/90d7cd65-b0e8-4afc-95a0-0dfab1135b09/

in the *Washington Post*, and Mr. Nader was invited to discuss it on NBC's *Today* show,
garnering him national attention. *See id.*

Over the years, *International Insight* became *Middle East Insight*.[7]  The magazine
became a publication powerhouse that repeatedly joined Christians, Arabs, and Jews at the
highest levels at conferences and in print regarding the most important issues confronting the
region.[8]  His first issue had sold 200 copies at the cost of $10 for an annual subscription.[9]  By
2000, Mr. Nader was charging $100 for an annual subscription and the journal had a circulation
of nearly 10,000 subscribers worldwide; it was "considered one of the most authoritative
publications on the Middle East."[10]  Through his work with *Middle East Insight*, Mr. Nader
gained the trust of officials at the highest levels, interviewing figures such as Israeli Prime
Minister Yitzhak Rabin, King Hussein of Jordan,[11] President Bill Clinton,[12] and Iranian
President Ali Akbar Hashemi Rafsanjani.[13]

In 1996, Mr. Nader's journalistic accomplishments earned him recognition on the floor of
the U.S. House of Representatives.[14]  Representative Nick Rahall praised Mr. Nader's work:

---

[7] https://web.archive.org/web/19990421040119/http://www.mideastinsight.org:80/mission.html

[8] https://www.dailystar.com.lb/ArticlePrint.aspx?id=104987&mode=print; *see also*
https://www.c-span.org/person/?georgenader; https://www.c-span.org/organization/?24163/Middle-East-Insight

[9] https://www.dailystar.com.lb/ArticlePrint.aspx?id=104987&mode=print; *see also* PSR ¶144.

[10] *Id.*

[11] http://www.kinghussein.gov.jo/98_june.html

[12] https://www.govinfo.gov/content/pkg/CREC-1996-02-01/html/CREC-1996-02-01-pt1-PgE133-3.htm

[13] https://www.washingtonpost.com/archive/opinions/1995/07/09/from-tehran-to-waco/ca3ce1f8-0af9-408c-947d-c4316426cd31/

[14] https://www.congress.gov/congressional-record/1996/4/16/extensions-of-remarks-section/article/E532-3

"By striving to rise above ideological passions that often divide the region, *Middle East Insight* has earned the respect of its readers in Washington, D.C. and throughout the region."[15] Congressman Rahall gave much of that credit directly to Mr. Nader.[16]

### C.     Mr. Nader's Efforts to Free Hostages in Lebanon

In addition to his work in the Middle East, Mr. Nader has consistently sought out ways to serve the United States, his adopted country.  As a young man during the Reagan administration, he leveraged the strong network of connections he had built through *Middle East Insight* and undertook a daring diplomatic mission to free the American hostages being held in his native Lebanon by Hezbollah terrorists.  Secretary of State George Schultz, Chief of Staff (and then Secretary of State) James Baker, and Presidents Ronald Reagan and George H.W. Bush entrusted Mr. Nader with this mission because they understood that his ability to gain the trust of all sides was critical to securing the release of hostages Thomas Sutherland, Father Lawrence Jencol, Terry Anderson, William Buckley, Terry Waite, and others.  On more than one occasion, Mr. Nader was able to diffuse tensions and keep the hostages alive, placing his own life at risk in the process.

Evidence of Mr. Nader's heroic and extraordinary work to free the hostages in Lebanon is contained within the Court's files from the early 1990s.  In July 1991, the Government consented to a continuance to permit Mr. Nader to continue his "direct involvement in negotiations concerning the release of American hostages being held in Lebanon."  *United States v. Nader*, Crim No. 91-0077-A, Unopposed Emergency Mot. for Continuance of Sentencing (E.D. Va. July 31, 1991), ¶ 3.  The motion stressed that "Mr. Nader is the <u>only</u> 'outsider' ever

---

[15] *Id.*

[16] *Id.*

allowed into the heart of the Shiite area of Beirut" and that "he cannot leave without disrupting the process and jeopardizing all of the gains that have been made in the last few weeks." *Id*. ¶¶ 7-8 (emphasis in original).

In a second emergency motion for continuance on September 5, 1991, Mr. Nader's counsel informed the Court:  "Within a week or so after the Court continued Mr. Nader's sentencing, British hostage Jon McCarthy and American hostage Edward Tracy were released in Beirut.  The release of these two hostages can be directly attributed to the work that Mr. Glazer and Mr. Nader had begun in early July in laying the foundation for further negotiations with the Lebanese hostage-holders and their backers." *United States v. Nader*, Crim No. 91-0077-A, Emergency Mot. for Continuance of Sentencing (E.D. Va. Sept. 5, 1991), ¶ 5.  Mr. Guilford Glazer, an advisor to several Israeli prime ministers who had also been intimately involved in the hostage negotiations, wrote to the judge on Mr. Nader's behalf, stating:  "I believe most emphatically that the Israeli Government, the United States Government, all the other nations involved, the hostages, and the United Nations have been served well in this matter by George Nader." *Id*. at Ex. 1 (Ltr. from G. Glazer to Hon. Judge Claude M. Hilton, Sept. 4, 1991) at 5.

Former Secretary of State James Baker recognized Mr. Nader's work on behalf of the hostages at a *Middle East Insight* summit in 1998, stating:  "[E]arly on in the [George H.W.] Bush administration, George Nader did some very discreet work for us of a humanitarian nature having to do with the then-ongoing crisis over the taking of hostages, American citizens, and George worked with us very closely and very discreetly on that."[17]

---

[17] https://www.c-span.org/video/?105089-1/us-interest-middle-east&start=0 (at about the 8:00 minute mark)

### D.      Mr. Nader's Other Diplomatic Efforts

During the 1990s, Mr. Nader was heavily engaged in other efforts to advance peace in the Middle East.  He became a close confidante of Israel's late Prime Minister Yitzhak Rabin, serving as Rabin's private channel to the late Syrian President Hafez al-Assad.  Mr. Nader was asked to attend the private funeral of Prime Minister Rabin after he was assassinated—a very high honor for a private citizen.

After Rabin's assassination, Mr. Nader worked closely on peace efforts with the Clinton administration and Prime Ministers Shimon Peres, Benjamin Netanyahu, and Ehud Barak.[18]  In 1998, Prime Minister Netanyahu asked Mr. Nader to launch a secret diplomatic initiative to negotiate an Israeli-Syrian peace deal.[19]  In the shuttle diplomacy that followed, Mr. Nader came closer than any negotiator before or since to completing a successful deal, with virtually all of the most sensitive issues settled in principle.  The historic opportunity was lost, however, when Netanyahu lost his bid for re-election in 1999.

During the early 2000s, Mr. Nader spent the majority of his time in the Middle East acting as a "shadow diplomat," facilitating relationships between United States and Middle Eastern officials.  For example, after the U.S. invasion of Iraq in 2003, Mr. Nader became a regular advisor to Vice President Dick Cheney and spent several years traveling to Baghdad in an effort to rally Iraq's new leaders to join the United States in defeating Al-Qaeda and the Iraqi insurgency, while containing Iranian influence.  Mr. Nader was the only one who was equally trusted by the Americans and the spiritual leader and prime minister of Iraq.  He contributed tremendously to the rebuilding effort.

---

[18] https://www.nytimes.com/2018/03/03/us/politics/george-nader-mueller-investigation-united-arab-emirates.html

[19] https://www.meforum.org/3943/the-road-to-damascus-what-netanyahu-almost-gave-away

For more than a decade now, Mr. Nader has served as an advisor to various leaders in the Middle East.  In that capacity, Mr. Nader has conducted countless international missions and helped facilitate the strong allegiance between the United States and countries of that region.  PSR ¶ 151.  Among other accomplishments during this time, Mr. Nader helped arrange President Trump's first international trip to Riyadh to meet with the Saudis.

Mr. Nader sincerely hopes that, after the period of incarceration to be imposed in this case, he will be able to resume his efforts working toward peace in the Middle East.  Not only is that work personally fulfilling, it is work where Mr. Nader has demonstrated his ability to make a difference for the United States and for the interests of peace.

### E.       Mr. Nader's Home Life in Lebanon and the UAE

Mr. Nader longs to see his loved ones back in the Middle East.  As noted, Mr. Nader is extraordinarily close to his sister, Leila Nader, who lives in Lebanon; Mr. Nader and Leila speak almost every day.  Leila misses her brother dearly; his prolonged absence has brought great sadness to her life and the lives of their family members, including their younger brother Tony.  Mr. Nader also has an extensive network of friends and family in the UAE.  He developed some of these relationships over the years through *Middle East Insight* and his other dealings in the Middle East.  Mr. Nader is a gracious and kind person and, as the thousands of non-objectionable WhatsApp messages on his phone demonstrate, someone with a great many close friends with whom he was in constant contact before his arrest.  Indeed, a person could not accomplish all that Mr. Nader has over the years without being the caring and fundamentally well-meaning person that he is.  Mr. Nader's close friends, many of whom he has known for decades, as well as his sister and his beloved dog, Archie, eagerly await his return to their lives.

### F.      Mr. Nader Suffers from Several Serious Health Conditions

Mr. Nader is 61 years old and has a number of serious health conditions, including heart disease, high blood pressure, high cholesterol, and pre-diabetes.  In April 2019, just prior to his arrest in this case, Mr. Nader was admitted to a hospital in Hamburg, Germany following a routine physical because his physician suspected he was suffering from high-grade coronary heart disease.  ECF No. 58, Ex. 1 (Hamburg medical records) at 2; Ex. 3 (Decl. from Dr. Matthew Hulse) at 1.  Those suspicions proved correct, and Mr. Nader required open-heart surgery on April 15, 2019.  During the procedure, doctors discovered evidence of severe coronary three-vessel disease.  *Id.*  Mr. Nader was in the ICU from April 15 to 16, 2019.  ECF No. 58, Ex. 1 at 3-4; Ex. 3 at 2.  He was then transferred to a lower acuity care unit but required re-admission to the ICU on April 17, 2019, after suffering "respiratory deterioration" due to a collapsed lung and swelling.  *Id.*  These complications required two surgically-placed chest tubes to resolve.  *Id.*

Dr. Matthew Hulse, a medical director at the University of Virginia, has reviewed Mr. Nader's records from his heart surgery.  Dr. Hulse opines that Mr. Nader's operation "is considered high-risk and grounds for immediate and ongoing medical attention."  ECF No. 58, Ex. 3 at 2.  Specifically, he explained that the use of both internal mammary arteries and the "I-graft" place a large amount of myocardium (the muscular tissue of the heart) at risk.  *Id.*  Dr. Hulse further opined that, though the operation was intended to restore adequate blood flow to the diseased area of the heart, the operation did not affect Mr. Nader's pre-existing conditions that led to his need for surgery—his advanced age, high blood pressure, high cholesterol, and family history of cardiac disease.  *Id.*  Due to his arrest in this case, Mr. Nader has been unable to receive any of the recommended cardiac rehabilitation after his heart surgery.

