1

```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .    Criminal No. 1:19cr201
                              .
       vs.                    .    Alexandria, Virginia
                              .    June 26, 2020
GEORGE AREF NADER,            .    11:09 a.m.
                              .
                 Defendant.   .
                              .
.  .  .  .  .  .  .  .  .  .  .

                     TRANSCRIPT OF SENTENCING
           BEFORE THE HONORABLE LEONIE M. BRINKEMA
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

```
FOR THE GOVERNMENT:            JAY V. PRABHU, AUSA
                               MELISSA L. CHONG, SAUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314


FOR THE DEFENDANT:             JONATHAN S. JEFFRESS, ESQ.
                               COURTNEY R. FORREST, ESQ.
                               EMILY A. VOSHELL, ESQ.
                               KaiserDillon PLLC
                               1099 14th Street, N.W.
                               8th Floor West
                               Washington, D.C. 20005
                                 and
                               JOHN N. NASSIKAS, III, ESQ.
                               Arnold & Porter Kaye Scholer LLP
                               601 Massachusetts Avenue, N.W.
                               Washington, D.C. 20001-3743


CZECH INTERPRETER:             ZUZANA ARATA

OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                               U.S. District Court, Third Floor
                               401 Courthouse Square
                               Alexandria, VA 22314
                               (703)299-8595
```

(Pages 1 - 33)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

```
 1                    P R O C E E D I N G S

 2                    (Defendant present.)

 3            THE CLERK:  Criminal Case 19-201, United States of

 4   America v. George Aref Nader.  Would counsel please note their

 5   appearances for the record.

 6            MR. PRABHU:  Jay Prabhu and Melissa Chong for the

 7   government, Your Honor.  Good morning.

 8            THE COURT:  Good morning.

 9            MR. JEFFRESS:  Good morning, Your Honor.  John

10   Jeffress, John Nassikas, Emily Voshell, and Courtney Forrest on

11   behalf of Mr. Nader.

12            THE COURT:  Good morning.  And, counsel, you may take

13   off your mask if you want to.

14            MR. JEFFRESS:  Thank you.

15            THE COURT:  We've got the guards up now.

16            All right.  Mr. Jeffress, have you had -- no, you may

17   stay there.  Have you had enough time to go over the

18   presentence report yourself and with your client?

