# Exhibit 6
## Letter from J. Jeffress to M. Frazer (Nov. 19, 2020)



1099 14TH ST. NW
8th FLOOR WEST
WASHINGTON, DC 20005
(240) 640-2850
WWW.KAISERDILLON.COM

jjeffress@kaiserdillon.com

November 19, 2020

**VIA ELECTRONIC MAIL**

Mr. Michael Frazier, Counsel
Bureau of Prisons
Mid-Atlantic Regional Office
302 Sentinel Drive
Annapolis, MD 20701
Mfrazier@bop.gov

    Re:    Mr. George Nader, USM# 17310-083, Case No. 19-CR-201 (E.D. Va.)
             Request for Compassionate Release Motion

Dear Mr. Frazier:

    I write on behalf of my client, Mr. George Nader, to request that the Bureau of Prisons promptly file a motion with the United States District Court for the Eastern District of Virginia recommending him for compassionate release and asking that his remaining term of imprisonment be reduced to home confinement pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i).

    On June 26, 2020, after over eleven months of pretrial detention,[1] Mr. Nader was sentenced to 10 years' incarceration and a lifetime of supervised release for his convictions on one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4) and (b)(2), relating to conduct in 2012, and one count of transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2423(a) and 2426, relating to conduct in 2000. ECF No. 197. As of this writing, Mr. Nader has not yet been designated to a BOP facility. Instead, he remains detained at the Alexandria Detention Center ("ADC") in Alexandria, Virginia.[2] Thus, I am writing directly to you rather than to a prison warden.

---

[1] Mr. Nader was arrested in the case on June 3, 2019.

[2] The ADC is a state facility that houses some federal prisoners, like Mr. Nader, pursuant to a contract with the U.S. Marshals Service. *See* https://www.alexandriava.gov/sheriff/info/default.aspx?id=8460 (last accessed Nov. 9, 2020).

The present COVID-19 pandemic is an "extraordinary and compelling" reason to grant Mr. Nader a sentence reduction. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Numerous courts around the country, including in the Eastern District of Virginia, have held that compassionate release is warranted when inmates suffer from medical conditions that place them at higher risk of serious illness in the event they contract COVID-19. *See, e.g.*, *United States v. Zellner*, 2020 WL 5240579 (E.D. Va. Sept. 2, 2020); *United States v. Woodard*, 2020 WL 3528413 (E.D. Va. June 26, 2020). Mr. Nader is 61 years old and has a number of serious health conditions that predispose him to severe illness or death from COVID-19, including heart disease, high blood pressure, high cholesterol, and pre-diabetes.[3]

On April 15, 2019, prior to his arrest, Mr. Nader required open-heart surgery. ECF No. 185, Presentence Investigation Report ("PSR") ¶ 136. During that procedure, doctors discovered evidence of severe coronary three-vessel disease. Mr. Nader was in the ICU from April 15 to 16, 2019. *Id*. He was then transferred to a lower acuity care unit but required re-admission to the ICU on April 17, 2019, after suffering "respiratory deterioration" due to a collapsed lung and swelling. *Id*. These complications required two surgically-placed chest tubes to resolve. *Id*.

Dr. Matthew Hulse, a medical director at the University of Virginia, has reviewed Mr. Nader's records from his heart surgery. Even before the COVID-19 pandemic, Dr. Hulse opined that Mr. Nader's operation "is considered high-risk and grounds for immediate and ongoing medical attention." *See* Ex. 1, Declaration from Dr. Matthew C. Hulse (Jun. 4, 2019), at 2. Specifically, he explained that the use of both internal mammary arteries and the "I-graft" place a large amount of myocardium (the muscular tissue of the heart) at risk. *Id*. Dr. Hulse further opined that, though the operation was intended to restore adequate blood flow to the diseased area of the heart, the operation did not affect Mr. Nader's pre-existing conditions that led to his need for surgery—his advanced age, high blood pressure, high cholesterol, and family history of cardiac disease. *Id*. Due to his arrest and conviction in this case, Mr. Nader has been unable to receive any of the recommended cardiac rehabilitation after his heart surgery.

