IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 1:19-cr-201 (LMB) |
| GEORGE AREF NADER, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S SECOND MOTION FOR COMPASSIONATE RELEASE**

In light of the novel coronavirus and the COVID-19 pandemic, defendant again seeks early termination of his prison term under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i).  The defendant GEORGE AREF NADER ("NADER") is a hands-on child predator, who pled guilty to transporting a 14-year old child for purposes of criminal sexual activity, in violation of 18 U.S.C. § 2423(a) and 2426 (1998), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4) and (b)(2) (2011).  The Court sentenced the defendant to 120 months of incarceration.  The Court should deny his renewed motion.  Using compassionate release in his case would fail to address a range of important practical and legal problems and would not satisfy the standards in § 3582(c)(1)(A).

**Background**

Defendant NADER has repeatedly engaged in the sexual abuse of minors and has demonstrated interest in images of child sexual abuse and children for decades.  The defendant's first known encounter with federal law enforcement occurred in 1984 when he was allegedly involved with child pornography sent to him through the mail.  Even 36 years ago, when the defendant was about 25 years of age, he showed his sexual interest in boys.  But a court in Washington, D.C. ruled that the evidence was improperly obtained and the defendant escaped

responsibility then.

In 1991, NADER, at age 31, was caught by customs officials when he knowingly transported two films of minor boys into the country.  He pled guilty but received a sentence far below what would be expected of such a crime today – six months of imprisonment.  Less than a decade later, NADER in his late 30's/early 40's had broadened his horizons by exploiting troubled teenage boys for his own sexual gratification, primarily targeting minor prostitutes overseas.  One of these boys, MINOR BOY 1, a 14 year old, was the subject of one of the counts of conviction.  Having enjoyed MINOR BOY 1's paid company in Prague, the defendant paid for him to travel alone from the Czech Republic to the United States, where the defendant continued committing his child exploitations in the comfort of his U.S. residence.  The Court should remember that this 14-year old boy was by himself in a strange country where he had no connections, spoke little English, and relied completely on NADER.  The boy says that he was taken advantage of sexually over and over again by the defendant; the defendant has admitted it happened once.

NADER was convicted in the Czech Republic for having paid sex with troubled teen boys in the early part of the decade. The defendant ended up serving approximately a year in a foreign jail for his conduct. His paid sexual activities in that period in Prague with MINOR BOY 1 was part of his charged conduct in the Czech Republic but MINOR BOY 1 did not testify in the Czech proceedings and the defendant was not convicted for his conduct with him.

NADER came across the radar of the federal authorities again later that decade, when a minor boy from another country who had stayed at NADER's residence in Washington, D.C. reported that NADER had shown him child pornography.  That case was never charged and NADER has spent the majority of his time since then overseas.

2

Over the course of 35 years, NADER has left a number of known and unknown minor victims in his wake, traveling around the world, with limited periods of time in the United States. As his reputation grew within the international community, so did his sexual desire for underaged boys. Through email and text exchanges with other pedophiles, the defendant had access to images and videos of child sexual abuse and made requests for certain kinds of child pornography to satisfy his sexual attraction to boys

The federal prosecution began with the filing of a criminal complaint on April 19, 2018. Dkt. No. 1.  The defendant was arrested in early June 2019 when he arrived at JFK International Airport in New York.  A grand jury sitting in Alexandria, Virginia on July 3, 2019 returned a three-count indictment charging the defendant with Transportation of Visual Depictions of Minors (18 U.S.C. § 2252(a)0) & (b)(1)), Transportation of Obscenity (18 U.S.C. § 1462), and Transportation of a Minor With Intent To Engage in Criminal Sexual Activity (18 U.S.C. § 2423(a)).