13

Mr. Nader's present physical condition remains poor.  At ADC, Mr. Nader is being treated for heart disease, high blood pressure, and for his diabetic condition.  He is currently being prescribed Atorvastatin (a medication to treat high cholesterol), Metformin (to treat diabetes—he has been told he is pre-diabetic), Bisoprolol (to treat high blood pressure), Clopidogrel (a blood thinner used to treat heart problems), Low-Dose Aspirin (to treat heart problems), Ramipril (to treat high blood pressure and cardiac disease), and Pantoprazole (to treat heartburn).  *See* PSR at ¶¶ 136, 137.

G.     **COVID-19 Poses Significant Danger for Mr. Nader**

Mr. Nader's age and poor health make him especially susceptible to serious illness, or even death, if he contracts COVID-19.   Dr. Michael Rosenbloom, Professor of Surgery and the Head of the Cardiac Surgery Division at Cooper University Health System, examined Mr. Nader's surgery records, Dr. Hulse's medical opinion, and Mr. Nader's current medications to assess Mr. Nader's risks if he contracts COVID-19.  *See* ECF No. 186-1.  Dr. Rosenbloom found that Mr. Nader is "at increased risk for bad outcome" if he contracts COVID-19 and that he "has several risk factors for a detrimental outcome[.]"  *Id*. at 1.

Specifically, Dr. Rosenbloom found that Mr. Nader's "history of heart disease" is "a recognized risk factor for mortality[.]"  *Id*.  Though Mr. Nader had coronary artery bypass surgery, "coronary artery disease is a progressive disease," and surgery "does not imply that his heart disease is cured, rather it is a matter of management."  *Id*. at 2.  Dr. Rosenbloom also notes that Mr. Nader has hypertension, which "has been identified as a risk factor for bad outcome in patients who contract Covid-19[.]"  He writes that "[s]tatistics have shown that the risk of death in patients who become infected with the Covid-19 virus is higher in patients over 60 and increases with age."  Finally, he writes that Mr. Nader's diabetic condition "has numerous deleterious effects which ultimately would increase his risk for bad outcome or death if he were

14

infected with the Covid-19 virus." *Id.*  These factors make Mr. Nader "at high risk" if infected and make his risk for death "markedly higher" than that of the typical defendant appearing for sentencing.  *Id.*

Dr. Rosenbloom's assessment squares with data showing that Mr. Nader's underlying conditions increase his risk for serious illness or death.  "According to mortality data released by the National Health Commission of China, 35 percent of the patients who died from COVID-19 had a history of high blood pressure and 17 percent had a history of coronary heart disease"— Mr. Nader has both.[20]  Preliminary CDC data for U.S. hospitalizations shows that 49.7% of those hospitalized had hypertension; 28.3% had chronic lung disease; and 27.8% had cardiovascular disease.[21]  Those conditions were "even more prevalent in deceased COVID-19 patients, according to data released by Louisiana, New York, and New Jersey."[22]  In New York, hypertension, diabetes, and coronary artery disease are three of the top five top comorbidities for people in Mr. Nader's age group.[23]  And new data from the CDC shows that hospitalizations were six times higher and deaths twelve times higher for people with underlying conditions (with cardiovascular disease and diabetes representing two of the three top underlying conditions).[24]

---

[20] https://www.aljazeera.com/indepth/features/doctor-note-coronavirus-heart-disease-200416072036397.html

[21] https://www.usatoday.com/in-depth/news/2020/04/15/coronavirus-risk-90-patients-had-underlying-conditions/2962721001/

[22] *Id.*

[23] New York State Department of Health COVID-19 Tracker, https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no

[24] https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm?s_cid=mm6924e2_w

### H.      Mr. Nader's Commitment to Not Re-Offend

Mr. Nader's past sexual conduct involving adolescents is a serious factor for the Court's consideration.  But it is behavior that Mr. Nader, at age 61, with serious heart problems and after over a year of incarceration under harsh conditions at the Alexandria Detention Center, will not repeat.  Indeed, Mr. Nader had already committed to this path years ago.

Dr. Fred Berlin's report places Mr. Nader's sexual history in the proper context, including how Mr. Nader has avoided illegal or even risky conduct in recent years, as well as Mr. Nader's demonstrated commitment to not re-offending.  Dr. Berlin makes clear that Mr. Nader's interest and offenses in the past have involved adolescent males—not pre-adolescent children— and that Mr. Nader has shown his ability to control this behavior in recent years.

Dr. Berlin has concluded that Mr. Nader does not suffer from pedophilia.  That is indisputably correct.[25]  As Dr. Berlin explains, however, when Mr. Nader was a teenager, he "discovered that he was sexually attracted to adolescent males." Ex. 1 at 11.  Dr. Berlin diagnosed Mr. Nader with homosexual ephebophilia, which means that "he is a man who is sexually attracted to adolescent males." Ex. 1 at 12.  Though "[m]any adults find adolescents, especially older adolescents, to be physically attractive," the "average adult does not experience recurrent urges to become sexually intimate with adolescents, to the exclusion of a significant interest in those their own age." *Id*.  "Men with homosexual ephebophilia, like Mr. Nader, experience an inordinately heightened sexual attraction to pubescent males." *Id*.

For Mr. Nader, that attraction to pubescent adolescent males started when Mr. Nader was a teenager himself. *Id*. at 11.  Dr. Berlin explains that "[r]esearch has been conducted to try to

---

[25] Notwithstanding the enormous amount of available information regarding Mr. Nader's life, there is zero evidence he has any attraction to pre-pubescent males (or females).

determine what sorts of biological and/or environmental factors contribute to the development of particular sexual interests" but ultimately there is "still much to be learned[.]" *Id.* at 13. However, "[w]hat is clear is that sexual attractions for all of us, including Mr. Nader, are discovered rather than chosen." *Id.* In words critical to a better and more empathetic understanding of this case—and human sexuality in general—Dr. Berlin states:

> No child weighs his or her options, deciding whether to be attracted to men, women, boys, or girls. Rather, in maturing into adulthood each of us discovers the nature of our own sexual makeup. Who would decide, if we had the choice (which we do not) to be sexually attracted virtually exclusively to adolescent males? Life can be challenging for individuals such as Mr. Nader who discover that to be the nature of their sexuality. Many (but not all) may need mental health support and guidance. In spite of prior arrests, apparently appropriate mental health treatment has not been recommended for Mr. Nader.

*Id.*

Mr. Nader acted on that attraction years ago by seeking out adolescent prostitutes and adolescent pornography—conduct he was already convicted of in 1991 and 2003 and for which he was punished, including time in prison. *See id.* at 11-12. As he has aged, however, Mr. Nader has brought those urges under control. The FBI thoroughly searched Mr. Nader's phones in 2018 and 2019 and the objectionable material found (for which Mr. Nader was charged but to which he did not plead) "can more accurately be described as obscene, rather than as child pornography." *Id.* at 13. Forensic evaluation of his phones "did not reveal the presence of search terms often used to seek out child pornography[.]" *Id.* Nor was there evidence "that he had been purchasing child pornography, or participating in file sharing networks known for distributing it." *Id.* The more recent Google searches the Government cited in its opposition to Mr. Nader's motion for pretrial release and that is also included in the PSR—*e.g.*, the October 2018 Google search for "incredible movie of 17 year old [sic] boy who became hustler and porno star," and "movie of 17 year old porno star in Hollywood," *see also* PSR ¶ 52—was quite

17

obviously for the 1997 movie *Boogie Nights*,[26] a mainstream American film nominated for three

Academy Awards, and was not for child pornography or child erotica.[27]

As Dr. Berlin explains, in recent years, Mr. Nader "has been able to refrain from having

sex with anyone under the age of consent." *Id.* at 12. The conduct in this case is from 2000 and

2012. Dr. Berlin notes that "[a]t his current age of 60 [Mr. Nader's age at the time of Dr.

Berlin's evaluation], Mr. Nader understands that were he to commit a future offense he would

likely die as an old man in prison." *Id.* at 14. He explains that Mr. Nader "does not want to do

that." *Id.* Mr. Nader is "committed to never having sex with anyone under the age of consent

again[.]" *Id.* at 7. Dr. Berlin's evaluation is consistent with Mr. Nader's written acceptance of

responsibility in the PSR, "I am committed to not re-offending. I am now 60 years old but feel

much older, especially after the last seven months of living here at the jail under difficult

conditions. … Please be assured that I will never engage in any illegal activity again." PSR ¶ 67.

Dr. Berlin notes that there are substantial reasons to believe that this is true, including Mr.

Nader's recent history, as well the lack of risk factors, like drug or alcohol addiction or an

antisocial personality disorder diagnosis, and Mr. Nader's age. Ex. 1 at 14. He notes that it is

not as if Mr. Nader received treatment and failed—rather, Mr. Nader never received treatment.

---

[26] *See* https://www.washingtonpost.com/wp-srv/style/longterm/movies/review97/boogienightshowe.htm. The only other Google search proffered by the Government from 2018 ("sex with boys in Russia" and "prostitution in Russia") is likewise addressed by Dr. Berlin in his report. *See* Ex. 1 at 13. The fact that this search was made immediately following the *Boogie Nights* search fully supports Dr. Berlin's opinion that these searches were made as part of (legal) sexual fantasizing, and not as part of any real-world activity. *See id.*

[27] Further, in that same opposition, the Government excerpted 2009 emails between Mr. Nader and "an unindicted co-conspirator" about Minor Boy 2, but neglected to mention that Mr. Nader never met Minor Boy 2, never discussed anything sexual with Minor Boy 2, never exchanged sexually explicit photographs with Minor Boy 2, and, indeed, there was nothing illegal at all about their interactions. *See* PSR ¶¶ 109-117.