19            MR. JEFFRESS:  Yes, Your Honor.

20            THE COURT:  Now, I know you've raised various

21   guideline disputes.  To put your mind at ease, I'm comfortable

22   with the plea agreement and what's going to be recommended in

23   that -- what was recommended in the plea agreement, and so I

24   don't need and am not going to address the nuanced arguments

25   you've made about the guidelines.
```

3

1          MR. JEFFRESS:  Thank you, Your Honor.

2          THE COURT:  I do think that the probation officer's

3   explanation as to why she made those particular calculations is

4   justified, so I'm leaving the presentence report as it is, and

5   the calculation there was an offense level of 42.  Your client

6   has a criminal history of I.  There's an advisory guideline

7   range of 360 to 600 months as to Count 1.  The period of

8   supervised release is five years to life.  The same applies to

9   Count 2.  The fine range is $25,000 to $250,000, and there is a

10  total of $200 of special assessments because there are two

11  counts of conviction.

12          Correct?

13          MR. JEFFRESS:  That's what's in the PSR, correct.

14          THE COURT:  All right.  Then I'll hear first then,

15  Mr. Prabhu, from the government.

16          MR. PRABHU:  Just as to the guideline, Your Honor?

17          THE COURT:  As to your position on sentencing.

18          MR. PRABHU:  Oh, thank you.  As the Court is aware,

19  we have a plea agreement in this case which we believe that the

20  Court should follow it, that the sentences should be

21  concurrent, but this -- the context of this case under the 3553

22  factors is actually quite unique.

23          George Nader is a 61-year-old man.  He's lived most

24  of his life in international privilege and much acclaim.  He's

25  worked with presidents and princes, the powerful and the

4

1    infamous, and his public career spans decades in the Middle

2    East, but that wasn't Mr. Nader's only passion.

3           For decades, Mr. Nader has been interested in images

4    of children, sexual images, and we often discuss with the Court

5    how damaging such an interest can be to children as a worldwide

6    market has developed responding to the prurient interest that

7    the community tries to serve, and these are images of children

8    in sexual and physical pain, and that's a particularly

9    significant context here.

10          The statement of facts in this case talks about

11   several instances where Mr. Nader participated in that market

12   of images.  In 2018 and 2019, Mr. Nader brought images into the

13   United States through Dulles and JFK Airports that the

14   government believes it would prove beyond any reasonable doubt

15   were child pornography.

16          This most recent conduct, however, was resolved by

17   Mr. Nader's plea to a charge that involved accessing videos of

18   child pornography on the internet when he was in New York in

19   2012.  So it's important for the Court to consider that

20   context, that it's not just about the charge in the

21   information.

22          2012 was not the first time that Mr. Nader interacted

23   with law enforcement regarding child pornography.  In 1984,

24   when Mr. Nader was 25 years old, he was investigated and found

25   to have received child pornography in the mail by federal

5

1    authorities, but that case was thrown out because the search

2    that found the pornography was faulty.

3           In 1991, when Mr. Nader was in his early thirties, he

4    was caught by customs officials when he transported two films

5    into Dulles Airport.  He pled guilty to that in this very

6    court, and he received a sentence of six months in prison.  The

7    fact that he is a recidivist on this is a very important issue

8    that the Court should consider.

9           Fifteen or so years later, after the 1991 conviction,

10   Mr. Nader again came to the attention of federal law

11   enforcement when he was investigated for possessing child

12   pornography at his home in Washington, D.C.  He was never

13   charged for that.  It is in the PSR, but it was yet another

14   interaction with law enforcement regarding his interest in

15   sexual images of children.

16          I raise these issues not to embarrass Mr. Nader or to

17   shock the Court, but it's clear from the record in this case

18   that Mr. Nader has had a sexual interest in minors for over 35

19   years, and a persistent and dangerous interest at that.

20          When Mr. Nader was in his late thirties-early

21   forties, he had broadened his horizons by exploiting troubled

22   teen boys for his own sexual gratification, primarily targeting

23   minor prostitutes overseas.  One of these boys, J.B., or Minor

24   Boy 1 as he's identified in the charging documents, a

25   14-year-old, is the subject of the second count of conviction.

6

1    Having enjoyed Minor Boy 1's paid company in Prague, the

2    defendant paid for him to travel from the Czech Republic to the

3    United States, where the defendant continued to exploit this

4    child in the comfort of his U.S. residence.

5            The Court should remember that this 14-year-old boy

6    was by himself, in a foreign country, where he had no

7    connections, spoke little English, and completely relied on

8    Mr. Nader.  The boy says that he was taken advantage of

9    sexually over and over again by the defendant.  The defendant

10   has admitted it happened once.

11           Rather than detailing it here further, Minor Boy 1

12   has provided the Court with an extensive statement and would

13   like briefly to address the Court from the Czech Republic,

14   where he still lives, before the defendant is sentenced.

15           Make no mistake, Mr. Nader is a repeat, hands-on

16   sexual offender.  We know that from Minor Boy 1, but we also

17   know that from the Czech court that found him guilty of two

18   counts.

19           Mr. Nader's repeated sexual tourism in Prague

20   eventually led to his conviction for paid sex with two other

21   troubled teen boys.  The pattern is very clear.  The defendant

22   ended up serving approximately a year in a Czech jail for his

23   conduct.

24           The record simply demonstrates that Mr. Nader has

25   been a persistent and dangerous child abuser and voyeur for

7

1    decades.  Considering the defendant's age, physical condition,