Dr. Michael Rosenbloom, Professor of Surgery and the Head of the Cardiac Surgery Division at Cooper University Health System, examined Mr. Nader's surgery records, Dr. Hulse's medical opinion, and Mr. Nader's current medications to assess Mr. Nader's risks if he contracts COVID-19. *See* Ex. 2, Letter from Dr. Michael Rosenbloom (Apr. 17, 2020) at 2. Dr. Rosenbloom found that Mr. Nader is "at increased risk for bad outcome" if he contracts COVID-19 and that he "has several risk factors for a detrimental outcome[.]" *Id*. at 1.

Specifically, Dr. Rosenbloom found that Mr. Nader's "history of heart disease" is "a recognized risk factor for mortality[.]" *Id*. Though Mr. Nader had coronary artery bypass surgery, "coronary artery disease is a progressive disease," and surgery "does not imply that his heart disease is cured, rather it is a matter of management." *Id*. at 2. Dr. Rosenbloom also notes that Mr. Nader has hypertension, which "has been identified as a risk factor for bad outcome in patients who contract Covid-19[.]" He writes that "[s]tatistics have shown that the risk of death in patients who become infected with the Covid-19 virus is higher in patients over 60 and increases with age." Finally, he writes that Mr. Nader's diabetic condition "has numerous

---

[3] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Nov. 9, 2020).

deleterious effects which ultimately would increase his risk for bad outcome or death if he were infected with the Covid-19 virus." *Id*. These factors make Mr. Nader "at high risk" if infected and make his risk for death "markedly higher" than persons without such conditions. *Id*.

Mr. Nader's present physical condition remains poor. At ADC, Mr. Nader is currently being prescribed Atorvastatin (a medication to treat high cholesterol), Metformin (to treat diabetes—he has been told he is pre-diabetic), Bisoprolol (to treat high blood pressure), Clopidogrel (a blood thinner used to treat heart problems), Low-Dose Aspirin (to treat heart problems), Ramipril (to treat high blood pressure and cardiac disease), and Pantoprazole (to treat heartburn). *See* PSR ¶ 137.

Dr. Rosenbloom's assessment squares with data showing that Mr. Nader's underlying conditions increase his risk for serious illness or death. For example, in New York, hypertension, diabetes, high cholesterol (hyperlipidemia) and coronary artery disease are four of the top five top comorbidities among people in Mr. Nader's age group who died of COVID-19.[4] And data from the CDC shows that hospitalizations for COVID-19 have been six times higher and deaths twelve times higher for people with underlying conditions (with cardiovascular disease and diabetes representing two of the three top underlying conditions).[5]

Mr. Nader poses a very low risk of reoffending if released and is not otherwise a danger to the community. Prior to sentencing, Dr. Fred Berlin, a renowned Johns Hopkins psychiatrist who specializes in treating and evaluating people charged with and convicted of sexual offenses,[6] performed a clinical assessment of Mr. Nader. Dr. Berlin concluded that Mr. Nader's "future prognosis is very good" due in part to the following factors: (1) Mr. Nader's demonstrated ability in recent years to control his behavior; (2) sexual recidivism rates for people over 60 are very low; (3) Mr. Nader has no comorbid conditions such as drug and alcohol addiction or a personality disorder; and, most importantly, (4) Mr. Nader is clearly "a man with considerable psychological strengths that facilitate future success." *See* ECF No. 190, Defendant's Memorandum in Aid of Sentencing at 3.

It is painfully clear that time is of the essence. On November 8, 2020, the United States surpassed 10 million coronavirus cases and daily new infections exceed 100,000.[7] Public health

---

[4] New York State Department of Health COVID-19 Tracker, https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no (last accessed Nov. 9, 2020).

[5] https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm?s_cid=mm6924e2_w (last accessed Nov. 9, 2020).

[6] Dr. Fred Berlin is the Associate Professor of Psychiatry and Behavioral Sciences at The Johns Hopkins University School of Medicine, the founder of The Johns Hopkins Sexual Disorders Clinic, and Director of the National Institute for the Study, Prevention, and Treatment of Sexual Trauma.

[7] https://www.washingtonpost.com/nation/2020/11/09/coronavirus-covid-live-updates-us/ (last accessed Nov. 9, 2020).

experts are currently warning that the country is entering the worst phase yet of this pandemic.[8] The Centers for Disease Control and Prevention ("CDC") has recognized that "people incarcerated in correctional and detention facilities are at greater risk for some illnesses, such as COVID-19, because of close living arrangements" inside the facility and the airborne nature of the virus.[9] As of November 9, 2020, the BOP reported 2,365 federal inmates and 953 BOP staff were currently positive for COVID-19.[10]

  We appreciate your prompt attention to this urgent matter. Please let me know if you need any additional information.