In January 2020, the defendant agreed to plead guilty to a two-count criminal information charging him with two counts: transporting a 14-year old child for purposes of criminal sexual activity, in violation of 18 U.S.C. § 2423(a) and 2426 (1998), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4) and (b)(2) (2011).  On January 13, 2020, NADER pled guilty to both counts of the information, and the pending indictment was dismissed. *See* Dkt. No. 175. NADER also enjoyed the benefit of the termination of potential child exploitation prosecutions in the District of Columbia, as well as the Southern and Eastern Districts of New York.  *See* Dkt. No. 171.  On June 26, 2020, this Court sentenced NADER to one-hundred and twenty (120) months of incarceration on both counts.  Dkt. No. 196.  The defendant remains in administrative

segregation at Alexandria Adult Detention Center, while he awaits his designation by the Bureau of Prisons.[1]

NADER moved for compassionate release on or about December 7, 2020.  *See* Dkt. No. 207-210.  This Court denied that request on December 9, 2020 in a written opinion.  Dkt. No. 212.  The defendant renewed his motion on December 31, 2020.  Dkt. No. 213.

The defendant has served about 13 percent of the mandatory minimum sentence this Court imposed on him, and significantly less than 5 percent of his potential sentence under the applicable Sentencing Guidelines.  *See* Dkt. No. 188, at 1.

## Argument

**I.     The Court should weigh a number of practical considerations in evaluating defendant's request for compassionate release.**

The Federal Bureau of Prisons ("BOP") is actively working to contain the spread of the coronavirus within prisons.  BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[2]  This last step carries special importance for defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided BOP with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of

---

[1] As an alternative to the extraordinary relief sought by the defendant's motion, the Court could order BOP to provide the defendant with designation to an appropriate federal prison facility.

[2] *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

imprisonment of that prisoner or 6 months." This provision is in keeping with BOP's authority to designate where an inmate serves a sentence. Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) of the Act suspends, during the coronavirus emergency, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[3] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, BOP has placed over 6,900 inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of particular inmates, the prisons most at risk, and the dangers posed by inmates if released. Inmates do not have to apply to be considered for home confinement.

In weighing the appropriateness of home confinement, BOP considers, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. BOP also seeks to ensure that the inmates it releases to home

---

[3] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, BOP is requiring a 14-day quarantine period before any inmate is released to home confinement.

In addition to these efforts to increase the use of home confinement, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Current modified operations plan require that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly admitted inmate is screened for COVID-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems.  All volunteer visits are suspended absent authorization by the Deputy Director of BOP.  Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and presently remain suspended to limit the number of people entering the facility and interacting with inmates.  To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month.  Tours of facilities are also suspended.  Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page:  www.bop.gov/coronavirus/index.jsp.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts.  And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

In any event, the Court's adjudication of the defendant's motion necessarily touches on

many of the following fact-specific issues:

- *Safety of place of home detention.*  An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism.*  The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[4]  New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection.*  Any release should include measures to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.*  Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.*  To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

This list is not exhaustive and, indeed, could include many additional considerations. The key point is that, in light of the BOP's efforts to control the spread of COVID-19, the Court should exercise its discretion in such a way as to grant compassionate release only where the defendant's medical situation, the presence of coronavirus at his facility of confinement, and the statutory sentencing factors support doing so.  For the reasons that follow, this is not such a case.

---

[4] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

## II.     The defendant has not established a sufficient basis for compassionate release.

The defendant bears the burden to demonstrate that he is entitled to compassionate release under § 3582(c)(1)(A)(i).  *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see also generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise … the burden of persuasion lies … upon the party seeking relief.").  Compassionate release is not appropriate on these facts because the defendant has not established "extraordinary and compelling reasons" for such relief under § 3582(C)(1)(A)(i).

Courts have generally agreed the existence of the pandemic, standing alone, is not a sufficient basis for granting compassionate release.  As the Third Circuit put it, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  Instead, courts in this district have found "extraordinary and compelling reasons for compassionate release [on the basis of COVID-19] when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, — F. Supp. 3d —, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).[5]

Because the defendant has not satisfied these criteria, the Court should deny his motion.

---

[5] *See also United States v. Little*, No. 1:10-CR-135 (CMH), 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020) (adopting the criteria from *Feiling*); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) ("Defendant's request for release on home confinement is based upon nothing more than 'the mere possibility that COVID-19 will spread to his facility'-a fear that is insufficient to justify release."(citing *Feiling*)).