*Id*.  Mr. Nader is committed to seeking treatment now so as to never be in his current position again.  There are also other positive reasons that he will not re-offend, including Mr. Nader's "considerable psychological strengths that can facilitate future success."  *Id*.  Dr. Berlin's professional opinion is thus that Mr. Nader's "future prognosis is very good."  *Id*.

## I.     Mr. Nader Has Been Subjected To Harsh Pre-Trial Confinement Conditions

Mr. Nader's conditions of confinement at the Alexandria Detention Center ("ADC"), especially since he was moved to administrative segregation following his January 2020 plea, and even more so since the COVID-19 outbreak, have been harsh.  Even while he was housed in the general population, ADC was a difficult environment in which Mr. Nader was largely cut off from the outside world.  He was not permitted to go outside.  An avid reader, he could receive only limited reading material.  He was not able to attend rehabilitation after his heart surgery.  Still, he at least was allowed out of his cell for the majority of the day, and he was able to access the phone—his one lifeline to the outside world—for most of that time.

Not so after his plea.  ADC moved Mr. Nader to "administrative segregation," purportedly for his safety, given the nature of his charge and news coverage of his plea.  Even after the media attention from his plea had waned, Mr. Nader remained in administrative segregation and is still there to this day.  Administrative segregation is essentially solitary confinement.  For over five months now, Mr. Nader has been allowed out of his tiny cell for only two hours each day.  He can no longer use the phone, even to speak to his attorneys, at any other time—rather, all of his contact with the outside world is limited to those two hours.[28]

---

[28] Since the onset of COVID-19, Mr. Nader is also permitted a time-limited video visit with his attorneys only through ADC's VTC system.

The COVID-19 pandemic and ADC's related precautions have only made Mr. Nader's conditions of confinement worse.  First, Mr. Nader is restricted from any in-person visits with counsel, or anybody else.  Those restrictions have been in place for at least three months. Second, Mr. Nader has lived with the fear of contracting COVID-19, which could well be fatal for a person fitting Mr. Nader's demographic.  As described above, Mr. Nader's heart condition, hypertension, and diabetes all put him at high risk for serious illness or even death if he contracts the virus.  This fear, too, has made the last three months of his incarceration excruciatingly difficult.

## II.   THE EVENTS LEADING TO MR. NADER'S ARREST AND PLEA

### A.   The Special Counsel Office's Investigation

To understand how Mr. Nader came to the attention of law enforcement involved in this case, and thus before this Court, one must understand Mr. Nader's role in the Special Counsel Office's ("SCO") investigation into Russian interference in the 2016 presidential election.  The images underlying the Complaint and arrest warrant in this case stemmed exclusively ███████ ███████████████████████████████████████████████, not from any other ongoing law enforcement investigation into Mr. Nader.  To the contrary, the investigations into Mr. Nader involving sex offenses *had been closed* many years earlier, in part due to law enforcement's belief that Mr. Nader's 20-year old conduct was beyond the applicable statute of limitations.  *See* ECF No. 127, Ex. 3 at US-00000001 ("From May 2002 through July 2010, George Aref Nader was investigated for child sex tourism and possession of child pornography (305B-WF-224395). No charges were brought as a result of the expiration of the statute of limitations directly resulting from Nader's long term residency outside the United States."); Ex. 2, at US-00000575 ("The USAO declined prosecution when Nader returned to the Unites States in 2009.")

Mr. Nader is a dual American and Lebanese citizen with significant professional ties worldwide, including with Heads of State and other influential persons.  Some of those individuals became the focus of the SCO investigation. ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████

    ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████  None of these ███████

related to child pornography or any similar offenses.



It was not until February 12, 2018, that the FBI came across any material relating to this case.  On that day, during the course of the FBI's search of the iPhone 7 ███████████████ ████████████ an FBI agent conducted a review of approximately ten percent of the more than ten thousand videos it contained.  *See* PSR ¶ 47.  The FBI agent allegedly came across three videos, sent to the iPhone 7 from other people, which the agent believed *could be* child pornography, located in their "native form" inside a WhatsApp chat conversation.  *See id*.  That agent then sought the opinion of a second agent, who deemed the videos "questionable" and referred the videos to the Washington Field Office for further review.  *Id*.  On March 16, 2018, law enforcement obtained a search warrant for the search of the iPhone 7 for evidence related to child pornography.  PSR ¶ 48.

### B.     The WhatsApp Videos

The FBI's forensic search ultimately revealed twelve videos (one of which was an extended and reedited version of the same video) that the Government alleged were unlawful. All of those videos were embedded in WhatsApp chats and most had been sent to Mr. Nader months or even years earlier.[32]  The vast majority of the videos had been sent from other people to Mr. Nader, and many of those videos were sent in a series of messages attaching various media.  Dr. Berlin has reviewed the images and videos and opines:  "In my professional experience, much of the alleged child pornography depicted on his confiscated cell phones is quite different in volume, duration, and nature from images often downloaded by those who are interested in child pornography."  Ex. 1 at 13.  Dr. Berlin further explains that "[n]one of the depicted children were engaging in intimate sexual acts with men or other children" and "many

---

[32] One of the videos was from November 2015; two of the videos were from December 2016; five of the videos were from the first half of 2017.  *See* PSR ¶ 50.

of the video clips lasted for only a relatively few seconds" and "seemed to be a misguided attempt at perverse humor, rather than a stimulus intended to elicit erotic arousal." *Id.*

Further, there was no forensic evidence that Mr. Nader knew that the videos, embedded in WhatsApp messages, were still present on his phone. The videos were not saved to Mr. Nader's files or videos or anywhere else on his phone, as they would be if Mr. Nader was collecting them. Indeed, Mr. Nader had thousands of WhatsApp chats and thousands of videos on his phone, of which these messages were a tiny fraction. There is no evidence showing that the videos were ever played more than once, if that.

The context of the exchange of the videos further supports that Mr. Nader did not intend to—and was not knowingly—transporting the images on his phone to the United States. In addition to the WhatsApp videos being among thousands of chats and videos on Mr. Nader's phone, they were often sent to Mr. Nader as part of a series of videos and links from other individuals, and many were sent months or even years before Mr. Nader's trip. For example, in one exchange, an individual sent Mr. Nader four messages in Arabic, then *thirty-one* videos, then the video in question, then *ten more videos*. PSR ¶ 50(i). Mr. Nader responded solely with two emojis—it was entirely unclear if the emojis were a response to that video or to one of the other forty-one videos, or to the messages in Arabic. The videos were also often sent as a part of completely non-objectionable exchanges of content from the internet between friends. For example, in another exchange, an individual sent Mr. Nader the video in question, another video, then a long message in Arabic. Mr. Nader responded "by sending an image of a man that is overlaid with a discussion in Arabic about an increase in depression among male residents of Riyadh and then, at 9:02:21AM, Nader sen[t] a video of a dog with a cup of water on his head." PSR ¶ 50(n).

Mr. Nader's lack of knowledge is also supported by the fact that the Government had just searched the very same phones a month earlier, *and returned them to Mr. Nader with no concerns*. On December 2, 2017, agents from U.S. Customs and Border Protection ("CBP") stopped Mr. Nader at John F. Kennedy International Airport in New York upon Mr. Nader's return to the United States from overseas. PSR ¶ 44. According to the CBP report of the encounter, upon Mr. Nader's arrival at JFK International Airport, federal agents detained and questioned Mr. Nader regarding his travels, business, and personal background. *See id.* During the encounter, the agents manually searched two smart phones in Mr. Nader's possession as well as his belongings, questioned Mr. Nader about the encrypted messaging apps he uses (e.g., WhatsApp), and later conducted a "post-analysis" of material from the phones. *Id.* The CBP did not seize Mr. Nader's smart phones or note that contraband of any kind was found on them, which would convey to any reasonable person—as it conveyed to Mr. Nader—that there was nothing illegal on his phones. *See id.*



Even after the FBI's discovery of these images, Mr. Nader was permitted to travel to and from the United States multiple times for ███████████████████████ the SCO investigation. He did this despite knowing that the FBI had full access to his phones, and everything contained in them.

### C.   Mr. Nader Completes His Immunized ███████ and Is Then Charged and Arrested

██████████████████████████████████████████, he returned to the UAE and Europe, where he remained for over a year.  Unbeknownst to him—████████████

████████████████████████████████████████████████

████—on April 19, 2018, the Government charged Mr. Nader in a Criminal Complaint with one count of alleged transportation of visual depictions of minors in violation of 18 U.S.C. § 2252(a)(1) and (b)(1).  ECF No. 1.  Meanwhile, just days earlier, on April 15, 2019, Mr. Nader underwent open heart surgery in Hamburg, Germany.  ECF No. 58, Ex. 1 (Hamburg medical records) at 2.  He returned to Dubai after his hospital stay and made plans to come to New York City to undergo post-heart surgery rehabilitation at Mount Sinai Hospital.  ECF No. 60 at 4.

On June 3, 2019, Mr. Nader flew to New York from Dubai to go to Mount Sinai for treatment.  PSR ¶ 136.  As soon as Mr. Nader landed, however, he was arrested on the sealed Complaint.  He never made it to Mount Sinai and has yet to receive cardiac aftercare.  Upon his arrest, agents seized from him two additional smart phones, an iPhone X and an iPhone 6.  Forensic examinations of these phones later located eight videos, similar to those recovered from the iPhone 7 in 2018, which had been sent to Mr. Nader by others in WhatsApp messages.

A preliminary hearing was held on June 10, 2019.  The weaknesses in the Government's case were clear at that hearing.  A single witness testified that the sole basis for the Complaint was the set of twelve short videos found exclusively in WhatsApp messages on Mr. Nader's phone in 2018.  The iPhone 7 contained years' worth of messages with hundreds of senders and recipients—and in total the device contained over 250,000 files.  The Government offered no evidence that Mr. Nader had actual knowledge that any of these files were on his iPhone 7 at the time that he entered the United States on January 17, 2018.

On July 3, 2019, the Government indicted Mr. Nader based on those twelve videos. Despite the lack of evidence that Mr. Nader *knowingly* brought those images into the United States, the Government charged Mr. Nader with transportation of child pornography and transportation of obscenity.