2    and the other 3553 factors, the government has recommended that

3    the Court sentence Mr. Nader to a period of incarceration of

4    ten years in prison on each of the counts of conviction and

5    asks for a lifetime of supervised release.

6            Thank you, Your Honor.

7            THE COURT:  Thank you.

8            MR. JEFFRESS:  Thank you, Your Honor.  We thank the

9    government for, for the recommendation.  We agree that the 3553

10   factors here, including the guideline calculation and all of

11   the other factors in this case, support a sentence from this

12   Court of ten years, including Mr. Nader's health.

13           Your Honor, I would like to -- now that the Court has

14   ruled on the guidelines, I'd like to address the 3553(a)

15   factors, and then Mr. Nassikas and I would like to approach

16   about one issue with the government counsel to address at the

17   bench with Your Honor's permission.

18           THE COURT:  All right.

19           MR. JEFFRESS:  Okay.  You know, on the 3553 factors,

20   I think our -- we have disagreements with the government about,

21   about the pattern that the government states early on, but I

22   think the more fundamental disagreement is, you know, when

23   did -- did that pattern continue up and until Mr. Nader 's

24   arrest in 2018 or 2019, or are these things that he largely put

25   behind him 20 years ago, and, you know, and then there's -- the

8

1    most recent allegation is from eight years ago, in 2012.

2             You know, what the -- I think -- and that is really

3    the big difference for us.  You know, in *Pepper v. Hamilton*,

4    the Supreme Court instructed courts that they could consider

5    post-offense rehabilitation, they could consider rehabilitation

6    of the defendant, and really the key question was does the

7    Court sentence the defendant as he was back when the crime was

8    committed, which in most cases is much more recent than the

9    offense committed in this case, or does the Court consider the

10   defendant as the defendant stands before the Court today.

11            And I think our major difference with the government

12   is that, you know, Mr. Nader as he stands here today in terms

13   of the need for specific deterrence, in terms of, you know,

14   his, his, you know, potential for repeating any of this

15   conduct, is nonexistent.

16            THE COURT:  Well, but aren't we talking, excuse me,

17   about him still being in possession of these images in a much

18   more recent time frame?

19            MR. JEFFRESS:  Your Honor, we respectfully disagree

20   with the government and -- we first of all, you know, as we

21   said, those, in our view, are not relevant conduct in this

22   case, and I, I think we are correct under the guidelines that

23   they should not be, respectfully, but more importantly, do they

24   say that Mr. Nader is the same person that he was back in 2012,

25   when he did receive child pornography, or earlier, when he had

9

1    some, some issues of child pornography?  And, and it's just

2    not.

3           The government has thoroughly excavated the entirety

4    of Mr. Nader's life as he stands -- as he was in 2019, when he

5    was arrested.  They took -- they had six electronic devices

6    which they subjected to thorough analysis, forensic analysis,

7    everything else.  Anything that they had found on those devices

8    demonstrating that Mr. Nader was still participating in this

9    activity, was still participating in the receipt of what is

10   more convention- -- what is really the child pornography that

11   we see in almost every case that comes before the Court, that

12   kind of child pornography, that was not there.

13          What was there was this group of, you know, people in

14   the Middle East who are -- who talk about all kinds of issues,

15   political issues, everything else, and then once in a while,

16   they send each other what they regarded -- and I realize this

17   is not how the Court looks at it and this is not how the

18   government looks at it -- but what they regarded as sort of

19   dirty jokes, that involved minors, yes, that involved minors in

20   sort of sexual, not sexual but naked situations, that is

21   totally unacceptable.  It probably meets the definition of

22   obscenity, the government would say, but this is not

23   pornography.

24          I mean, this is not child pornography that someone

25   uses to sexually stimulate themselves.  This is not what we see

1    in these cases day in and day out.  It's just not.

2              And Dr. Berlin's report -- Dr. Berlin is one of the

3    foremost experts in the world on this stuff, has seen thousands

4    of child pornography cases -- that was very clearly his

5    opinion.  I've done many of these cases.  That is my opinion.

6    I've never seen a case involving images like this.

7              These images were sent to Mr. Nader on his WhatsApp

8    messaging platform by lots of different people in the Middle

9    East who would send him, like, 50 messages, and then one of

10   those messages would contain one of these sort of what they

11   regarded as a, you know, very -- what they regarded as sort of

12   something.

13             There's no evidence that Mr. Nader -- these images

14   were sent to Mr. Nader sometimes years, sometimes many months

15   before he came to the United States in, in January of 2018.

16   These images were -- there is no evidence that Mr. Nader ever

17   looked at any of these images even twice.

18             There is no, you know, what we think of more as child

19   pornography on that phone in terms of sexually stimulating

20   material, there's just -- that's not what this was.  And so the

21   question is, you know, for us is is this part of a continuous

22   pattern of him using this, this material for, you know, sexual

23   stimulation, the way almost all child pornography cases are, or

24   is this something different, and it's very clearly something

25   different.

1          And, you know, if the government had more, after

2     excavating all of his devices, after sending agents to really,

3     you know, different parts of the world to interview witnesses

4     with respect to Mr. Nader and to investigate his life, the FBI

5     went to Prague, they went to Czech, I think they went to other