Sincerely,

Jonathan Jeffress
*Attorney for George Nader*

---

[8] *Id*.

[9] Center for Disease Control, *FAQs for Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (last visited Nov. 9, 2020).

[10] https://www.bop.gov/coronavirus/ (last visited Nov. 10, 2020).

Jonathan Jeffress Letter to Michael Frazier

Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                     Plaintiff,<br><br>- against -<br><br>GEORGE AREF NADER,<br><br>                                     Defendant. | 1:19-mj-00513 (CLP)<br><br>**DECLARATION OF**<br>**DR. MATTHEW HULSE** |

I, Dr. Matthew Hulse, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a certified anesthesiologist and Assistant Professor of Anesthesiology and Medial Director at the University of Virginia. I submit this declaration in support of Mr. Nader's application for release from detention, upon my own personal knowledge.

2. On April 12, 2019, Mr. Nader sought care from his physician due to his significant risk factors for coronary artery disease ("CAD") as part of a routine check-up. Although Mr. Nader did not exhibit symptoms which are usually associated with CAD, he had significant and advanced cardiac disease necessitating surgical intervention, as more minimally invasive options were no longer able to be offered, given the burden of disease.

3. Among the diseased vessels were coronary arteries, which supply the vast majority of the cardiac function, including the left anterior descending artery (the "LAD" or, more commonly, the "widowmaker lesion" because of its importance).

4. Given the extent of the diseased vasculature within the coronary arteries, it would not be unreasonable to expect that, without intervention, Mr. Nader's clinical condition eventually would have presented as a large area of myocardial infarction (a heart attack) and subsequent cardiogenic shock leading to death.

5. On April 15, 2019, Mr. Nader therefore underwent an open-cardiac surgical procedure to revascularize the portions of his at-risk myocardium (heart muscle). The surgical procedure involved splitting open Mr. Nader's sternum (chest bone) and connecting new blood vessels to the areas past the diseased blood vessels.

6. Mr. Nader was in the intensive care unit ("ICU") from April 15-16, 2019.

7. Mr. Nader was then transferred from the ICU to a lower acuity care unit (referred to on page 3 of Exhibit 1 as the "General ward").

8. Mr. Nader then needed readmission to the ICU on April 17, 2019, after suffering from "respiratory deterioration" due to a collapsed lung (pneumothorax) and generalized edema (swelling), which impeded the ability of his lungs to absorb oxygen, ultimately requiring two surgically-placed chest tubes.

9. In the absence of the chest tubes which were used to re-inflate Mr. Nader's lung, this condition could have rapidly progressed a tension pneumothorax, which is a medical emergency and deadly.

10. For a number of reasons, Mr. Nader's operation is considered high-risk and grounds for immediate and ongoing medical attention.

11. First, the use of both of the internal mammary arteries (LIMA and RIMA), as well as the "T-graft" or "jump graft," place a large amount of myocardium at risk, should the grafted blood vessel have postoperative complications.

12. Additionally, while the operation performed on Mr. Nader was intended to restore adequate blood flow to the diseased areas of the myocardium, the operation does not have any effect on Mr. Nader's pre-existing conditions that directly led to the vasculopathy of the coronary arteries (advanced age, high blood pressure, high cholesterol, and family history of cardiac disease). Mr. Nader's condition therefore needs to be monitored on an ongoing basis in light of these factors.

US-DOCS\105689162.1

13. Furthermore, under the "Course Operation of [April 15, 2019]" section on page 3 of Exhibit 1, the description indicates that Mr. Nader had disease in a blood vessel that was not amenable to being fixed surgically, which means a portion of his heart may still not have adequate blood supply.

14. Additionally, the description of Mr. Nader's initial stay in the intensive care unit from April 15-16, 2019 (also on page 3 of Exhibit 1) reflects aspects of the electrocardiogram which can indicate myocardial ischemia (impaired blood flow to the heart muscle).