**A.     While the defendant has demonstrated that he faces higher susceptibility to COVID-19, there has been no significant showing that his health conditions have not been appropriately addressed in his current confinement in administrative segregation**

This Court has previously found that the "defendant has health conditions that put him at greater risk of severe illness from Covid-19," Dkt. No. 212, at 2. But the record before the Court is clear that the defendant has had his conditions cared for and addressed in the more than year and a half that he has been at the Alexandria Adult Detention Center. The care available in the prison system should mitigate any significant consideration of reduction of sentence for the condition. *See also United States v. Shmuckler*, 2019 WL 6257959, at *3 (E.D. Va. Nov. 22, 2019) (denying compassionate release where defendant was "able to manage most of his medical issues through medication and the use of assistive devices" while in prison); *United States v. Manuel*, 2020 WL 1466000 (D.S.C. Mar. 26, 2020) (defendant suffers from a chronic cardiac condition, but is able to independently manage his activities of daily living); *United States v. Goode*, 2020 WL 58272 (S.D.N.Y. Jan. 6, 2020) (while inmate's kidney disease is incurable, and she receives dialysis, "her disease is treatable, she is responding well to that treatment, and she does not have an 'end of life trajectory.'"); *United States v. Hansen*, 2019 WL 7281937 (D.S.D. Dec. 27, 2019) (defendant suffers from numerous chronic conditions, but he is able to provide self-care within the correctional facility, and his ailments are "not nearly as severe as the health issues contemplated under the notes to the Sentencing Guidelines").

**B.     The defendant has not shown that his continued isolation in administrative segregation poses a heightened risk of a coronavirus exposure.**

With respect to an individualized showing regarding NADER's prison facility, his claim is unpersuasive. He currently is incarcerated at Alexandria Adult Detention Center ("ADC"). While there are currently COVID-positive individuals at ADC, all inmates who have tested positive are being appropriately treated or isolated according to CDC guidelines adopted by the

BOP.  Since NADER himself has been isolated through administrative segregation at the facility with significant restrictions on his access to other persons, *see* Dkt. No. 209, it is obvious that he is even less at risk than the average inmate at ADC.  The facility continues to adhere to the BOP modified operations plan described above in the government's responsive pleading, and has, among other steps, restricted prisoner movements within the facility, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, and provided masks and hand cleaners.

For all of these reasons, NADER has not shown, in any particularized fashion, that he is entitled to additional relief based on the risk of contracting COVID-19.  *Cf. United States v. Campos-Ramenthol*, 805 F. App'x 328, 330 (5th Cir. 2020) (defendant not entitled to pretrial release due to COVID-19 where "the jail has procedures in place in case of an outbreak, including the isolation of high-risk inmates").

### C.   The defendant has not shown that his release plan reduces his risk of contracting COVID-19.

In light of the risks posed by his release, the defendant does not have a viable release plan.  As previously presented to the Court, the defendant is an extreme risk of flight.  Dkt. No. 78, at 18-19. Allowing him to return to the community is basically seeking a return to the exact same environment that allowed him to use his wealth and influence to seek young boys, abuse them, and commit the crimes of conviction.  As previously indicated, the defendant was searching for such opportunities on the Internet as recently as October 2018.  *Id.*, at 7.

The defendant's release could potentially increase the risk of exposure for the defendant, his family, and anyone with whom they come into contact, including court employees (like probation officers) who will be required immediately interact with and supervise defendant under demanding conditions, likely for an extended period of time.  *See also United States v. White*,

No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *6 (E.D. Va. June 23, 2020) ("[I]t is not clear to this Court that Defendant would be safer from the virus on home confinement."); *United States v. Brady*, No. 18-CR-316 (PAC), 2020 WL 2512100, at *4 (S.D.N.Y. May 15, 2020) (denying compassionate release because releasing the defendant "from prison may be to simply take him out of the proverbial frying pan and place him into the fire, as the general public continues to suffer from COVID-19 as well."); *United States v. Feiling*, — F. Supp. 3d —, 2020 WL 1821457, at *8 (E.D. Va. Apr. 10, 2020) ("Defendant's release on home confinement presents its own risks to Defendant's health, the health of his family and public safety.").

### D. In the exercise of its discretion, the Court should deny compassionate release in light of the statutory sentencing factors.