Additionally, and likely in recognition of the weakness of its evidence with respect to Mr. Nader's knowledge of the WhatsApp videos, the Government revived a 20-year-old allegation of transportation of a minor with intent to engage in sexual activity. That charge comprised the third count of the indictment. Notably, Mr. Nader had already been convicted and served time in the Czech Republic for activity involving that same former minor.[33]

On October 18, 2019, Mr. Nader filed a motion to dismiss Count 3 of the indictment, arguing that the statute of limitations had expired with respect to the alleged transportation of a minor offense from 2000. *See* ECF Nos. 132, 133. The Court held a hearing on that motion on November 1, 2019 and denied Mr. Nader's motion in a written order on November 26, 2019.

On January 13, 2020, Mr. Nader pled guilty to a two-count Criminal Information, and the indictment was dismissed. Mr. Nader *did not* plead guilty to the two counts related to the recent charges from Counts 1 and 2 of the indictment. Rather, he pled guilty to Count 3 from the initial indictment, reserving his right to appeal this Court's denial of his motion to dismiss. He also pled guilty to an additional count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4) and (b)(2). That charge, too, was from long ago. Mr. Nader pled to possessing

---

[33] Mr. Nader was not convicted in the Czech Republic for the conduct involving Minor Boy 1 that took place in the United States in 2000. In 2003, however, Mr. Nader was convicted and sentenced for conduct involving Minor Boy 1 that occurred in the Czech Republic, which is where they met.

images from 2012, and for which the images themselves were never recovered.  Thus, the only charges to which Mr. Nader pled were for conduct from 2000 and from 2012.

### D.        The Offense Conduct Underlying Mr. Nader's Plea

Mr. Nader did not knowingly bring illegal videos into the United States in 2018, *see* 18 U.S.C. § 2252(a)(1), which was the charge on which he was arrested and detained.  *See* discussion in Section II.B, *supra*.  Rather, in his plea to Count 1 of the Information, Mr. Nader admitted to receiving emails from an associate, D.S., between September 20 and October 1, 2012, that contained at least one video depicting child pornography.  *See* PSR ¶¶ 18-26.  In part because these emails were sent to Mr. Nader nearly eight years ago, the links to the material are no longer functional.  As a result, there is no information regarding the content of these videos beyond the URLs and the facts to which Mr. Nader has stipulated in order to reach a plea deal.

Mr. Nader's conviction on Count 2 relates to conduct that is two decades old.  Mr. Nader brought MINOR BOY 1 to the United States more than twenty years ago, in February 2000.  Although the Court denied Mr. Nader's motion to dismiss this count based on the statute of limitations, there are several mitigating aspects of this charge—including the nearly two-decade delay in bringing it—that the defense respectfully asks the Court to consider when determining the appropriate sentence.

First, Mr. Nader's conduct has not gone unpunished for all of these years.  About two years after Minor Boy 1 left the U.S. and returned home, Mr. Nader was convicted and served prison time in the Czech Republic in part for his relationship with Minor Boy 1  *See* PSR ¶ 123.

Second, the Government previously investigated Mr. Nader's relationship with Minor Boy 1 and declined to bring charges.  The Government has been aware since 2002 that Minor Boy 1 briefly lived with Mr. Nader in the United States, and it was also aware of Mr. Nader's Czech conviction in 2003.  ECF No. 127, Ex. 1 at US-00000862-5.  Discovery in this case

revealed that the Government's investigation of Mr. Nader went on for *eight years*.  *See* ECF No. 127, Ex. 3 at US-00000001 ("From May 2002 through July 2010, George Aref Nader was investigated for child sex tourism and possession of child pornography.").  Although Mr. Nader was living overseas for much of this time, he returned to the United States in 2009, prior to the expiration of the then-applicable statute of limitations.  The Government was aware of his presence in the United States, but declined to prosecute him at that time.  *See* ECF No. 127, Ex. 2, at US-00000575 ("The USAO declined prosecution when Nader returned to the Unites States in 2009.").  In 2010, the Government closed the case and returned or destroyed all the evidence.  *Id.* ("The case was closed in 2010.  All evidence was returned or destroyed.").[34]

Third, Mr. Nader is committed to never re-offending, as he expressed in both his written acceptance of responsibility in the PSR and to Dr. Berlin.  Indeed, Mr. Nader had stopped having unlawful sexual contact with individuals under the age of consent years ago.  *See* Ex. 1 at 7, 10.

---

[34] One potential reason the Government declined to charge Mr. Nader during that time is that Minor Boy 1's story has been highly inconsistent.  Minor Boy 1 has given multiple statements to various law enforcement authorities about his time with Mr. Nader in the United States, including to the Czech police, the Monterrey, California police department, and the FBI.  His account of key events has varied significantly.  On May 14, 2002, the Czech police directly asked Minor Boy 1 how many times he had sex with Mr. Nader in the United States.  Minor Boy 1 stated that during his 3.5 month stay, Mr. Nader performed oral sex on him only once, and he did not claim there had been any other sexual contact or abuse.  *See* PSR ¶ 61.  When Minor Boy 1 (who, by this time, was an adult) gave oral and written statements to the Monterrey police in March 2012, he did not mention having any sexual contact *at all* with Mr. Nader in the United States.  But when the FBI sought out Minor Boy 1 in 2018 in connection with this federal case, Minor Boy 1 changed his story again, this time claiming that he lied to the Czech police and actually had many sexual encounters with Mr. Nader in the U.S., as frequently as every 1-2 days.  *See* PSR ¶ 61.  Minor Boy 1 apparently now claims that, after he returned to the Czech Republic, he again saw Mr. Nader—something that Minor Boy 1 did not say in any of his three interviews with law enforcement (in 2002 with the Czech police, in 2012 with California police, or in 2018 with the FBI).  The PSR notes this contradiction—that Minor Boy 1 "initially reported he had no additional contact with Nader following his return from the United States" but "subsequently reported" that he saw Mr. Nader "many times" after his return.  PSR ¶ 62.

He also ceased seeking out pornography featuring adolescents as he had in years past.  Though he acknowledges that others, who were aware of his prior interest in child pornography, have at times sent him unsolicited images, there is no evidence Mr. Nader has  produced, purchased, distributed, or collected child pornography in many years.

## **DISCUSSION**

### III.     THE AGREED-UPON TEN YEAR SENTENCE IS APPROPRIATE UNDER THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

Pursuant to the Plea Agreement, the Government and Mr. Nader have agreed to a joint recommendation of a ten-year sentence in this case.  When evaluating this recommendation, the Court should consider that the Government agreed to make this recommendation knowing all of the circumstances surrounding this case, including its previous investigation of Mr. Nader's conduct with Minor Boy 1 and the relative seriousness of the number and content of the videos on Mr. Nader's phones.  It is thus well-positioned to make an informed decision regarding the offense, the harm caused by the offense, and the need to protect the public.  The Government's willingness to recommend ten years reflects that such a length of incarceration is a significant punishment.

The overarching goal of any sentencing is to "impose a sentence sufficient, but not greater than necessary" to accomplish the purposes of sentencing.  18 U.S.C. § 3553(a).  Section 3553(a) instructs courts to consider the following factors when determining a sentence:  (1) the nature and circumstances of the offense and the history and character of the defendant; (2) the purposes of sentencing; (3) the applicable advisory sentencing Guideline range; and (4) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar misconduct.  *See* 18 U.S.C. § 3553(a).  These factors, along with the parties' joint recommendation, support the appropriateness of a ten-year sentence.

### A.    The Nature and Characteristics of the Offense, and the History and Character of the Defendant Are Adequately Reflected in the Parties' Recommended Ten-Year Sentence

The nature and characteristics of the offenses to which Mr. Nader pled are serious, to be sure.  He acknowledges that his conduct was completely unacceptable.  In his written acceptance of responsibility, Mr. Nader writes, "I take full responsibility for my conduct.  Though it occurred some time ago, I want to apologize now to all those who are involved.  I am deeply sorry and am doing everything I can to make amends."  PSR ¶ 67.  Mr. Nader has resolved not to re-offend.  To that end, he is committed to completing the mental health counseling Dr. Berlin has recommended in his report.

That said, in accounting for the nature and characteristics of the offense, there are several mitigating factors.  First, there has never been any allegation that Mr. Nader used physical force against anyone.  Second, the offenses were also long ago.  Finally, ten years is a very substantial period of incarceration, particularly for someone of Mr. Nader's age and poor health.  That, in part, is why the parties have agreed that ten years is a sufficient sentence here.

Mr. Nader's history and character also suggest that ten years of incarceration is enough.  The parties' recommended sentence reflects Mr. Nader's decades of service to the United States and his humanitarian and diplomatic efforts abroad.  As Dr. Berlin emphasized:  "Mr. Nader's charged acts do not define him as an individual.  He is a complex person with many strengths of character.  He has spent much of his life working on behalf of Middle East peace."  Ex. 1 at 14.

### B.    The Purposes of Sentencing Are Served by the Parties' Recommended Ten-Year Sentence

18 U.S.C. § 3553(a)(2) identifies four purposes of sentencing:  to (1) "reflect the seriousness of the offense… and to provide just punishment for the offense"; (2) "afford adequate deterrence to criminal conduct"; (3) "protect the public from further crimes of the

defendant"; and (4) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." A ten-year term of imprisonment accomplishes those objectives without being greater than necessary.

1. _The proposed sentence reflects the seriousness of the offense._ Ten years in prison is, by any humane measure, a substantial period of incarceration. That is especially true for Mr. Nader, who is 61 years old and is suffering from a number of serious health issues; the reality is that Mr. Nader may well not survive a ten-year sentence. A ten-year sentence is also particularly harsh for Mr. Nader, who at his current age has little risk of re-offending, because in that instance only a small part of his sentence can be said to reflect a need to deter him from future misconduct. The great majority of the sentence, rather, serves to satisfy this sentencing objective: It is a significant punishment that reflects the seriousness of the offense.

Additionally, Mr. Nader has agreed to pay restitution in this case and has worked with Minor Boy 1's counsel to reach an agreement for the sum of $150,000. This is a significant amount of restitution in this type of case. _See United States v. Justin Deonta Strom_, 1:12-cr-00159-LMB (E.D. Va. Sept. 14, 2012) (restitution of total of $91,925.94 allotted amongst three different complainants where defendant masterminded sex trafficking operation that prostituted teenagers, and also choked and raped one of the 16-year-olds); _United States v. Eric Noe Araujo Flores_, 1:15-cr-00320 (E.D. Va. June 3, 2016) (restitution of $40,370.00 where defendant lured 14-year-old girl from El Salvador to United States and raped her multiples times, sometimes under threat of beating and deportation); _see also United States v. Schneider_, 801 F.3d 186, 189-91 (3d Cir. 2015) (restitution of $35,000 where defendant took in 12-year-old boy who had trouble paying for ballet school and engaged in sex acts with him over course of years, which eventually progressed to anal sex three to four times per week).