6     places in pursuit of those cases, that information, that

7     evidence would be before the Court.

8          But what the evidence shows instead is that in the

9     last eight years, Mr. Nader has, as he has aged and as he has

10    realized that his work doing good things for people, doing good

11    things for peace, doing good things for the United States, you

12    know, as that work became more important to him, and he did

13    become more prominent doing that work, was he able to put these

14    things largely behind him, and he was, Your Honor.

15         And I really, I really hope that that does not get

16    lost here, because, you know, the question here, the big

17    question is what is needed for, you know, specific deterrence.

18    Is anything beyond ten years needed for specific deterrence is

19    the question at this sentencing, and we would say absolutely

20    not.

21         This isn't the Nader -- Mr. Nader of 2000, 20 years

22    ago.  This isn't the Mr. Nader of 2012.  This is George Nader

23    as he stands before the Court today, and there's just precious

24    little evidence in the last eight years he's continued that

25    pattern.

12

1          And so, you know, I really -- that's our major

2    fundamental difference with the government.  Much else we don't

3    have.  And I think we agree for various reasons that ten years

4    is the appropriate sentence largely because of that.

5          THE COURT:  All right.

6          MR. JEFFRESS:  So, Your Honor, the other issues I do

7    want to address here, Mr. Nader's, Mr. Nader's health.  I know

8    many times defendants will come before the Court, they'll be

9    arrested and then after they're arrested, you know, a bevy of

10   health concerns show up that are then, you know, pled to the

11   Court as reasons for lenience.  Here that is very clearly not

12   the case.

13         Mr. Nader was -- had open heart surgery, I believe it

14   was quadruple bypass surgery, in April 19 of 2019, which is

15   just several months before his arrest in this case.  So

16   obviously, this is not something the defense is pulling out of

17   its hat and saying please look at this health condition.  That

18   was done there.

19         And the whole reason Mr. Nader was coming to the

20   United States on the date of his arrest well over a year ago

21   now, in the beginning of June -- well, yeah, over a year ago in

22   June of 2019, was he was coming here for cardiac aftercare at

23   Mt. Sinai Hospital.  That was obviously medical treatment that

24   Mr. Nader never reached because he was arrested at the airport.

25         And so, you know, this is not something that we're

13

1    inventing.  This is something that's very real.  For a man who

2    just had quadruple bypass and who's 61 years old and who also

3    suffers from, you know, pre-diabetic and some of his other

4    conditions, his life expectancy is dramatically shortened.

5           And, you know, it's -- and then on top of that, Your

6    Honor, now we have to add the danger of, of COVID, of COVID-19.

7    You know, I see that Bureau of Prisons is actually telling

8    people -- telling courts please don't send people here right

9    now because of COVID.  It's that dangerous within the system.

10          Well, if it's dangerous within the system, then it's,

11   you know, ten times more dangerous than that to Mr. Nader.  He

12   is extremely susceptible.  Having had his heart condition, I

13   mean, if he goes -- you know, if he has to go on a ventilator

14   because he contracts COVID within the Bureau of Prisons, then

15   this will be a death sentence for him.

16          And, you know, you know, ten years under these

17   circumstances at Bureau of Prisons, under these circumstances

18   with Mr. Nader, I have real fear that he will not outlive the

19   sentence that the government has agreed to and that we have

20   agreed to.  I have very much concern.  And I just think that is

21   the reality of the medical situation right now.

22          THE COURT:  Well, as you know, I mean, your client,

23   once he's in the custody of the Bureau of Prisons, can

24   certainly try to take advantage of the statutes that now

25   provide for compassionate release.

14

1          MR. JEFFRESS:  Yes.

2          THE COURT:  He'll have to first apply to the warden,

3   and whether or not that's granted is another matter down the

4   road, but there are certainly options that are available to him

5   to address those issues.

6          Plus, I note for the record at least as far as I'm

7   aware, there have been no positive tests at the Alexandria

8   Adult Detention Center, a real tribute to our sheriff and his

9   deputies and our marshals as well in their transporting of

10  prisoners, and so he's actually been in a pretty safe

11  environment, probably safer than he would have been in New

12  York, frankly, over the last several months.

13         MR. JEFFRESS:  I've made the observation several

14  times to, to personnel at ADC, that they have done a remarkable

15  job, because I have several clients there, including Mr. Nader,

16  and I do understand that they have had a zero infection rate so

17  far, and that is remarkable, but he will not be there for this

18  ten-year sentence.  He will be in the Bureau of Prisons, and

19  the Bureau of Prisons has not done a remarkable job at --

20         THE COURT:  Well, he may or may not be; I don't know.

21  I think what's happening right now is a lot of our prisoners

22  are going to Northern Neck, which also has at last I saw a zero

23  infection rate, and I understand several of our defendants have

24  been held there quite a period of time.

25         So whether or not, you know, that happens in

15

1    Mr. Nader's case, I don't know.  That's beyond our control, but

2    that does appear to be a pattern that we're seeing.

3              MR. JEFFRESS:  Sure.

4              THE COURT:  What's the status of the charges against

5    your client in the District of Columbia?

6              MR. JEFFRESS:  Your Honor, we have a -- could I

7    approach on that, Your Honor?

8              THE COURT:  Oh, I don't know if we need to do that.

9              MR. JEFFRESS:  Okay.  They're pending.

10             THE COURT:  They're pending.  That's -- okay.  But

11   there's no detainer or anything that's been filed out of that

12   court?