15. Although Mr. Nader did not have rhythm events and the laboratory check of his heart enzymes was consistently normal, the impaired blood flow can also present post-operatively from cardiac surgery. And, in most patients, these changes are often indicators of an underlying myocardial infarction which requires urgent intervention.

16. Concerning post-operative recommendations for patients such as Mr. Nader, they should not return to "desk work" earlier than six to eight weeks after the date of surgery, assuming an uneventful post-operative course, which was not the case for Mr. Nader, given his eventful post-operative course.

17. Within those restrictions, patients should not lift weights greater than five to eight pounds, push or pull with intensity, or move their arms through large ranges of motion in order to abide by "sternal precautions."

18. Given that the sternum is surgically dissected via a sternal saw during the operation, strict sternal precautions are in place post-operatively (*e.g.*, no lifting of arms past 90 degrees, no placing of the hands behind the back, in addition to the above examples) in order to preserve the healing and integrity of the sternum, which is being tenuously held together with surgical wire.

19. For Mr. Nader in particular, these precautions are even more necessary due to the surgical technique, which required that both arteries on the inside of the sternum were used to bypass his diseased native coronary arteries (referred to as the LIMA and RIMA).

US-DOCS\105689162.1

20. Using both of these arteries of the sternum is controversial in cardiac surgery as it has been demonstrated repeatedly that utilizing both arteries can predispose certain patients to sternal dehiscence and subsequent deep sternal wound infection.

21. Some patients are more predisposed to this infection; nevertheless, patients are urged to take sternal precautions for longer durations of time if procedures such as Mr. Nader's were undertaken.

22. Other factors can make a deep sternal wound more likely, such as advanced age, diseases of the bone, diabetes, and other conditions which can impair wound healing.

23. In this case, Mr. Nader was taking a diabetic medicine whose only FDA approval is for diabetes, which places him at a much higher risk for deep sternal wound infection should he truly be diabetic.

24. Although his medical report states that there is no indication of diabetic disease, understanding why he was taking this medicine is critical to his well-being.

25. Furthermore, should a deep sternal wound infection or infectious mediastinitis occur, his condition could become an extremely morbid complication necessitating multiple subsequent operations, admission to an intensive care unit, or potentially long-term antibiotic treatment, and also potentially result in death.

26. Given the patient's ongoing risk factors for coronary artery disease, the fairly recent major surgery, the complicated hospital admission, and the potential for subsequent decompensation (a rapid decline in lung function), Mr. Nader requires the ability to be urgently evaluated.

27. Under the circumstances, it can be assumed that Mr. Nader is not able to abide by these post-operative sternal precautions while incarcerated, and that he cannot reliably perform the self-care which is encouraged in the post-operative period.

28. Stress in the post-operative period, whether related to the physiological stress of surgery or the psycho-social stress of external factors, predisposes patients to heart rhythm disorders, most notably

atrial fibrillation, which is relatively common after cardiac surgery and can require urgent intervention with possible further procedures and medical therapy to intervene.

29. Based on Mr. Nader's laboratory values from his hospital stay, it is evident that he was also significantly anemic at the time of discharge (*i.e.*, he had low hemoglobin levels), which is fairly standard for a patient undergoing cardiac surgery.

30. Nevertheless, without the ability to assess routine labs in the post-surgical period, it is impossible to determine whether these levels are improving or worsening.

31. Low hemoglobin levels after open cardiac surgery can be common, which could require blood transfusions to correct. If this trend has continued to worsen in the case of occult bleeding, the patient could require hospitalization and a blood transfusion, or otherwise face deterioration, coronary ischemia, or possible death.

32. Given the compelling factors that Mr. Nader suffers from advanced coronary artery disease requiring surgical intervention, experienced life-threatening complications while recovering from the aforementioned procedure, and is in the post-operative time period where the ability to meticulously follow post-operative instructions from the cardiac surgeon as well as have reliable access to advanced medical care are paramount, I would have the patient urgently referred for medical evaluation.

Dated: 6/4/2019
Charlottesville, Virginia

Dr. Matthew C. Hulse, M.D.