Compassionate release is only appropriate where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). That statute instructs the court to consider several factors, including whether the underlying offenses constitute crimes of violence, whether the offenses involved firearms, and the defendant's criminal record. At the same time, § 3582(c)(1)(A) expressly directs the Court to consider the statutory sentencing factors under 18 U.S.C. § 3553(a) in adjudicating a compassionate-release motion. These § 3553(a) factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Here, these factors counsel strongly against granting any reduction in the defendant's sentence.

It is beyond dispute that transporting a 14-year old boy for sex and engaging in repeated acts of seeking and possessing child abuse images are particularly horrible offenses that deserve

significant punishment. The defendant took advantage of a young homeless boy in Europe who was desperate for money and abused him there and in the United States.  It is clear that NADER was a willing and able child predator, looking to take advantage of anyone he could, and he has not demonstrated that his relatively brief time in prison is likely to have significantly changed that.

Possession of child pornography is also a grievous offense that deserves serious sanctions. *See United States v. Morace*, 594 F.3d 340, 350 (4th Cir. 2010) (citing a legislative enactment in 2003 as "ample evidence of Congress's intent that offenses involving child pornography be treated severely" (internal quotations and citation omitted)).

Those involved in child sex offenses, such as those in the defendant's criminal history, have frequently been denied compassionate release specifically due to the nature of their crimes. *See, e.g., United States v. Clews*, 2020 WL 3529780 (S.D. Cal. June 30, 2020) (defendant suffers from COPD and diabetes, but relief denied 2 years into 168-month sentence, because the crimes involved "possession and distribution of large volumes of sadistic child pornography images over many years. Further, the undisputed relevant conduct attributed to Defendant includes production of child pornography with two different minors on two separate occasions."); *United States v. Sears*, 2020 WL 3250717 (D.D.C. June 16, 2020) (although inmate is at risk, denied because he has only served 23 months of 71-month sentence for child exploitation offenses); *United States v. McCloud*, 2020 WL 3066618 (D.N.D. June 9, 2020) (notwithstanding significant ailments, relief is denied for 68-year-old man who has served 11.5 years of 20-year sentence for abusive sexual contact with a child); *Coleman v. United States*, 2020 WL 3039123, at *5 (E.D. Va. June 4, 2020) (denied because the defendant committed child pornography offenses "while in the presence of family members, usually waiting until they went to sleep to view illicit

images….His offense also involved the exploitation and subsequent alienation of his family members, casting doubt on whether placement with his 88-year-old mother is a suitable post-release arrangement."); *United States v. Schultz*, 2020 WL 2764193, at *7 (W.D.N.Y. May 28, 2020) (inmate is vulnerable, but denied because of "abhorrent" conduct in attempting to meet purported 15-year-old for sex); *United States v. Fischer*, 2020 WL 2769986 (D. Md. May 27, 2020) (defendant presents CDC risk factors, but relief is denied due to "heinous" offense involving interstate travel to abuse a vulnerable teenage girl); *United States v. Jenkins*, 2020 WL 2814437, at *4 (D. Neb. May 26, 2020) (denied 4.5 years into 17-year sentence for child pornography offenses, as defendant is a "recidivist sex offender who…had previously been convicted of sexually assaulting a 17-year-old and contributing to the delinquency of a 16-year-old he had also been having sex with—and the child pornography he was convicted of receiving in this case was discovered when law enforcement executed a search warrant based on his online solicitation of a 14-year-old"); *United States v. Mortensen*, 2020 WL 2549970, at *2 (D. Nev. May 19, 2020) (70-year-old defendant collected and traded child pornography, and attempted to solicit teenagers online; "The predatory nature of this conduct by a man (then) in his late fifties cannot be overlooked and suggests that he remains a danger to the community—particularly its teenage girls."); *United States v. Lebrecht*, 2020 WL 2519721 (W.D.N.Y. May 18, 2020) (inmate has no risk factors, and poses danger based on child pornography offenses and lack of sex offender treatment); *United States v. Wooley*, 2020 WL 2490093 (D. Or. May 14, 2020) (Lompoc inmate has COPD, and tested positive for COVID-19; denied "because the Court finds that defendant would pose a danger to others or the community if released. Defendant has a long history of convictions and uncharged conduct that involved abuse of children and substance abuse"); *United States v. Starr*, 2020 WL 2312045 (S.D. Iowa May 8, 2020) (declining to reduce