31

2. *The proposed sentence affords adequate general deterrence*.  For those same reasons, a ten-year term of incarceration affords adequate general deterrence, particularly on the child pornography charge where the conduct took place eight years ago; the conduct involved receipt only (and not distribution); and so few images were involved.  By their nature, mandatory minimum sentences send an especially strong deterrent signal to offenders Mr. Nader's age, because the older an offender is, the more likely it is that the last portion of his or her life will be spent in prison.  Even were that not so, a ten-year term of imprisonment is substantial for anybody.  It serves adequately to deter this kind of conduct.

3. *The proposed sentence is far more than necessary to foster specific deterrence*.  For reasons already explained, there is very little need here to foster specific deterrence.  Mr. Nader's illicit activity has seriously diminished in recent years.  He is committed to never again having sex with anyone under the age of consent or engaging in any illegal activity.  PSR ¶ 68; Ex. 1 at 7.

As Dr. Berlin confirms, Mr. Nader's "future prognosis is very good," and his risk for recidivism is low.  This is not only due to his advanced age, but also because he has does not have any conditions that frequently lead to relapse into criminal sexual behavior, such as drug addition, alcoholism, or antisocial personality disorder.  Ex. 1 at 14.  Moreover, Dr. Berlin stressed that Mr. Nader fully understands that if he were to commit a future offense—or even just a violation of his conditions of supervised release—he would "likely die as an old man in prison" and "[h]e does not want to do that."  *Id.*  Dr. Berlin further noted that Mr. Nader will benefit from the mental health counseling and sex offender treatment he will receive while incarcerated, and that Mr. Nader "is a man with considerable psychological strengths that facilitate future success."  *Id.*

32

Dr. Berlin's conclusion that Mr. Nader is unlikely to re-offend at his age is backed by extensive research about the low rates of recidivism among sexual offenders in general, especially those over age 60.  Research has shown that sexual re-offending past age 60 is extremely low—one study found "[t]here were very few recidivists among the sexual offenders released after age 60"—only 3.8%.  R. Karl Hanson, *Recidivism and Age: Follow-Up Data from 4,673 Sex Offenders*, J. Interpersonal Violence (Oct. 2002).

Given the above, a ten-year sentence is sufficient, and in fact far greater than necessary, to effect specific deterrence.

### C.     The PSR Incorrectly Calculates Mr. Nader's Guidelines Range

Mr. Nader respectfully submits that the Guidelines range reflected in the PSR is incorrect, and lodges the below objections for the Court's consideration.

> 1.   Application of the 2018 Guidelines Manual to Mr. Nader's Conviction for Transportation of a Minor in 2000 Violates the Ex Post Facto Clause

Mr. Nader objects to the PSR author's use of the 2018 Guidelines Manual, rather than the 1998 Guidelines Manual, to calculate his offense level for the transportation offense in Count 2. The Government and Mr. Nader have jointly recommended that the Court apply the 1998 Guidelines Manual to Count 2.  PSR ¶ 6; PSR Addendum at 43.  The Court should follow this recommendation, not only to give effect to the parties' mutual agreement, but also because doing otherwise would violate Mr. Nader's constitutional rights.

The policy statement[35] in U.S.S.G. § 1B1.11, known as the "one book rule," cannot be applied when doing so would violate the *ex post facto* clause of the Constitution, U.S. Const.

---

[35] The one-book rule is a policy statement by the Sentencing Commission, which the Court is not required to follow. An agency's interpretation of its own regulations is only given "controlling weight" where its interpretation "does not violate the Constitution or a federal statute." *Stinson v. United States*, 508 U.S. 36, 45 (1993); *see also United States v. McMillian*, 777 F.3d 444, 448

art. I, § 9, cl. 3, as it does in Mr. Nader's case.  Calculation of his offense level for Count 2 using

the 2018 Guidelines is both retrospective and disadvantageous to Mr. Nader.  *See*, *e.g.*, *United*

*States v. Lewis*, 235 F.3d 215, 218 (4th Cir. 2000) ("[A] law violates the Ex Post Facto Clause

when it is retrospective—*i.e.,* when it applies to events predating its enactment—and it

disadvantages those to whom it applies.") (citing *Lynce v. Mathis,* 519 U.S. 433, 441 (1997)).

First, use of the 1998 Guidelines with respect to Count 2 is unquestionably retrospective.

Mr. Nader's offense conduct charged in Count 2 ended when Minor Boy 1 left the United States

on March 18, 2000—*nearly two decades prior to the effective date of the 2018 Guidelines*.  PSR

¶¶ 27-33.  The 1998 version of the Guidelines was then in effect.

Second, use of the 2018 Guidelines is disadvantageous to Mr. Nader because it

significantly increases his total offense level for the same conduct.  The Government and

Mr. Nader agree that under the 1998 Guidelines, the total offense level for Count 2, including

then-applicable enhancements, is 23.  PSR ¶ 6 (base offense level 14, plus seven-level

enhancement for age of victim and two-level enhancement because victim was otherwise in

custody, care, or supervisory control of defendant).  However, under the 2018 Guidelines, the

PSR has calculated Mr. Nader's adjusted offense level for Count 2 as 34—*eleven levels higher*.

PSR ¶¶ 80-87 (base offense level 28 plus three 2-level enhancements).[36]

The increased offense level for Count 2 alters the calculation of Mr. Nader's combined

adjusted offense level pursuant to § 3D1.4 in the 2018 Guidelines.  PSR ¶¶ 88-91.  Count 1 is the

---

(7th Cir. 2015) (Posner, J.) ("The [one book] rule is not statutory, and so does not bind a
sentencing judge.").  In Mr. Nader's case, the application of the one book rule would violate the
*ex post facto* clause of the Constitution, and thus the Court need not—indeed cannot—follow it.

[36] Mr. Nader specifically objects to the adjustments in PSR ¶¶ 82 and 83 because they did not
exist in the 1998 Guidelines Manual.

group with the highest offense level and is assigned 1 unit.[37]  Using the incorrect offense level of

34, Count 2 is presently assigned one unit because it is between 1 and 4 levels less serious than

Count 1 (presently calculated as 38).  PSR ¶ 88.  However, when the 1998 Guidelines are used to

calculate the proper offense level for Count 2, it is disregarded and *does not increase the*

*adjusted offense level* because it is more than 9 levels less serious than Count 1.  *See* U.S.S.G.

§ 3D1.4(c); PSR Addendum at 44.  Consequently, Mr. Nader's combined adjusted offense level

is not increased by 2 levels, and should be 33 rather than 40.  PSR ¶ 91.  Mr. Nader's total

offense level should therefore be 35, not 42.  PSR ¶ 95.

Mr. Nader's criminal history category is I.  PSR ¶ 156.  Therefore, when the 1998

Guidelines are used for Count 2, his guidelines range is 168 to 210 months.  This is dramatically

lower than the range of 360 to 600 months presently calculated.  *Id*.  This increase in

Mr. Nader's guidelines range violates the *ex post facto* clause.  *See, e.g., Peugh v. United States*,

569 U.S. 530 (2013) (finding *ex post facto* violation "when a defendant is sentenced under

Guidelines promulgated after he committed his criminal acts and the new version provides a

higher applicable Guidelines sentencing range than the version in place at the time of the

offense").

Third, Mr. Nader did not have fair notice of potentially increased punishment for his past

conduct charged in Count 2.  "The central concern of the ex post facto prohibition is 'the lack of

fair notice and governmental restraint when the legislature increases punishment beyond what

was prescribed when the crime was consummated.'"  *Lewis*, 235 F.3d at 217-18 (quoting *Miller*

*v. Florida*, 482 U.S. 423, 430 (1987)).  Importantly, the Constitution requires not just any notice,

---

[37] Based on Mr. Nader's objections to the specific offense characteristic enhancements discussed
above in Section III.B, *supra*, the correct offense level for Count 1 should be 33 rather than 38.

but notice that is "*fair.*" *E.g.*, *Weaver v. Graham*, 450 U.S. 24, 30 (1981). "The constitutional prohibition against *ex post facto* laws cannot be avoided merely by adding to a law notice that it might be changed." *Miller*, 482 U.S. at 431.

The question of whether the *ex post facto* clause is violated when a revised edition of the Guidelines is applied to offenses that both predate and postdate the revision is one that has divided the courts of appeal. The Ninth Circuit has held that the one-book rule violates the *ex post facto* clause in every circumstance in which it would apply a heightened guidelines range to a crime that is completed before the guidelines were amended to increase the punishment for that offense. *See United States v. Ortland*, 109 F.3d 539, 547 (9th Cir. 1997) (finding that mail fraud is a completed, rather than continuing, offense and thus "[a]pplication of the policy statement in this case would violate the Constitution"). Mr. Nader's transportation of a minor in violation of 18 U.S.C. § 2423(a) was an offense that was completed no later than March 18, 2000, when Minor Boy 1 left the United States. Therefore, under this standard (which Mr. Nader submits is the appropriate one), the application of the 2018 Guidelines to Count 2 would clearly be an *ex post facto* violation.

The majority of circuits have adopted a different standard, holding that the *ex post facto* clause is not violated by the one-book rule *only* as applied to a series of similar or identical offenses. *See, e.g.*, *United States v. Ngombwa*, 893 F.3d 546, 553 (8th Cir. 2018) (approving application of one-book rule "only when applied to grouped offenses"); *United States v. McMillian*, 777 F.3d 444, 448 (7th Cir. 2015) (Posner, J.) ("one-book rule should not be applied indiscriminately," for example when the "victim of the old offense is different from the victim of the new one"); *United States v. Siddons*, 660 F.3d 699, 707 (3d Cir. 2011) (applying one-book rule to "ongoing, connected fraudulent conduct occurring both before and after the enactment of

36

the sentencing enhancement"); *United States v. Kimler*, 167 F.3d 889, 895 (5th Cir. 1999) ("a defendant has notice that the version of the sentencing guidelines in effect at the time he committed the last of a series of grouped offenses will apply to the entire group"); *United States v. Bailey*, 123 F.3d 1381, 1404-05 (11th Cir. 1997) ("[T]he one book rule, together with the Guidelines grouping rules and relevant conduct, provide that related offenses committed in a series will be sentenced together under the ... Manual in effect at the end of the series.").  In *Lewis*, the Fourth Circuit did not discuss the grouping rules, but concluded that there had been no *ex post facto* violation when a later-enacted Guidelines manual was applied to a series of four counts of tax evasion occurring both before and after the adoption of the one-book rule.  *See Lewis*, 235 F.3d at 218.