13             MR. JEFFRESS:  I'm sorry, Your Honor?

14             THE COURT:  Is there a detainer or any kind of

15   process?

16             MR. JEFFRESS:  There is a detainer on him there.

17             THE COURT:  All right.

18             MR. JEFFRESS:  You know, I raise that issue with the

19   prosecutors.  We are in communication with them about what

20   happens here, obviously, and, you know, if there's something

21   that can be done to avoid him going to the D.C. Jail, I

22   absolutely -- that would be a disaster, so that would be my

23   foremost concern there is that -- to avoid that situation.

24             THE COURT:  All right.

25             MR. JEFFRESS:  Yeah.  But even, you know, even

1  just -- even if we took the COVID out of the equation, you

2  know, just having had open heart surgery and having come here

3  for that purpose, that standing alone would, I think, you know,

4  it would rightly give the government, I think, concern about

5  the length of the sentence, the overall length, and it gives me

6  great concern that ten years is -- and that is another reason

7  why I think we're mutually agreeing to propose this sentence of

8  ten years.

9           Your Honor, the last year, you know, has -- is

10  extremely -- has been extremely hard.  He -- Mr. Nader does not

11  have any family here.  His sister is, as the Court is aware,

12  his family is -- his sister, who he is very close to, Leila

13  Nader, is in Lebanon.  His brother is in California but is, you

14  know, that's fairly far away, especially, you know, during

15  recent times when people cannot travel.

16           He's just been totally taken away from everyone who

17  he loves the most and who loves him the most.  You know, it is

18  my worst nightmare to be taken away from my family so that I

19  cannot communicate with them except by phone, I cannot touch

20  them, I cannot see them.  He has not been able to see any

21  family member or, you know, friend in over a year.  The only

22  people he gets to see are me and, you know, his -- on video and

23  the people at the jail.  It's been very hard.

24           After the plea in January, for his own safety, he was

25  moved to administrative segregation, which is the reason they

1    gave us, so that's been since January, so for quite a long time

2    now.   In administrative segregation, you're allowed out two

3    hours a day.   Other than that, you're restricted to a tiny

4    cell.   You're not allowed any contact with other human beings.

5            You basically have to just rely on your own faculties

6    and company, and, you know, Mr. Nader has -- I think he's

7    gotten into meditation to -- in order to endure that, but it's

8    been very hard.   Especially with COVID and everything else,

9    there have been even greater restrictions at ADC, and it's

10   enabled them to maybe have a zero infection rate, but it's very

11   hard on the people there, especially the ones that are put in

12   solitary confinement, which is essentially what administrative

13   segregation is except for those, those two hours a day he's

14   been let out.   So it's just been extremely difficult.

15           I know that the Court is aware that we have worked

16   hard to make restitution.   We have agreed to a -- Mr. Nader has

17   agreed to a restitution amount to the victim, the victim in

18   this case from 2000, who's the only victim that has come

19   forward in this case, and, and, you know, that's -- we've

20   agreed to that in the amount of $150,000, Your Honor, which,

21   frankly, is much higher than the other restitution cases that

22   we were able to find from this district.   It is the highest,

23   actually, even though I don't think by far the conduct is the

24   worst that we see in these cases.   We cited those cases in our

25   brief.

18

1          So it is a truly substantial amount, I think, and,

2    you know, that is part of his process of making amends here.

3    So we'd ask the Court to consider that as well in imposing the

4    sentence and, and hopefully the jointly recommended sentence of

5    ten years.

6          THE COURT:  All right.

7          MR. JEFFRESS:  Your Honor, there's one other issue

8    that we wanted to -- Mr. Nassikas and I wanted to approach on.

9          THE COURT:  Well, here's what we're going to do

10   logistically:  Do we have headsets we can use for the

11   defendant?  Do we have a headset for the defendant, headset?

12          We're going to -- this is going to be difficult

13   because we're also on a live phone hookup, all right?  Is it

14   something the Court needs to consider before the sentence is

15   actually imposed, or can it be sent to the Court via a written,

16   under seal communication?

17          MR. NASSIKAS:  Your Honor, I think it's best before

18   sentence is imposed.

19          THE COURT:  All right.  I'm going to have you-all

20   come over with masks to the side.  My court reporter will do

21   the best that she can, but we need to try to get a headset for

22   the defendant so he can hear.  There'd just be too many people

23   in the one corner to practice the appropriate distancing that

24   we're requiring in the courthouse.

25          So first of all, Mr. Nader, can you hear me right

19

1   now?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Well, you may not be able to -- you may

4   not be able to hear me actually once we're over here.  I won't

5   have a microphone, so actually the headset is not going to

6   work.  Are you willing to have your counsel speak to the Court

7   without your being present to hear it?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  All right, that's fine.

10          Then, Mr. Nassikas and Mr. Jeffress, get your masks

11  on.  Do I need both of you actually, or do I only need one

12  attorney?

13          MR. JEFFRESS:  No, Mr. Nassikas can do it, Your

14  Honor.  That's fine.

15          THE COURT:  All right.  Mr. Prabhu and Ms. Thomson,

16  I'll ask you to get as close as you're comfortable so that you

17  can still hear, all right?

18    (Sealed bench conference not transcribed in this volume.)

19          *       *       *       *       *

20          THE COURT:  All right.  Mr. Prabhu, was there

21  anything further that you wanted to say in response to anything

22  raised by defense counsel?

23          MR. PRABHU:  No.  I was just going to note that the