US-DOCS\105689162.1

Jonathan Jeffress Letter to Michael Frazier

Exhibit 2



**Heart Institute**
**Division of Cardiothoracic Surgery**

One Cooper Plaza
Dorrance 361
Camden, NJ 08103

856-342-2141

April 17, 2020

**Jonathan Jeffress**
KaiserDillon PLLC
1099 14th Street NW
8th Floor- West
Washington, D.C. 20005

*Re: United States of America v. George Aref Nader*

Dear Mr. Jeffress,

I am a board certified Thoracic surgeon practicing in the field of Adult cardiac surgery since 1989. I have been actively involved in performing cardiac surgery and currently am Head of Cardiac Surgery at Cooper University Hospital of Rowan University where I hold appointment as Professor of Surgery. I frequently perform coronary bypass surgery which is the procedure that Mr. Nader underwent.

I have reviewed the following documents pertaining to Mr. Nader:

1. Operative Record and postoperative notes listed as Exhibit 1. This includes the surgical report and summary of the postoperative course of Mr. Nader's coronary artery bypass surgery performed on April 15, 2019.

2. Medical opinion of Dr. Matthew C. Hulse listed as Exhibit 3.

3. Alexandria Sheriff's Office Covid-19 protocols, effective March 18, 2020 listed as Exhibit A.

My expert opinion was requested to determine whether Mr. Nader would be at increased risk for serious outcome including death as a result of his underlying medical conditions.

It is my expert opinion that Mr. Nader would be at increased risk for a bad outcome if he developed infection with Covid-19. The patient has several risk factors for a detrimental outcome including, but not limited to:

1. The patient has a history of heart disease which is a recognized risk factor for mortality in patients who contract Covid-19.



One year ago, he underwent coronary artery bypass surgery. According to the operative report, only 3 of 4 intended target vessels were able to be "grafted". In addition, on or around the first postoperative day he developed electrocardiogram changes indicative of ischemia. These may have indicated a technical issue with the bypass grafts that may possibly have resulted in occlusion of one of them. Postoperative cardiac catheterization was not performed and so the cause for these changes is not known. Echocardiography performed prior to discharge showed reduced right ventricular function which was a new finding compared to previous echocardiographic studies. It should be noted that coronary artery disease is a progressive disorder. That he underwent coronary artery bypass surgery does not imply that his heart disease is cured, rather it is a method of management.

2. Mr. Nader has hypertension for which he is treated with Bisoprolol. This medication is a beta blocker and is typically used in heart patients to treat hypertension. Hypertension has been identified as a risk factor for bad outcome in patients who contract Covid-19 infection.

3. Mr. Nader is over age 60. Statistics have shown that the risk of death in patients who become infected with the Covid-19 virus is higher in patients over 60 and increases with age.

4. Mr. Nader has diabetes. He is currently maintained on Metformin which is an oral hypoglycemic agent used to treat diabetes. Diabetes has numerous deleterious effects which ultimately would increase his risk for a bad outcome or death if he were infected with the Covid-19 virus.

It should also be recognized that in creating protocols for any facility in the current Covid environment reliance on even an aggressive measure like testing those who will come in contact with the inmates is not perfect. Although information on testing is still evolving, it is known that a negative test for Covid-19 does not completely exclude the possibility of a person being infected. Using temperature measurement also suffers from limitations. Patients may be in the early stages of the disease and may be able to transmit the Covid-19 virus without having even a low grade fever. Similarly, there are those who have a mild presentation of the disease and don't even recognize symptoms. They are just as contagious. For a high risk person like Mr. Nader, it would be difficult under the best of circumstances, if not impossible, for him to protect himself in his current environment. Significant social distancing, respiratory precautions and meticulous hand hygiene would be required at the minimum and avoiding surfaces that have be touched by others would also be important.

Therefore based on these facts, it is my opinion that Mr. Nader is at high risk were he to be infected with Covid-19. Of course his risk for death is markedly higher due to the factors outlined above.

In addition to the risk of death, he would also be at risk for non-fatal critical illness such as the need to be on a ventilator with a prolonged stay in the intensive care unit, cardiac complications or a lengthy hospital stay.

My opinions are made within a reasonable degree of medical certainty and I reserve the right to amend them should additional information become available.

Respectfully,

Michael Rosenbloom, MD, FACS, FACC
Professor of Surgery, Department of Surgery Head of Division of Cardiac Surgery

Cooper Medical School of Rowan University
Co-director, Cooper Heart Institute
Cooper University Health System
Camden, NJ 08103