240-month sentence for manufacturing child pornography as the defendant committed the crime at home and in his neighborhood, and has no remorse); *United States v. Smith*, 2020 WL 1903160 (D. Conn. Apr. 17, 2020) (denied notwithstanding heart condition that puts him at greater risk of COVID-19, upon consideration of 3553(a) factors, including the nature of child sex offense); *United States v. Clark*, 2020 WL 1874140 (M.D.N.C. Apr. 15, 2020) (congestive heart failure constitutes a terminal condition meeting the standard for early release, but denied based on nature of sex trafficking offenses for which 30-year sentence was imposed); *United States v. Kincaid*, 2020 WL 1874113 (C.D. Ill. Apr. 15, 2020) (defendant had Stage IV non-small cell lung cancer and renal cell carcinoma with suspected brain metastases and was given a prognosis of 3 months; but reduction of 30-year sentence denied because the child sex offender victimized dozens of children over a period of decades); *United States v. Van Dyke*, 2020 WL 1811346, at *2 (E.D. Wash. Apr. 8, 2020), *adhered to on reconsideration*, 2020 WL 1845553 (E.D. Wash. Apr. 10, 2020) (denied notwithstanding severe chronic illnesses because he likely would not comply with sex offender treatment); *United States v. Hahn*, 2020 WL 980185 (D. Minn. Feb. 28, 2020) (compassionate release would not be appropriate in child abuse case given the nature of the conduct, the fact that release would undermine the 15-year mandatory sentence dictated by Congress, and in light of the defendant's conduct in prison).

Child predators and abusers are amongst the most heinous criminals and represent a danger to the most vulnerable in our community. The short shrift given by counsel to this danger is inconsistent with both the intent of Congress in demanding lengthy mandatory minimum sentences for child abusers and many district courts who have rejected compassionate release claims for such criminals. *See*, *e.g., United States v. Sears*, No. 19-CR-21 (KBJ), 2020 WL 3250717, at *3 (D.D.C. June 16, 2020) ("[G]iven the ease with which child pornography is accessible in the modern world, Sears's release is likely to require stringent and frequent monitoring. This, too,

poses a risk to the community, because the need for intensive monitoring in the age of COVID-19 would likely result in heightened safety risks ... to the probation officers who would be tasked with monitoring his behavior….") (internal quotation marks and citation omitted); *United States v. Pitcock*, 2020 WL 3129135, at *4 (S.D. Fla. June 12, 2020) (denied notwithstanding health conditions, as defendant possessed and transported a large volume of child pornography; "while the Defendant has served a majority of his sentence and has eleven months remaining, there is no evidence before the Court that he has completed any treatment regimen or programs that would inform whether the Defendant is no longer a danger."); *Coleman v. United States*, No. 4:17-CR-69 (RAJ), 2020 WL 3039123, at *5 (E.D. Va. June 4, 2020) ("[T]he Court is concerned that Petitioner's release plan does not adequately protect the public from the potential of a subsequent offense involving child pornography." (citing 18 U.S.C. § 3553(a)(2)(C); U.S.S.G. § 1B1.13(2))); *United States v. Sims*, 2020 WL 2838611, at *6 (W.D. Wash. June 1, 2020) ("In today's society with smartphones, tablets, laptops, smart TVs, and countless other devices, it would not be possible to place Mr. Sims in home confinement and eliminate his ability to engage in his prior criminal conduct [trading in child pornography]. Further, the pandemic and the CDC's recommended guidelines would only serve to make it more difficult to monitor Mr. Sims's behavior. Because Mr. Sims could engage in his prior criminal conduct at any time from his place of home confinement, effectively monitoring him would require repeated visits to his home. Such visits would enhance the risk of the spread of COVID-19 to the individuals charged with monitoring his compliance. Based upon the foregoing analysis, the court finds that Mr. Sims would be a danger to the community if he were released."); *United States v. Miezin*, 2020 WL 1985042 (N.D. Ohio Apr. 27, 2020) (54-year-old has hypertension and is borderline diabetic; but he committed child exploitation offenses and would present a danger to the

community, particularly because these crimes may be committed at home, he would require close monitoring, and that would expose others to the risk of COVID-19); *Dinning v. United States*, No. 2:12-cr-84 (RAJ), 2020 WL 1889361, at *3 (E.D. Va. Apr. 16, 2020) (denying compassionate release because the petitioner "poses an ongoing danger to the community" based on his stated desire to return to the same positions of trust that facilitated his offense); *United States v. Stone*, 2019 U.S. Dist. LEXIS 182081, at *32 (S.D. Iowa Oct. 22, 2019) (based on danger to the community in child exploitation case).