The use of the 2018 Guidelines with respect to Mr. Nader's conviction on Count 2 also violates the *ex post facto* clause under this standard.  Mr. Nader's convictions were not repeated violations of the same statute, as in *Lewis*, nor were they sufficiently similar to be grouped under the guidelines.  PSR ¶ 88 (not grouping Count 2 with Count 1); *see Ngombwa*, 893 F.3d at 553 (only finding sufficient notice under *ex post facto* clause for grouped offenses); *Bailey*, 123 F.3d at 1404-05 (same); *Kimler*, 167 F.3d at 895 (same).  Mr. Nader's conviction for transportation of a minor was not a continuing offense; it was completed in 2000.  *See McMillian*, 777 F.3d at 448-49 (noting that each of four convictions for transporting women across state lines to engage in prostitution was distinct, completed offense and that offenses against different people generally cannot be grouped).  Mr. Nader's offenses did not involve the same victim.  *See id.* at 448 (one-book rule should not be applied "in a case in which the victim of the old offenses is different from the victim of the new one").  Moreover, Mr. Nader's later possession of child pornography offense was not designed to conceal or "embrace" his prior transportation offense.

*See Ngombwa*, 893 F.3d at 555 (applying one book rule where false statement was intended to conceal naturalization fraud occurring years prior).

Indeed, the only notice Mr. Nader arguably had that his sentence could be increased for his decades-old transportation offense was the existence of the one-book rule itself.  But this "carr[ies] the proposition that ignorance of the law is no defense to a preposterous extreme." *McMillian*, 777 F.3d at 449.  It amounts to nothing more than a "notice that [the law] might be changed," which is not "fair" notice under the *ex post facto* clause.  *Miller*, 482 U.S. at 431.

        2.   The PSR Improperly Applies Two Specific Offense Characteristic
              Adjustments to Count 1

            *a.   The Court Should Not Increase Mr. Nader's Guidelines Based
                 on the Images Seized in 2018 and 2019.*

The Court should not apply the adjustments in paragraphs 71 and 75 of the PSR.  These adjustments are based solely on the images found on Mr. Nader's phones in 2018 and 2019, rather than the offense conduct from 2012 to which Mr. Nader pled guilty.  The videos from 2018 and 2019 cannot form the basis for application of any adjustments for specific offense characteristics under U.S.S.G. § 2G2.2 for two independent reasons.  *See* PSR ¶¶ 71, 75.  As discussed below, (1) these images are not "relevant conduct" under the Guidelines; and (2) the factual basis for these increases is not supported by a preponderance of evidence.

Mr. Nader pled guilty to a Criminal Information charging him only with possession of child pornography *between September 20 and October 1, 2012*, while he was located in the Southern District of New York.  ECF No. 165; PSR ¶ 4.  After it accepted Mr. Nader's plea, the Court dismissed the indictment—including Count 1 alleging transportation of child pornography based on the images found on the iPhone 7 seized in January 2018 in the Eastern District of Virginia.  PSR ¶ 4.  Mr. Nader was never charged for the images found on the phone that was

seized in New York when he was arrested in June 2019.  For at least two reasons, the Court

cannot now use this unadjudicated conduct to increase Mr. Nader's offense level.

First, the images found in 2018 and 2019 are wholly unrelated to the offense for which

Mr. Nader was convicted, and thus are not "relevant conduct" for the purpose of Chapter 2

adjustments.  U.S.S.G. § 1B1.3 provides that specific offense characteristics "shall be determined

on the basis of . . . all acts and omissions committed . . . by the defendant . . . that occurred

*during the commission of the offense of conviction*, in preparation for that offense, or in the

course of attempting to avoid detection or responsibility for that offense."  U.S.S.G.

§ 1B1.3(a)(1)(A) (emphasis added).  This requires that there be both a temporal and substantive

overlap between the relevant conduct and the conduct constituting the crime of conviction.  *See*

*United States v. Agyekum*, 846 F.3d 744, 751 (4th Cir. 2017) ("[T]he term 'during' conveys a

linkage that is more than a mere temporal overlap; it also conveys a qualitative overlap such that

the conduct must be *related or connected to* the crime of conviction.") (emphasis in original).

The unadjudicated 2018-19 conduct is not temporally related to the offense of conviction,

as it occurred more than *five years later*.  Nor is the alleged 2018-19 conduct related or

connected to Mr. Nader's possession of child pornography in 2012.  The 2018-19 conduct

allegedly occurred outside the United States[38] and did not involve communications with D.S.

And there is no evidence that the alleged 2018-2019 conduct involved any of the same images as

Mr. Nader's offense of conviction.

---

[38] The application of this enhancement is also prohibited by the canon of presumption against
extraterritorial application, which provides that "when a statute gives no clear indication of an
extraterritorial application, it has none" and reflects "the presumption that United States law
governs domestically but does not rule the world."  *Kiobel v. Royal Dutch Petroleum Co.*, 569
U.S. 108, 115 (2013) (citations omitted).

Notably, the PSR does not address Mr. Nader's argument that the 2018-19 videos fall outside the definition of relevant conduct under U.S.S.G. § 1B1.3(a)(1)(A).  PSR Addendum at 39-41.  This silence should be treated as an implicit concession that there is no defensible way to consider conduct occurring five to six years later as happening "during the commission of the offense of conviction."  U.S.S.G. § 1B1.3(a)(1)(A).

Instead, the PSR states that the 2018-19 videos constitute "relevant conduct" under U.S.S.G. § 1B1.3(a)(2).  This is also incorrect.  That Application Instruction provides that, solely with respect to offenses of a character that would require grouping of multiple counts, "relevant conduct" includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).[39]

In assessing conduct for purposes of § 1B1.3(a)(2), "the significant elements to be evaluated are similarity, regularity and temporal proximity between the offense of conviction and the uncharged conduct."  *United States v. Mullins*, 971 F.2d 1138 (4th Cir. 1992).  "If the uncharged conduct is both solitary and temporally remote, then there must be 'a strong showing of substantial similarity.'"  *Id.*

Without question, the asserted "relevant conduct" here is temporally remote from Mr. Nader's offense of conviction.  The videos found on Mr. Nader's phones in 2018 and 2019 were received between five and six years after the images he admitted possessing in 2012.  Courts rightfully have been very wary of including such remote actions as relevant conduct.  *See,*

---

[39] A "common scheme or plan" requires that the offense of conviction and the other alleged offense conduct be "substantially connected to each other by at least one common factor," such as common victims or common accomplices.  U.S.S.G. § 1B1.3, Application Note 5(B)(i).  Further, two offenses may only be considered part of "the same course of conduct" if the defendant's actions are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  U.S.S.G. § 1B1.3, Application Note 5(B)(ii).

*e.g.*, *United States v. Dugger*, 485 F.3d 236, 242 (4th Cir. 2007) (uncharged drug distribution was not relevant conduct for drug distribution conviction where the uncharged conduct occurred more than a year later); *Mullins*, 971 F.2d at 1144 ("Regularity and temporal proximity are extremely weak here, if present at all, as the uncharged conduct took place over six months prior to the two phone calls underlying the offense of conviction."); *United States v. Griffith*, 115 F. Supp. 3d 726, 738 (S.D. W. Va. 2015) ("Where the gap in time between the offenses is as long as . . . two years . . . the court must be cautious and exacting in permitting such relatively stale dealings to be included in the same course of conduct as the offense of conviction.") (quotation marks and citations omitted).

Particularly in light of the many intervening years, there is insufficient similarity or regularity between the offense of conviction and the purported "relevant conduct." There is no evidence whatsoever of regularity; the Statement of Facts does not describe any conduct by Mr. Nader between 2012 and 2018. PSR ¶¶ 14-43. Nor is the conduct sufficiently similar. The 2012 offense conduct and the 2018-19 unadjudicated conduct have no common victims or accomplices. The 2018-19 videos involved wholly different images and communications from different individuals than the 2012 possession for which Mr. Nader was convicted. The Government concedes that those videos were sent and received outside the United States, whereas the 2012 conduct occurred in New York. There is no continuous course of conduct here.

To the extent that the Government argues that the unadjudicated conduct is part of the same course of conduct as Mr. Nader's possession of child pornography six years earlier because both involve "sexual interest in children," that thread is far too thin to support the application of a relevant conduct adjustment. "[I]t is not sufficient that other crimes are 'of the same kind' as the

charged offense if they are not part of the same course of conduct or plan." *Mullins*, 971 F.2d at

1145. As the Fourth Circuit has held:

> to describe [defendant's] conduct at such a level of generality . . .
> eviscerate[s] the evaluation of whether uncharged criminal activity is part
> of the "same course of conduct or common scheme or plan" as the offense
> of conviction. With a brushstroke that broad, almost any uncharged
> criminal activity can be painted as similar in at least one respect to the
> charged criminal conduct. "The goal of the provision . . . is for the sentence
> to reflect accurately the seriousness of the crime charged, but not to impose
> a penalty for the charged crime based on unrelated criminal activity."

*Id.* (quoting *United States v. Wood*, 924 F.2d 399, 404 (1st Cir. 1991)). Indeed, the fact that

Count 1 and Count 2 are not groupable under the Guidelines (*see* PSR ¶ 88) illustrates that not

all offenses that arguably reflect a "sexual interest in children" are part of a continuous course of

conduct—particularly when the offenses are separated by many years.

Second, for all of the reasons discussed in Background Section II.B *supra*, the

preponderance of the evidence does not support the allegation that Mr. Nader knowingly

transported the images into the United States. *See United States v. Arbaugh*, 951 F.3d 167, 173

(4th Cir. 2020) (Government must prove applicability of sentencing enhancements by

preponderance of evidence).