24  victim is interested in making a statement.

25          THE COURT:  Yes, that's the next step.  All right.

20

1          MR. PRABHU:  Great.  Thank you.

2          THE COURT:  The victim is in the Czech Republic.  We

3  have an interpreter whose sole job, as I understand it, is

4  going to be to read the letter which the victim has written.  I

5  guess he wrote it in Czech?

6          THE INTERPRETER:  Yes.

7          THE COURT:  All right.  So what's going to happen

8  first is let's have our interpreter affirmed.

9          ZUZANA ARATA, CZECH INTERPRETER, AFFIRMED

10         THE COURT:  All right.  And actually, ma'am, for the

11  record, what is your -- take the mask off so we can hear it

12  clearly.  What is your name?

13         THE INTERPRETER:  Zuzana Arata.

14         THE COURT:  Can you spell the last name?

15         THE INTERPRETER:  A-r-a-t-a.

16         THE COURT:  All right.  I think when you read the

17  letter, I'll ask you to go to the podium since we have the face

18  guard there.

19         THE INTERPRETER:  Okay.

20         THE COURT:  Then you don't have to wear the mask, all

21  right?

22         THE INTERPRETER:  Okay.

23         THE COURT:  All right?  But in the meantime, my

24  understanding is that the victim is on the phone, and he is

25  going to make his statement in Czech, and then the statement --

21

1  the version of the statement will then be translated for us all

2  at one time by the interpreter, all right?

3          So if our victim would like to be heard, this is his

4  opportunity.

5          Hello, can you hear us?

6          THE VICTIM:  (Inaudible).

7          THE COURT:  This is your chance to say -- make the

8  statement which you've prepared for court, please.

9          THE VICTIM:  (In English) Can I start right now?

10         THE COURT:  You may start now, yes.

11         THE VICTIM:  (In English) Okay.  Thank you.  I will

12  say it in Czech, right.  So I'll start now.

13         (Victim made statement in Czech.)

14         THE VICTIM:  (In English) That was all.  Thank you to

15  everybody for your time.

16         THE COURT:  All right, thank you for your statement.

17  We'll now have the interpreter go to the podium and read the

18  statement in English.

19         THE VICTIM:  (In English) Thank you.

20         THE COURT:  Please take your mask off.  It will be

21  hard to hear you.

22         THE INTERPRETER:  Sorry.

23         "Hello.  My name is Jan K.  First of all, I would

24  like to thank you for the opportunity to make a statement

25  regarding the case of George Aref Nader and to have the

1    opportunity to listen to the entire process.  It has been a

2    long journey, and for me it still will be.

3           "My health is bad.  After returning from the U.S. in

4    2000, I had stomach ulcers, bad teeth.  I stopped eating and

5    started having nightmares.  Unfortunately, I continue having

6    these problems until now, and many more health problems due to

7    stress.

8           "It was hell for me in the institute due to my

9    status -- a prostitute from the USA.  I was an object of

10   ridicule and bullying.  I had plenty of time there to think of

11   how George deceived and abused me and sent me to David in

12   Monterey, who also abused me several times.

13          "After I was released from the institution in 2002, I

14   started school but I was not capable of functioning normally,

15   to sleep and to be in an acceptable mood, not to vomit what

16   I've eaten.  I was forced to end my studies.

17          "I started inquiring if there is a hope for me to

18   tell someone all that happened.  I did have one such

19   possibility with the Czech police, who visited me at the

20   institution, when they arrested George in the Czech Republic.

21   Unfortunately, due to fear and insecurity, I did not do it at

22   that time.  I hated myself and was ashamed of myself.

23          "I wanted very much to have my own family.  I hoped

24   that my own child will help me forget my past.  After the birth

25   of my son, rather than relief, I started to feel even worse.  I

1    began to wonder if I can ever handle it.  I definitely did not

2    want to allow that such an event could be repeated with my

3    son -- to be without a father, without supervision, without

4    nurture, without love, in power of people like George.

5         "In 2012, I decided to risk my family's future, and

6    in spite of their protests, I sold our car, I used the money

7    saved for my teeth and traveled to California to report

8    everything to the police.  My wife always stands by me, even

9    though sometimes it's very hard on her.

10        "After my return from the USA, I felt a hope that

11   something started happening, but over time, everything seems to

12   have stopped.  Only after six years, in 2018, the FBI contacted

13   me and everything started moving again.

14        "As of February 2020, I have not been able to go to

15   work.  I would like to have everything behind me and to be

16   again a full-fledged father to my children and partner to my

17   wife, and not to constantly burden them with my problems.

18        "We have agreed with George upon a compensation.  It

19   is less than I was asking for, but no doubt this money will

20   help me to solve at least a part of the problems which I have

21   had for the long 20 years.  Unfortunately, I will never get rid

22   of some illnesses and will carry them to my death.

23        "George destroyed practically my entire life, which

24   I'm trying to put back together piece by piece.  I have a

25   wonderful family, and I believe that they will help me and

24

1    stand by me in restoring my soul and health.

2              "In conclusion, I would like to thank the help of the

3    FBI, the translator, and my legal representative for their

4    willingness and helpfulness.  I hope that since we have all

5    spent so much time, strength, emotions, and health problems,

6    the conclusion will be a learning lesson.  To abuse a child, to

7    practically kidnap it and destroy his entire life, is not

8    right.

9              "Once more, I'd like to thank the Court for allowing

10   me to share everything with you.  I feel a small measure of

11   relief.

12             "Jan."

13             THE COURT:  Thank you, ma'am.

14             All right, Mr. Nader, come up to the lectern.  This