To reduce the defendant's sentence, where he has served about 13 percent of his mandatory minimum sentence, would undermine respect for the law and provide far less than just punishment for the defendant's victims and society.  The Court was certainly justified in saying last month that defendant NADER "was sentenced only a few months ago and has served very little of his 10-year sentence for what are serious offenses."  Dkt. No. 212, at 2.  Other courts have recognized this reality in denying similar claims for relief from defendants who have failed to serve a significant amount of their sentences.  *See, e.g., United States v. Pawlowski*, — F. App'x —, 2020 WL 3483740, at *2 (3d Cir. June 26, 2020) (affirming denial of relief where release "would effectively reduce Pawlowski's sentence from 15 years to less than two years' imprisonment"); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) ("Despite Kincaid's assertion that the amount of time served is not a proper basis for denying compassionate release, the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law permit the court to consider the amount of time served in determining whether a sentence modification is appropriate."); *Porter-Eley, v. United States*, No. 4:16-CR-89 (RAJ), 2020 WL 3803030, at *3 (E.D. Va. July 6, 2020) ("Petitioner has served a small percentage of her term of incarceration implicating the need for

17

deterrence and a sentence that reflects the seriousness of her offense."); *United States v. Torres*, 2020 WL 3498156, at *10 (E.D. Pa. June 29, 2020) (served less than 15% of 63-month sentence for drug offense); *United States v. Spencer*, 2020 WL 3047439 (N.D. Ohio June 8, 2020) (not clear whether supraventricular tachycardia (rapid heartbeat) is a CDC risk factor; denied in any event as defendant has long criminal history and has served only 55 months of 151-month sentence); *United States v. Hamman*, 2020 WL 3047371 (D. Or. June 8, 2020) (denied despite significant medical issues because of the defendant's criminal history, there are no cases at USP Tucson, and he has served only 50% of the sentence); *United States v. DeMille*, 2020 WL 2992190 (D. Or. June 8, 2020) (former registered nurse for a pill mill had several health problems, but none fell within the CDC risk factors; court denied compassionate release, noting that defendant had only served about 30% of her sentence); *United States v. Hernandez*, 2020 WL 3494512, at *3 (S.D. Tex. June 26, 2020) (inmate suffers from diabetes, but has served only 7 months of 48-month sentence for accepting bribes as border patrol agent; release would not serve purposes of sentencing); *United States v. Kibble*, 2020 WL 3470508, at *3 (S.D.W. Va. June 25, 2020) (inmate has heart condition, but has served only 10% of 57-month sentence for illicit sexual contact); *United States v. Doty*, 2020 WL 3440948, at *3 (S.D.W. Va. June 23, 2020) (inmate is medically vulnerable and at institution with outbreak, but release after less than a third of 42-month sentence, imposed for a fraud she committed while superintendent of schools, would be inappropriate); *Easter v. United States*, 2020 WL 3315993 (E.D. Va. June 18, 2020) (defendant suffers from diabetes, but has served only 36 months of 150-month sentence for large-scale fraud); *United States v. Shulick*, 2020 WL 3250584 (E.D. Pa. June 16, 2020) (records do not establish moderate asthma; "there is no evidence that defendant ever sought or received treatment while incarcerated for any asthmatic episode. He has been taking his