Furthermore, many of the videos do not depict minors "engaged in sexually explicit

conduct."[40] As a general matter, the videos do not feature the children's genitalia as a focal

point; the setting of the visual depictions are not sexually suggestive; the children are not in

unnatural poses or inappropriate attire, considering the children's ages; though many of the

children are partially clothed, almost all, if not all, of the videos depict children in other

countries, where a different state of dress for children could be culturally acceptable; the visual

---

[40] Mr. Nader also objects to the characterization of the videos this way in paragraph 49 of the PSR.

depictions do not suggest sexual coyness or willingness to engage in sexual activity; and the visual depictions are not intended or designed to elicit sexual responses from the viewer. *See United States v. Boudreau*, 250 F.3d 279, 282 n.2 (5th Cir. 2001).[41]  As Dr. Berlin has opined, many of the videos seemed to be "a misguided attempt at perverse humor, rather than a stimulus intended to elicit erotic arousal." Ex. 1 at 13.  Thus, for the majority of the videos, the preponderance of the evidence fails to establish that they are child pornography at all.

       b.  *The Section 2G2.2(b)(3)(F) Adjustment for Distribution of Child Pornography Does Not Apply*

Mr. Nader objects to the 2-level adjustment for distribution of child pornography pursuant to U.S.S.G. § 2G2.2(b)(3)(F). PSR ¶ 71.  This was not an adjustment that was agreed upon in Mr. Nader's plea agreement. *See* PSR ¶ 6 (listing four other agreed-upon adjustments, but not distribution).  Mr. Nader pled guilty only to possession of child pornography between September 20 and October 1, 2012.  ECF No. 165; PSR ¶ 4.  The Statement of Facts incorporated into Mr. Nader's plea agreement reflects that the Government cannot prove by a preponderance of the evidence that Mr. Nader knowingly distributed child pornography in connection with his offense of conviction.  *See* PSR ¶¶ 20-26 (describing only Mr. Nader's *receipt* of links to child pornography from D.S.).

---

[41] The court in *Boudreau* analyzed images to determine if they were "lascivious," and thus "sexually explicit," under 18 U.S.C. § 2256(2)(A)(v) under the six "*Dost*" factors: "(1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; (2) whether the setting of the visual depiction is sexually suggestive, i.e. in a place or pose generally associated with sexual activity; (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed, or nude; (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Boudreau*, 250 F.3d at 282 n.2 (citing *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986)).

Finally, as discussed above, Mr. Nader's unadjudicated conduct from 2018-19 cannot support the application of this enhancement because it is not "related or connected to the crime of conviction," *Agyekum*, 846 F.3d at 751, and because it has not been proven that the images constitute child pornography.  In addition, these images had nothing to do with the United States and were exclusively sent and received abroad.

> c. *Section 2G2.2(b)(7)(D) 5-Level Adjustment for More Than 600 Images Does Not Apply*

Mr. Nader further objects to the 5-level adjustment for an offense involving 600 or more images.  PSR ¶ 75.  In his plea agreement, Mr. Nader admitted that he knowingly possessed or knowingly accessed with intent to view "at least one video of child pornography" between September 20 and October 1, 2012, as part of his offense of conviction.  PSR ¶ 26.  Pursuant to U.S.S.G. § 2G2.2, one video is the equivalent of 75 images.  *See* U.S.S.G. § 2G2.2, Application Note 6(B)(ii).  The links that Mr. Nader received from D.S. during the relevant timeframe, as listed in the Statement of Facts in Mr. Nader's plea agreement, *see* PSR ¶¶ 20-26, are no longer accessible.  Therefore, the Government cannot prove by a preponderance of the evidence that Mr. Nader's offense involved more than 75 images.  *See Arbaugh*, 951 F.3d at 173.

Once again, the videos located on Mr. Nader's phones in 2018 and 2019 cannot be used to enhance the guidelines for his unrelated offense of conviction that was completed in 2012. Mr. Nader's 2018-19 conduct occurred between five and six years after the offense conduct to which he pled guilty, it did not involve any of the same images or communications with the same people, and it largely occurred outside the United States.  Moreover, the Government has not proven which, if any, of the 2018-19 images constitute child pornography.

Accordingly, the correct adjustment under § 2G2.2(b)(7) is a 2-level increase for at least ten, but fewer than 150 images (i.e., the range for a single video).

**D.**      **The Guidelines Range Fails to Identify the "Sufficient But Not Greater Than Necessary" Sentence**

In determining what sentence is appropriate, the applicable advisory Guidelines range is only a starting point. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). As this Court is well aware, the Guidelines are merely "one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Mr. Nader also submits that it is appropriate in this case for the Court to give more weight to the parties' joint ten-year recommendation than the Guidelines.

A sentencing court "may not presume that the Guidelines range is reasonable" and must consider all of the 18 U.S.C. § 3553(a) factors before determining the appropriate sentence, so that it can make "an individualized assessment based on the facts presented." *Id.* at 50-52. And indeed, the court can find that a "Guidelines sentence itself fails properly to reflect § 3553(a) considerations." *Rita v. United States*, 551 U.S. 338, 351 (2007); *see also Kimbrough*, 552 U.S. at 101-102 (noting that "courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines").

For all of the reasons discussed above, a term of incarceration of ten years is the sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing. But there are at least five additional reasons that the Court should impose this sentence, which the Government and Mr. Nader agree is appropriate in this case.

<u>First</u>, these offenses are not recent, and Mr. Nader committed not to re-offend even before his arrest in this case. As Dr. Berlin writes, Mr. Nader "finds it to be a 'sad irony' that now that he has largely changed his behavior, he is on trial for past alleged actions." Ex. 1 at 10. *Id*.

Second, Mr. Nader's guidelines range on the child pornography charge is driven by a number of enhancements that the United States Sentencing Commission has repeatedly criticized.  In its 2013 report, the Sentencing Commission found that the current sentencing scheme in U.S.S.G. § 2G2.2 does not accurately measure the severity of non-production child pornography offenses.  United States Sentencing Commission, Federal Child Pornography Offenses at 207, 321 (Feb. 2013).[42]  Conduct that is now typical of almost every child pornography offense "triggers multiple guideline enhancements and exposes the vast majority of defendants today to substantial penalty ranges."  Id.

Three of the enhancements that apply to this case—nature and volume of the images possessed and an offender's use of a computer—are ones that the Commission identified as "being applied routinely to most offenders."  Id. at 313.  For example, in 2010, the "typical non-production offender" was subject to three of the four enhancements present here—images of pre-pubescent minors, use of a computer, and quantity of images—in more than 96 percent of cases. Id. at 316.

Third, as to Count 2, it should be noted that Mr. Nader was already convicted in the Czech Republic for conduct that involved Minor Boy 1 there.  Though this is Mr. Nader's first conviction in the United States related to that behavior, it should be noted that he has already served a year of incarceration related to activity with Minor Boy 1  PSR ¶ 123.

Fourth, Mr. Nader will be particularly vulnerable to abuse in prison, and may require extended periods of time in administrative segregation to ensure his safety, due to his convictions

---

[42] Available at: https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

for crimes involving underage males and the extraordinary amount of publicity surrounding his case. *See, e.g.*, *United States v. DeBeir*, 186 F.3d 561, 568 (4th Cir. 1999) ("extreme vulnerability in prison is a factor that the Guidelines did not take into consideration and which could, in proper circumstances, warrant departure"); *United States v. Parish*, 308 F.3d 1025, 1032 (9th Cir. 2002) (concluding it is "permissible for the district court to consider the nature of the offense in combination with other factors increasing the susceptibility to abuse"); *United States v. Lara*, 905 F.2d 599, 603 (2nd Cir. 1990) (considering defendant's sexual orientation in conjunction with other characteristics as it related to vulnerability).  "The trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will necessarily experience in prison.  When a long term is fixed by statute, the prison environment must be considered by the sentencing judge in estimating total harm and benefits to prisoner and society—a utilitarian as well as a compassionate exercise."  *United States v. D.W.*, 198 F. Supp. 3d 18 (E.D.N.Y. 2016).

It is no secret that rape and sexual assault continue to be a serious problem in federal prisons.  The BOP has recognized that several factors render an inmate especially susceptible to abuse while incarcerated, including being gay (or perceived as gay) and being a sex offender against minors.  *See D.W.*, 198 F. Supp. at 66.  Individuals with any *one* of these characteristics is considered at high risk for sexual assault, *see id.*, and Mr. Nader has at least two.  Sadly, it is not unusual for child pornography offenders to be brutally beaten—or even killed—in prison. *See id.* at 73 (citing several murders of elderly convicted child molesters).

Mr. Nader's vulnerability is further compounded by the extraordinary amount of negative publicity that his case has attracted, not only for the nature of his convictions, but because of his cooperation with the SCO investigation—which was deeply unpopular among a large segment of

the American population and dramatically raised the profile of this case.  *See Koon v. United States*, 518 U.S. 81, 112 (1996) (upholding downward departure based on likelihood of abuse by other inmates due to "widespread publicity and emotional outrage").  His arrest in June 2019 on "child pornography" charges was reported all over this country and the world, almost always in conjunction with references to his status as a witness in the SCO investigation and/or his associations with the Trump campaign.

In January 2020, the negative attention greatly intensified when Mr. Nader pled guilty not only to possession of child pornography (with which he had been previously charged), but also to transporting a minor from the Czech Republic to the U.S. for illicit sexual activity (which had not previously been known publicly).  News of his plea appeared in almost every major national news outlet, including the Washington Post, New York Times, Rolling Stone, CBS News, Stars and Stripes, Axios, and CNN, and attracted international attention from organizations such as Independent UK and UPI.  Nearly every headline screamed that Mr. Nader was both a former witness in the SCO investigation and had pled guilty to "child sex crimes."  Most of these articles reported that Mr. Nader had brought a "child" or "boy" from the Czech Republic to the U.S. to engage in sexual activity, which had not been previously reported.  Some wrongly labeled him as a "lifelong pedophile."