15   is your chance, Mr. Nader, to say anything you'd like the Court

16   to consider before sentence is imposed, and yes, you may remove

17   the mask.

18             THE DEFENDANT:  Thank you.  Thank you, Your Honor,

19   for giving me the chance to address this Honorable Court.  I'm

20   sorry to all involved, and there is nothing else.  I say today,

21   nothing else.  I say today it is that.

22             The last year has been the most difficult of my life,

23   Your Honor.  As you know, America is my adopted country, but

24   it's not my home.  While I take great pride in the professional

25   life I've had here and the work I have done for the United

1    States over the course of decades, my family and the people

2    whom I love and who I care for, who I care about me the most,

3    are back home in Lebanon and in the Middle East.  I've not been

4    able to see any of them in over a year now.  Not being able to

5    see any of them, whom I love very much, has been very painful

6    for me.

7              The only human relationship I have here was my

8    attorney and some other inmates and guards in the jail, whom I

9    have tried to help whenever I can.  Missing my family has been

10   the worst part of all of this for me.

11             I have listened to what's been said about me, and I

12   can say that I'm sincerely deeply sorry for the pain and

13   suffering I have caused.  Please know that I will continue to

14   do everything possible to make things right in every respect.

15             And I am deeply, sincerely sorry that my action have

16   required Your Honor, the Court, to take up time with me.  I

17   hope you are able to see my true effort to stay on correct path

18   in recent years, much before my arrest in 2019.  This was

19   something very deliberate and sincere by me and was not just

20   because I didn't want to end up in that -- in this position

21   before a court.  It was also because I know I can use my

22   talents in order to truly help people, and I was not able to do

23   that to my greatest potential while struggling with these

24   issues, and I'm certainly not able to help people the most from

25   inside the jail or prison.

1          Please, Your Honor, believe me when I say that there

2    will be no need for me to ever be before a court anymore

3    anywhere in the world ever again.  With my greatest sincere

4    apologies and greatest respect to you, Your Honor, and this

5    country, thank you very much.

6          THE COURT:  All right.  Mr. Nader, stay there,

7    please.  I want to go over some documents with you.  First of

8    all, you have signed along with your counsel and Mr. Prabhu an

9    amendment to the plea agreement; is that correct?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  All right.  And under that amendment,

12    you've asked that a portion of the second paragraph of

13    section 9 of the plea agreement is amended as follows, and it

14    says:  "At this time, the defendant specifically acknowledges

15    that J.B. of the Czech Republic is a victim who is entitled to

16    restitution in an amount to be determined."  That was in the

17    original, and now that has been amended, as I understand it, to

18    be the following:

19          "At this time, the defendant specifically

20    acknowledges that J.B. of the Czech Republic is a victim who is

21    entitled to restitution.  Victim J.B.'s specific loss amount

22    has been determined to be $150,000.  Pursuant to 18 U.S.C.,

23    section 3663(a)(3), the defendant agrees to pay restitution in

24    the amount of $150,000 to J.B.

25          "In all other respects, the plea agreement should

27

1    remain as entered previously."

2              And you have agreed to that, correct?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  All right.  Then I will make sure that

5    that is made part of the actual plea agreement.

6              You have also then signed a consent order -- I'm

7    sorry, you have signed the restitution order, and the only

8    thing I'm adding, my understanding is that you have agreed that

9    this is going to be paid in full no later than 60 days from the

10   entry of this order.

11             Is that your understanding of what you've agreed to?

12             THE DEFENDANT:  Yes, that is my understanding.

13             THE COURT:  I'm checking the box that if that is not

14   done, then interest will accrue on the judgment, and I have

15   signed it.

16             And the last document you have signed is a consent

17   order of forfeiture in which you are forfeiting three iPhones.

18   Is that your understanding?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  All right.  All right.  Well, the Court

21   has listened carefully to counsel, we've listened to the victim

22   today, and the victim also did submit a much longer statement

23   which is part of the record in this case.  It may be under

24   seal; I can't recall.  I think it is, for appropriate reasons.

25             But I am satisfied, as I said at the very beginning,

1    that the plea agreement, which included a nonbinding

2    recommendation that the Court sentence you to ten years, is

3    sufficient but not greater than necessary to achieve the

4    purposes of Section 3553(a) of Title 18 of the United States

5    Code.

6              I have taken into consideration your age, your health

7    conditions, your past record of good works, because as is often

8    the case with people in our court who are being sentenced,

9    there's both good and bad, and we have to take all of that into

10   consideration.  And I also have taken into consideration some

11   of the matters that Mr. Nassikas mentioned of which I was

12   already previously somewhat aware in concluding that the

13   ten-year sentence is appropriate at this time.

14             Therefore, it is the sentence of the Court as to each

15   of Counts 1 and 2 that a sentence of ten years in the custody

16   of the Bureau of Prisons, to be served concurrent, that means

17   it's a total of ten years, with credit for the time you've been

18   serving, as I said, is sufficient but not greater than

19   necessary to achieve the purposes of federal law.

20             I am going to require that you serve a life term of

21   supervised release.  I know that counsel, I think, only asked

22   for five years, but I think in this case, the government's