18

prescribed medications and has access to an inhaler to be used 'as needed.'" In addition, he has served only 19 months of a 60-month sentence for a significant fraud); *United States v. Zubiate*, 2020 WL 3127881 (S.D.N.Y. June 12, 2020) (defendant presents risk factor of severe obesity, but release after only 26.5 months of 102-month sentence for major drug offenses "would substantially undermine the § 3553(a) factors"); *United States v. Richardson*, 2020 WL 3104909 (S.D.W. Va. June 11, 2020) (denied where defendant served only 2 years of 6-year drug sentence; "to relieve the Defendant of over fifty percent of his imposed sentence based on these facts would constitute an unwarranted sentencing disparity among similarly situated defendants facing similar conditions of confinement in light of the pandemic."); *United States v. Adams*, 2020 WL 3057756 (S.D.N.Y. June 9, 2020) (defendant has served only 60 months of 360-month term for robberies and murder); *United States v. Carter*, 2020 WL 3051357, at *3 (S.D.N.Y. June 8, 2020) (Judge Engelmayer explains that this case, in which the defendant has only served 24 months of 75-month drug sentence, "stands in sharp contrast to those in which the Court has ordered the release of heightened-risk inmates," where an inmate has "served most of his or her term of incarceration"); *United States v. Fernandez*, 2020 WL 3034799 (S.D.N.Y. June 5, 2020) (diabetes and hypertension are under control; has only served half of sentence, and played significant role in drug trafficking); *United States v. Bird*, 2020 WL 2903904 (D.S.D. June 3, 2020) (significant health concerns do not justify release on 136-month drug sentence with eight years remaining); *United States v. Hasan-Hafez,* 2020 WL 2836782, at *5 (S.D.N.Y. June 1, 2020) ("It would undercut the § 3553(a) factors for the Court to allow Mr. Hasan-Hafez to serve just 13 months of a 45-month sentence."); *United States v. Rodarmel*, 2020 WL 2840059, at *2 (D. Kan. June 1, 2020) (release approximately three years into 204-month sentence for child exploitation offense would not be consistent with 3553(a) factors); *United States v. Aikens*, 2020

19

WL 2744192, at *5 (W.D.N.Y. May 26, 2020) (reducing 54-month child pornography sentence to less than six months "would be a dereliction of this Court's responsibilities"); *United States v. Johnson*, 2020 WL 2526965 (E.D. La. May 18, 2020) (has served less than 1/5 of 120-month sentence); *United States v. Mack*, 2020 WL 2489163 (S.D.N.Y. May 14, 2020) (26-year-old inmate has severe obesity, hypertension, and diabetes, but 10 months served so far on below-guideline 30-month drug sentence is insufficient); *United States v. Farchione*, 2020 WL 2319291 (S.D.N.Y. May 11, 2020) (release denied for 67-year-old Devens inmate suffering from heart disease and hypertension because only served one year of 84-month fraud sentence); *United States v. Bogdanoff*, — F. Supp. 3d —, 2020 WL 2307315, at *6 (E.D. Pa. May 8, 2020) (denying compassionate release where the inmate had served only seven years of an 18-year sentence, and noting that the case was "much different than others where defendants [sought compassionate release] at the end of their sentence"); *United States v. Condon*, 2020 WL 2115807 (D.N.D. May 4, 2020) (defendant has served about half of 180-month drug sentence; is 61 and suffers from asthma, COPD, cardiovascular disease, hepatitis C, hypertension, and hidradenitis suppurativa (an inflammatory skin disease that is frequently described as an auto-immune disorder), but there are no cases at the facility and no showing she would be safer in the community); *United States v. Moskop*, No. 11-CR-30077 (SMY), 2020 WL 1862636, at *1–2 (S.D. Ill. Apr. 14, 2020) (denying compassionate release where the inmate had served less than 10 years of a 20-year sentence and explaining that the "sentencing objectives of specific deterrence and protecting the public [would] not [be] fully served by less than 10 years of incarceration").

In the exercise of its discretion, the Court should deny compassionate release in light of all these statutory sentencing factors.

\*       \*       \*

Finally, if this Court were to disagree with the United States' position, any release order should require defendant to undergo a 14-day quarantine controlled by BOP.

### Conclusion

For the foregoing reasons, the Court should again deny the defendant's motion for compassionate release in its entirety.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

Jay V. Prabhu
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:    (703) 299-3700
Fax:       (703) 299-3981
Email:    Jay.Prabhu@usdoj.gov

**Certificate of Service**

I certify that on January 14, 2021, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.

_____

Jay V. Prabhu
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:    (703) 299-3700
Fax:       (703) 299-3981
Email:    Jay.Prabhu@usdoj.gov