In the wake of this media furor following his plea, Mr. Nader was placed in administrative segregation for his own protection.  There is likely to be an extraordinary amount of additional publicity surrounding his sentencing.  And it is highly likely that the combination of the nature of his offenses and this nationwide press coverage will necessitate further time in segregation once he enters BOP.  Even though protective custody is not intended to be punitive, it results in the same deprivations that are imposed on inmates separated from the general

48

population for disciplinary reasons.  *See D.W.*, 198 F. Supp. at 74.  All of this means that

Mr. Nader's term of incarceration is likely to be much more difficult than it is for inmates who

are not so high-profile and vulnerable, and the Court should properly factor that into account

when determining the appropriate sentence.  *See Lara*, 905 F.2d at 603 ("The severity of [the

defendant's] prison term is exacerbated by his placement in solitary confinement as the only

means of segregating him from other inmates.").

    <u>Fifth</u>, COVID-19 makes incarceration more dangerous and agonizing for Mr. Nader.  As

discussed above, Mr. Nader is at a high risk for serious illness if he contracts COVID-19.

Further, the Bureau of Prisons ("BOP") has suspended visitation and put extreme restrictions on

inmate movement.[43]  And despite these efforts to contain the virus, 35% of those incarcerated in

the BOP who have been tested for COVID-19 have tested positive.[44]  Cases inside prisons

continue to "soar" even as the infection rate in the U.S. remains relatively flat.[45]  It is further

counsel's understanding that BOP's practice with people like Mr. Nader, who are being

transported from county jails, is to send them to transfer facilities, where they must quarantine in

isolation for weeks before ultimately being transported to a more permanent facility.  It is unclear

how long those and other isolating measures will continue.  What is clear is that the time that Mr.

Nader serves will be harsher because of COVID-19.  That is because of the fear that he will

contract a deadly virus, because of the serious illness that he will suffer if he contracts that virus,

---

[43] https://www.bop.gov/resources/news/20200313_covid-
19.jsp#:~:text=SOCIAL%20VISITS%3A%20Social%20visits%20will,300)%20telephone%20m
inutes%20per%20month.; *see also* https://www.npr.org/2020/06/15/877457603/as-covid-
spreads-in-u-s-prisons-lockdowns-spark-fear-of-more-solitary-confinement (describing
conditions akin to solitary confinement in federal prisons).

[44] https://abcnews.go.com/Politics/tested-federal-inmates-positive-
coronavirus/story?id=71275461

[45] https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html

and because, under BOP's policies, his confinement will likely continue to be marked by isolation from the outside world, much like the time he has spent awaiting sentencing. *See United States v. Beck*, 425 F. Supp. 3d 573, 586 (M.D.N.C. 2019) (considering under the § 3553(a) factors that defendant's suffering as result of her medical condition meant that her sentence would be "significantly more laborious" than that of most other inmates).

E.     **Need to Avoid Unwarranted Sentencing Disparities Counsels in Favor of the Recommended Ten-Year Sentence**

This Court and other courts have often implicitly acknowledged that the Guidelines overstate the appropriate sentence for sex crimes, *see, e.g.*, *United States v. Rocco*, No. 1:17-cr-20-AJT (E.D. Va. 2017), including in cases such as Mr. Nader's that involve the possession of child pornography and/or transportation of a minor with the intent to have (or actually having) sexual contact with a minor.  The cases below are all cases from this District involving conduct worse than Mr. Nader's in which the courts imposed below-Guidelines sentences:

3.  Cases involving possession or receipt of child pornography

a.      In *United States v. Bosyk*, No. 17-CR-302-LMB (E.D. Va. 2018), the defendant was a member of an internet-based bulletin board catering to individuals who want to share and receive child pornography.  *See* ECF No. 41, Statement of Facts.  He downloaded thousands of files to multiple devices and kept bookmarks for several websites dedicated to the distribution of child pornography.  ECF No. 49, Gov't Sentencing Memo.  The offense conduct spanned more than three years.  ECF No. 41.  The defendant was in criminal history category I and the parties agreed that a Guidelines sentence at the bottom of the Guidelines range of 97-121 months would be appropriate. ECF No. 49.  This Court nonetheless sentenced the defendant to the mandatory minimum of 60 months.

50

b.      In *United States v. Webb*, No. 16-CR-298-LMB (E.D. Va. 2017), the

defendant possessed approximately 5,500 images files and 362 video files of child pornography,

including videos of more than 12 and 17 minutes depicting adults having sex with prepubescent

minors.  *See* ECF No. 8, Statement of Facts.  The defendant was in criminal history category I

and the guidelines ranges was 97-121 months.  ECF No. 16, Gov't Sentencing Memo.  The

Government requested a sentence at the low end of the guidelines.  *Id.*  This Court imposed the

mandatory minimum sentence of 60 months.

c.      In *United States v. Chatelain*, No. 19-CR-133-LMB (E.D. Va. 2019), the

defendant possessed hundreds of images and videos of child pornography, and carried them from

country to country while working for the U.S. State Department. ECF No. 46, Gov't Sentencing

Memo.  He was in criminal history category I, and the guidelines range was 121-151 months.

This Court imposed the mandatory minimum of 60 months.

d.      In *United States v. Imparato*, 19-CR-173-LMB (E.D. Va. 2019), the

defendant was charged with *both* distribution of child pornography *and* travel with intent to

engage in illicit sexual conduct under 18 U.S.C. § 2423(b).  In addition to possessing hundreds of

image and video files of child pornography on his computer, the defendant used Kik messenger

to solicit and receive child pornography from others, and engage in sexually explicit chats with

minors, over a period of several months.  ECF No. 47, Statement of Facts.  The defendant also

had oral and anal sex with a 12-year old boy that he met using Kik.  *Id.*  Even while on pretrial

supervision, the defendant continued to send explicit texts, images, and videos to minors.  ECF

No. 57, Gov't Sentencing Memo.

The Guidelines sentence was 600 months.  The Government recommended a below-guidelines sentence between 84 and 120 months.  ECF No. 62, Gov't Supp. Sentencing Memo.  This Court sentenced the defendant to 60 months.

4.  <u>Cases involving transportation of a minor for illicit sexual activity or sex trafficking of children.</u>

a.  In *United States v. Dumas*, No. 13-cr-286-GBL (E.D. Va. 2013), the defendant was convicted after trial of one count of sex trafficking of a child.  The evidence at trial established that, for at least six months, the defendant was a member of an interstate prostitution ring that exploited teen girls.  ECF No. 115, Gov't Sentencing Memo.  The defendant was in criminal history category I.  The probation office calculated the applicable guidelines as 360 months to life.  *Id*.  After the court sustained some of the defendant's objections, the guidelines range was revised to 262-327 months. ECF No. 122.  The court imposed a sentence of 120 months.

b.  In *United State v. Kweme*, No. 11-cr-345-AJT (E.D. Va. 2011), the defendant pleaded guilty to one count of sex trafficking of a child.  The defendant advertised a minor female on the internet as a prostitute, drove her to various locations to engage in commercial sex acts, and took a percentage of the money she collected.  ECF No. 17, Statement of Facts.  He had also personally engaged in a sexual relationship with the minor.  *Id.*  The court imposed a sentence of 132 months, substantially below the guidelines range of 235-293 months.

c.  In *United States v. Murillo*, No. 17-cr-174- CMH (E.D. Va. 2017), the defendant pleaded guilty to one count of interstate travel for the purpose of engaging in illicit sexual activity pursuant to 18 U.S.C. 2423(b), though the facts also would have supported a charge under § 2423(a).  The defendant traveled from Virginia to Texas, where he had sexual intercourse with a 13-year old girl.  ECF No. 23, Statement of Facts.  He then traveled with the

same girl to Honduras where he had sex with her multiple times while she was 13 and 14. *Id.* The defendant kept the girl away from her family for more than three months. The defendant was in criminal history category I, and the advisory guidelines range was 57-71 months. The court imposed a below-guidelines sentence of 42 months.

        d.    In *United States v. Jackson*, No. 09-cr-441-GBL (E.D. Va. 2010), the defendant was an ROTC instructor at the minor victim's high school. ECF No. 18, Statement of Facts. The defendant drove the minor from Maryland to Virginia to have sex with her on three occasions when she was 16 years old. *Id.* The defendant acknowledged that the victim viewed him as a "father figure." *Id.* The applicable guidelines range was 70-87 months and the Government asked the court to impose a sentence within the guidelines. ECF No. 19, Gov't Sentencing Memo. The court sentenced the defendant to 12 months and a day.

* * *

As demonstrated above, the ten-year mandatory minimum for the offenses to which Mr. Nader has pled is consistent with the sentences imposed in these and other cases, which involved conduct similar to, and frequently worse than, Mr. Nader's. Only one of these cases, *Kweme*, resulted in a sentence of more than 120 months, and the conduct in that case (advertising a teen girl online as a prostitute and transporting her for commercial sex acts, from which the defendant profited financially) was much more egregious than Mr. Nader's. Indeed, in similar cases, defendants in this District have typically received sentences far less than ten years.

The Court should impose the parties' recommended ten-year sentence. To impose a higher sentence would punish Mr. Nader more severely than similarly-situated defendants and result in unwarranted sentencing disparities.

## REQUESTED JUDICIAL RECOMMENDATIONS

Mr. Nader respectfully requests that the Court recommend that he serve his time at FCI Petersburg Low. This placement will keep Mr. Nader close to his home in the United States (Washington, D.C.), and the facility also has a treatment program.

## CONCLUSION

For all of the foregoing reasons, Mr. Nader respectfully requests that the Court impose a sentence of no more than the parties' agreed-upon sentence: ten years' incarceration and five years of supervised release.

Dated: June 22, 2020                         Respectfully submitted,

                                            */s/ Jonathan S. Jeffress*
                                            Jonathan S. Jeffress (#42884)
                                            Emily Anne Voshell (#92997)
                                            Courtney Roberts Forrest (#76738)
                                            KaiserDillon PLLC
                                            1099 14th Street, NW, 8th Fl. West
                                            Washington, DC 20005
                                            Tel: (202) 640-4430
                                            Fax: (202) 280-1034
                                            jjeffress@kaiserdillon.com
                                            evoshell@kaiserdillon.com
                                            cforrest@kaiserdillon.com

                                            John N. Nassikas III (#24077)
                                            Andrew E. Talbot (#93801)
                                            Arnold & Porter Kaye Scholer LLP
                                            601 Massachusetts Ave., NW
                                            Washington, DC 20001
                                            Tel: (202) 942-5000
                                            Fax: (202) 942-5999
                                            John.Nassikas@arnoldporter.com

                                            *Attorneys for Defendant*
                                            *George Aref Nader*