23   recommendation is more appropriate.

24             Now, the terms and conditions of the life period of

25   supervised release, which is concurrent on both counts of

29

1  conviction, is first of all you must be of uniform good

2  behavior, which means you may not violate any federal, state,

3  or local laws.

4          Do you understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And secondly, you must follow all the

7  conditions of supervision, which will be printed on the

8  judgment order and explained to you by the Probation Office.

9          Do you understand that?

10         THE DEFENDANT:  Yes.

11         THE COURT:  Now, there are many special conditions of

12 the supervision, and I want to make sure this is clear.  My

13 understanding is that the defendant will be permitted to leave

14 the United States while he's on supervised release once you

15 have finished whatever prison sentence you have.

16         At any point, though, should you come back to the

17 United States, then you are going to have to comply with all of

18 the additional conditions that are going to be printed on the

19 judgment order, and so those will include the following:

20         You must within 48 hours contact the United States

21 Probation Office in this district.  Do you understand that?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  And then you will be required to comply

24 with all of the following conditions:  Number 1, you must

25 comply fully with the requirements of the Sex Offender

1   Registration and Notification Act, and that means that you must

2   register with the state sex offender registration agency for

3   any state in which you may reside, work, attend school, or in

4   any other respect be required to register.

5           Do you understand that?

6           THE DEFENDANT:  Yes.

7           THE COURT:  All right.  You will be required to

8   participate in such mental health evaluation and treatment

9   programs, including a psychosexual evaluation and sex offender

10  treatment, as directed by the Probation Office.

11          Do you understand that?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And the costs of that program and any

14  treatment modalities you will have to pay.  Do you understand

15  that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  You will have to -- you are not permitted

18  to engage in any employment or volunteer services that would

19  give you access either to computers or to minors.  Do you

20  understand that?

21          THE DEFENDANT:  Yes.

22          THE COURT:  You may not purchase, possess, or in any

23  respect have access to any materials involving young juvenile

24  models under the age of 18 which would be considered to be

25  pornographic.  Do you understand that?

1          THE DEFENDANT:  Yes.

2          THE COURT:  You may not have any contacts with minors

3   unless there is a responsible adult present, and you have to

4   make sure that the Probation Office is advised as to such

5   contacts.  Do you understand that?

6          THE DEFENDANT:  Yes.

7          THE COURT:  All right.  You will be required to

8   comply with the Probation Office's computer monitoring program,

9   and that would involve among other things your giving consent

10  to the installation of computer monitoring software on any

11  computer to which you have access, and that would be done by

12  the Probation Office.

13         Do you understand that?

14         THE DEFENDANT:  Yes.

15         THE COURT:  All right.  And there are restrictions on

16  how you can use your computer.  All right.

17         I'm going to find in this case that you are capable

18  of paying the minimum fine of $25,000, so the Court is imposing

19  the $25,000 fine.  Although the restitution is a significant

20  amount, I am satisfied that your resources do enable you to pay

21  the fine as well.

22         That's due and payable immediately; however, if it is

23  not paid immediately, within 60 days of your release from

24  custody, you must begin paying minimum payments of $500 a month

25  towards the fine obligation.

1          Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  All right.  The Court finds that other

4  than this, there is no other financial obligations for you to

5  cover the costs of incarceration, supervision, or any of the

6  statutory fines other than the 25,000, and that's on both

7  counts concurrent.  So that's the total.  But there are --

8  there is a $100 special assessment per count of conviction, for

9  a total of $200 of special assessments, and that must be paid

10 immediately.

11         Do you understand that?

12         THE DEFENDANT:  Yes.

13         THE COURT:  All right.  There is no history of drug

14 abuse, so the mandatory drug testing is not imposed, but the

15 Probation Office can demand a drug test from you, and you must

16 comply.  Do you understand that?

17         THE DEFENDANT:  Yes.

18         THE COURT:  All right.  Counsel, Mr. Jeffress, you

19 can stay there.  Just speak up loudly.  Did you want the Court

20 to make any kind of a recommendation as to a facility for

21 incarceration?

22         MR. JEFFRESS:  Thank you very much.  Yes, Your Honor.

23 We would like FCI Petersburg, which has a program and also is

24 close enough so that he can stay in touch with counsel.

25         THE COURT:  All right, FCI Petersburg will be our

33

1    recommendation.

2            And is there anything else, counsel, that we need to

3    address?  Anything, anything else from the government?

4            MR. PRABHU:  Nothing from the government, Your Honor.

5            MR. JEFFRESS:  Not for defense, Your Honor.  Thank

6    you.

7            THE COURT:  How about from probation?  Anything

8    further that we need to address?

9            THE PROBATION OFFICER:  No, Your Honor.

10           THE COURT:  No?  All right, then the defendant is

11   remanded at this time, and we'll call the next case.  Thank

12   you.

13           THE DEFENDANT:  Thank you.

14                           (Which were all the proceedings

15                            had at this time.)

16

17                   CERTIFICATE OF THE REPORTER

18      I certify that the foregoing is a correct transcript of

19   the record of proceedings in the above-entitled matter.

20

21

22   _____
                            /s/
23                   Anneliese J. Thomson

24

25