IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>v.<br><br>GEORGE AREF NADER,<br><br>Defendant. | Case No. 1:19-CR-201<br><br>The Honorable Judge Brinkema<br>**Hearing Requested** |

**DEFENDANT GEORGE NADER'S REPLY IN SUPPORT OF HIS
<u>SECOND MOTION FOR COMPASSIONATE RELEASE</u>**

As this Court has already recognized, Mr. Nader has serious health conditions that render him highly vulnerable to severe illness or death if he contracts COVID-19.  Mr. Nader filed his Second Motion for Compassionate Release ("Second Motion") (ECF Nos. 213, 216) in the wake of an ongoing outbreak of COVID-19 at the Alexandria Detention Center ("ADC") where he is incarcerated.  Since that December 31, 2020 filing, case numbers and hospitalizations in the surrounding community have continued to climb and are at their highest rates since the start of the pandemic.  Also since Mr. Nader's Second Motion was filed, the Eastern District of Virginia has suspended most in-person proceedings until the end of February 2021.  Given his underlying conditions and the escalating spread of the virus, Mr. Nader's release is more urgent than ever.  Unless the Court grants Mr. Nader's motion for compassionate release, there is an unacceptably high risk that his imprisonment will become a death sentence.  Further, Mr. Nader's release to home confinement would not endanger the public because any risks could be mitigated with strict conditions of supervised release.

Mr. Nader respectfully requests that the Court exercise its considerable discretion in this matter and resentence Mr. Nader to time served with a lifetime of supervised release, to include home detention for a period at the discretion of the Court.

I. **THE GOVERNMENT CONCEDES THAT THIS COURT HAS THE AUTHORITY AND JURISDICTION TO GRANT MR. NADER RELIEF**

In its opposition (ECF No. 218), the Government does not dispute that Mr. Nader has exhausted his administrative remedies, and thus the Court has jurisdiction to grant him compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  *See* Mot. for Compassionate Release, ECF Nos. 208, 209 at 14-19.  Further, the Government has not disputed that this Court may grant Mr. Nader's motion for compassionate release ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  This Court thus has both jurisdiction and authority to grant Mr. Nader's motion for compassionate release.

II. **MR. NADER HAS AMPLY DEMONSTRATED THAT "EXTRAORDINARY AND COMPELLING REASONS" WARRANT HIS COMPASSIONATE RELEASE**

This Court has already recognized that Mr. Nader "has health conditions that put him at greater risk of severe illness from Covid-19."  ECF No. 212 at 2.  Yet, inexplicably, the Government still claims that Mr. Nader has not demonstrated "extraordinary and compelling reasons" supporting his compassionate release.  The Court should reject the Government's minimizing of Mr. Nader's precarious health situation and grant his motion for a sentence reduction to time served, with an appropriate period of home detention imposed as a condition of his supervised release.

    A. **Mr. Nader Is Susceptible to Severe Illness, Complications, or Death if He Contracts COVID-19**

Mr. Nader is 61 years old and suffers from progressive coronary artery disease, diabetes, hypertension, and high cholesterol.  He required triple-bypass surgery just prior to his arrest in this case, and was coming to the U.S. for cardiac aftercare when he was arrested—aftercare he never received.  *See* ECF Nos. 208, 209 at 11-14.  As the Court has recognized, Mr. Nader falls

squarely within several groups that are at elevated risk for severe illness or death from COVID-19. *Id.*; ECF No. 212.

### B. Mr. Nader's Risk of Contracting COVID-19 Has Greatly Increased Since the Date of His First Motion for Compassionate Release

#### 1. Mr. Nader Is at High Risk at ADC

Since Mr. Nader filed his first Motion for Compassionate Release ("First Motion") on December 7, 2020, and notwithstanding ADC's previous success in controlling the virus and its best efforts, an outbreak of COVID-19 occurred at the facility. After Mr. Nader filed his Second Motion on December 31, 2020, the coronavirus has continued to spread at ADC. According to ADC's December 31, 2020, press release, the entire detention center was put on lockdown on December 18, 2020, and the Sheriff ordered that all inmates be tested. This testing was conducted on December 29, 2020, and results were received on December 31, 2020. These results revealed that 78 out of 278 inmates tested—more than 28%—were infected with COVID-19, and that cases were found in multiple housing units.[1] The press release also noted that "COVID-19 has had a detrimental effect on the staffing at the Adult Detention Center and has impeded operations."[2]

On January 8, 2021, the Eastern District of Virginia issued General Order No. 2021-01, suspending all criminal jury trials, grand jury proceedings, and all in-person misdemeanor, traffic, and petty offense dockets through February 28, 2021. Gen. Order No. 2021-01 (E.D. Va.

---

[1] https://www.alexandriava.gov/sheriff/default.aspx?id=119464 (last visited Jan. 18, 2021).

[2] *Id.* As of January 13, 2021, two more inmates tested positive. *Id.* The Alexandria Sheriff's Department also reported that Sheriff's Office employees began receiving vaccinations on January 9, 2021. *Id.* However, no information was provided regarding what proportion of correctional employees have been vaccinated or whether any employees had received both doses of the vaccine, and vaccines have not been given to any incarcerated people. *Id.*

Jan. 8, 2021).[3] In the Order, Chief Judge Davis recognized that "COVID-19 case counts and hospitalizations across Virginia have skyrocketed during the Thanksgiving and December holiday season" and that "all three gating criteria (Facility Exposure Risk, Community Case Analysis, and Community Action Assessment) continue their trend in the wrong direction." *Id.* The Order continues:

> When this Court suspended criminal jury trials shortly before Thanksgiving, the 7-day average of new daily cases in Virginia was approximately 1,600 cases, which at the time was the highest it had been during the pandemic. As of today, the average number of daily cases in Virginia is over 4,700, which again constitutes a record-high (the 7-day average has increased by over 1,000 in the last ten days alone, and new daily cases have exceeded 5,200 for three straight days). The number of people hospitalized in Virginia with COVID-19 has likewise experienced an unprecedented spike, with the 7-day average of hospitalizations increasing from approximately 1,300 in mid-November to over 2,850 as of the date of this Order, again the highest it has been during the pandemic.

*Id.* at 4. The Chief Judge also referenced the perilous conditions at ADC, noting that "the Alexandria Detention Center, which houses multiple federal inmates, has recently been in 'lockdown' status based on new COVID-19 testing." *Id.* at 3.

Since the General Order was issued, cases in this District have continued to increase at an alarming rate. This past Sunday, January 17, 2021, Virginia set a new daily record of nearly 10,000 cases.[4] Of those, 3,600 were in Northern Virginia. Sunday's record beat out the record

---

[3] *Available at* https://www.vaed.uscourts.gov/sites/vaed/files/Gen%20Order%202021-01%20-%20Temporary%20Suspension%20of%20Jury%20Trials%20Grand%20Jury%20and%20Misdemeanor%20Docket.pdf (last visited Jan. 18, 2021).

[4] Inside Nova Staff, *Virginia COVID-19 cases spike to daily high of nearly 10,000; over 3,600 in Northern Virginia*, INSIDE NOVA (Jan. 17, 2021) https://www.insidenova.com/headlines/virginia-covid-19-cases-spike-to-daily-high-of-nearly-10-000-over-3-600/article_c75feb92-58dd-11eb-9d1f-67b2ff36eef6.html (last visited Jan. 19, 2021).

from just one day earlier (Saturday, January 16, 2021) by over 3,000 cases.[5] Prior to January 16, 2021, no previous day had more than 5,800 new cases reported.[6] Experts at Virginia's Biocomplexity Institute are predicting that there could be as many as 75,000 new cases per week in Virginia by April.[7] Thus, there is an extremely high risk that COVID-19 will continue to spread in ADC and the surrounding community (as well as in the BOP).

    2.    <u>Mr. Nader Would Remain at High Risk in the BOP</u>

The Government suggests, in a footnote, that the Court could just kick the can down the road and avoid granting Mr. Nader's motion for compassionate release by instead ordering the BOP to designate him to a BOP facility. *See* ECF No. 218 at 4 n.1. This would be inappropriate as Mr. Nader has met all the requirements for immediate release now, and because he would remain at unacceptably high risk of contracting COVID-19 even if transferred to the BOP.

For one thing, once Mr. Nader is designated to a BOP facility, he is unlikely to be transferred directly there. Rather, that transition would likely involve several flights and at least one stopover at a BOP transfer facility, such as the one in Oklahoma City. It would be nearly impossible for Mr. Nader to avoid exposing himself to infection during this process.[8]

Nor would Mr. Nader's safety be assured once he arrived at his designated BOP facility. At sentencing, the Court recommended that Mr. Nader be placed at FCI Petersburg in Hopewell, Virginia. ECF No. 197. Since Mr. Nader's sentencing in June 2020, conditions have

---

[5] *Id*.

[6] *Id*.

[7] *Id*.

[8] Undersigned counsel has had two clients go through the U.S. Marshals' transfer process in Oklahoma City since the onset of COVID-19; both individuals—who fortunately are significantly younger and more healthy than Mr. Nader—contracted the disease.

significantly worsened there, as well. When Mr. Nader filed his First Motion on December 7, 2020, there were 4 incarcerated people and 8 staff members at the complex positive for COVID-19. *See* ECF Nos. 208, 209 at 11 n.22. Now there are 131 incarcerated people and 14 staff there who are positive.[9] An additional 322 incarcerated people and 31 staff at Petersburg have "recovered."[10]

Further, the outbreak continues to rage throughout the BOP. There are currently 4,594 incarcerated people and 2,041 BOP staff who have current confirmed positive COVID-19 tests.[11] Infections of both incarcerated people and staff have spread exponentially since Mr. Nader was sentenced. As of June 1, 2020 (about 3 weeks before Mr. Nader's sentencing), there were just 1,650 incarcerated people and 171 BOP staff positive for COVID-19.[12]

> 3. Mr. Nader's Risk Is Increasing Due to the Emergence of New, More Contagious Coronavirus Variants

Unfortunately for everyone, the novel coronavirus that causes COVID-19 is likely to become even more contagious in the immediate future. As many news outlets have reported, a new mutation of the virus that was first identified in the U.K. is roughly 50 percent more transmissible than the common strain.[13] This more virulent strain has already been identified in

---

[9] https://www.bop.gov/coronavirus/ (last visited Jan. 18, 2021).

[10] *Id*.

[11] *Id*.

[12] Statements of Michael D. Carvajal, Director, and Dr. Jeffery Allen, Medical Director, Federal Bureau of Prisons to the Judiciary Committee of the U.S. Senate, (June 2, 2020) *available at* https://www.bop.gov/resources/news/pdfs/06022020_written_statement.pdf (last visited Jan. 19, 2021).

[13] *See, e.g.*, Joel Achenback, *CDC Warns Highly Transmissible Coronavirus Variant to Become Dominant in U.S.*, THE WASHINGTON POST (Jan. 15, 2021), *available at*

12 states and the CDC has warned health officials nationwide to "assume the variant is present in their state."[14] The CDC estimates that, by some point in March, this highly transmissible U.K. strain will account for the majority of cases in the United States.[15] The variant's higher rate of transmission "will lead to more cases, increasing the number of persons overall who need clinical care, exacerbating the burden on an already strained health care system, and resulting in more deaths."[16]

California is also battling a separate, new, and more contagious variant.[17] An epidemiologist at UCLA "certainly" suspects that there are even more variants than the California and U.K. strains, noting that officials have not been actively looking for additional variants.[18] It is more urgent than ever before that Mr. Nader be granted compassionate release so that he can isolate in his home to protect himself from these highly contagious threats. *See* E.D. Va. Gen. Order 2021-01 at 12 ("The risks posed in enclosed/indoor spaces by a more contagious

---

https://www.washingtonpost.com/health/coronavirus-variant-dominant-us/2021/01/15/4420d814-5738-11eb-a817-e5e7f8a406d6_story.html (last visited Jan. 19, 2021).

[14] *Id.*

[15] *Id.*

[16] Summer E. Galloway et al,, *Emergence of SARS-CoV-2 B.1.1.7 Lineage – United States, December 29, 2020-January 12, 2021*, Morbidity and Mortality Weekly Report (Jan. 15, 2021), *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7003e2.htm?s_cid=mm7003e2_w (last visited Jan. 18, 2021).

[17] Jamie Yuccas, *U.S. Expected to Have 500,000 COVID-19 Deaths By February*, CBS News (Jan. 19, 2021) https://www.cbsnews.com/news/covid-death-toll-united-states-expected-500k-february/ (last visited Jan. 19, 2021)

[18] *Id.*

strain of the virus cannot be overstated, and existing distancing protocols will have to be reexamined in light of this development.").

    4.    <u>Mr. Nader's Placement in Administrative Segregation Does Not Negate the Extraordinary and Compelling Reasons for His Compassionate Release</u>

Although Mr. Nader is presently in administrative segregation at ADC, that does not eliminate his risk of contracting COVID-19 while there. During the two hours per day he is permitted outside his small cell, he has to be in heavily-used indoor spaces such as the recreation and phone areas, shortly after others have been in them, without any assurance that the ventilation or cleaning protocols are sufficient to prevent his infection. Mr. Nader also has close contact with correctional staff multiple times a day; for example, he comes into close contact with staff when his meals are delivered and picked up, when he receives his medications, and when he is escorted to the shower, recreation area, or phones.

There have been numerous documented cases of COVID-19 transmission between detainees and corrections officers during such brief encounters. In one such incident published in the CDC's Morbidity and Mortality Weekly Report, a 20-year old corrections officer contracted COVID-19 following a series of less than one-minute encounters with asymptomatic detainees in a quarantine unit.[19] None of these encounters qualified as a "close contact," defined as being within 6 feet of an infectious person for at least 15 consecutive minutes.[20] However, video surveillance showed that the officer had numerous brief interactions of less than 1 minute

---

[19] *See* Julia Pringle, *et al.*, "COVID-19 in a Correctional Facility Employee Following Multiple Brief Exposures to Persons with COVID-19 – Vermont, July-August 2020," <u>Morbidity and Mortality Weekly Report</u> Vol. 69, No. 43 (Oct. 30, 2020) *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6943e1-H.pdf (last visited Jan. 18, 2021).

[20] *Id.*

each that cumulatively exceeded 15 minutes during his 8-hour shift.[21]  These interactions included opening detainees' doors to allow them out for showers or recreation, performing health checks, dispensing medications, and delivering/retrieving meal trays.[22]  During all of these interactions, the officer was wearing a microfiber cloth mask, gown, and eye goggles, and for most he was wearing gloves as well, yet he still got infected.[23]  Though Mr. Nader has been provided with a non-surgical mask, he does not have access to personal protective equipment like gowns, gloves, or goggles.  It is thus likely that his risk of infection from these types of encounters is higher than for the correctional staff involved.

Moreover, Mr. Nader is not likely to remain in administrative segregation if he is moved to a BOP facility.  Pursuant to ADC policy, Mr. Nader was placed in administrative segregation after his plea because he had been convicted of a sexual offense that attracted some publicity.[24]  The BOP does not have such a policy, and Mr. Nader expects that he would be placed in the general population when he is moved to a BOP facility.

      C.      **BOP's Failed Efforts to Control COVID-19 in Its Facilities Weigh in Favor of Granting, Not Denying, Mr. Nader's Motion for Compassionate Release**

The Government devoted several pages of its opposition to so-called "practical" considerations it claims that the Court should consider when evaluating Mr. Nader's motion for compassionate release.  *See* ECF No. 218 at 4-8.  Therein, the Government described efforts the BOP has taken to attempt to control the spread of COVID-19 in its facilities and issues that BOP

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] Administrative segregation is an extraordinary mental and emotional strain, and in early 2020, Mr. Nader tried unsuccessfully to get placed back in the general population.

9

considers when considering whether it decides to move a person from one of its facilities to home confinement. But as the Court well knows, Mr. Nader is not at a BOP facility. And the Court must consider factors beyond those relevant to prison administration—in particular all of the factors specified in 18 U.S.C. § 3553(a)—when considering a motion for compassionate release.

Moreover, to the extent the Government is arguing that the BOP's efforts are sufficient to control infections in prison and therefore Mr. Nader is not at risk, the argument flies in the face of reality. Mr. Nader does not doubt that the BOP has made efforts to reduce the spread of COVID-19, but the unfortunate reality is that those efforts have failed. *See* p. 6, *supra* (describing the exponential increase in BOP positive COVID-19 cases since Mr. Nader's sentencing); ECF Nos. 208, 209 at 8-11. Courts in this District have recognized that the BOP's efforts to protect vulnerable inmates during this unprecedented public health crisis have been insufficient. *See, e.g.*, *Zellner v. United States*, No. 2:99-cr-164, 2020 WL 5240579 (E.D. Va. Sept. 2, 2020) ("The Court is aware of growing evidence of the BOP's mismanagement of its vulnerable population during the COVID-19 pandemic."). Massive outbreaks of COVID-19 have swept through numerous BOP facilities, and the pandemic is still raging out of control within many institutions. For example, FMC Lexington currently has 450 incarcerated people and staff who are positive; FCI Fort Dix has 350; and FCI Butner Medium has 231.[25] Approximately 18 BOP facilities currently have more than 100 positive cases.[26]

Mr. Nader's age and underlying health conditions make him extremely vulnerable to severe illness, complications, or death if he contracts COVID-19. Mr. Nader should not have to

---

[25] https://www.bop.gov/coronavirus/ (last visited Jan. 18, 2021).

[26] *Id.*

rely on the BOP's inadequate measures to protect him; the Court should immediately release him to a period of home confinement so that he can protect himself.

### III. MR. NADER'S REQUEST FOR COMPASSIONATE RELEASE IS CONSISTENT WITH THE SECTION 3553(a) SENTENCING FACTORS

The section 3553(a) factors reflect that the determination of the appropriate sentence requires consideration of more than just the offenses for which a person was convicted. *See* 18 U.S.C. § 3553(a). In this case, the § 3353(a) factors, when taken together, favor resentencing Mr. Nader to time served and a lifetime of supervised release, with a period of home detention for a duration and with conditions at the discretion of the Court. *See* 18 U.S.C. § 3582(c)(1)(A).

#### A. Nature and Circumstances of the Offense

The offenses for which Mr. Nader was convicted are serious, and he has never argued otherwise. But his offenses do not disqualify him from being granted compassionate release, as the Government implies, categorically or otherwise. Certainly some courts have denied compassionate release to individuals convicted of crimes similar to Mr. Nader's, but so, too, have many courts *granted* compassionate release to others who have committed comparable—and far worse—offenses. *See* ECF Nos. 208, 209 at 26-27 & nn.36-37 (collecting cases granting compassionate release for individuals serving life sentences and/or convicted of child pornography or child sex offenses).

Mr. Nader's offenses were committed many years ago—his trafficking conviction is from *20 years ago*—and his conduct is far from the worst this Court sees, even within the subcategory of child sex offenses. As noted, his only hands-on offense occurred more than twenty years ago, and he had largely ceased his unlawful sexual conduct years before his arrest. Mr. Nader has also expressed sincere remorse for his actions and has already begun the process of making

amends by immediately paying the full restitution ($150,000) and fine amounts ($25,000) assessed at his sentencing.[27] *See* ECF Nos. 208, 209 at 26-28.

### B. History and Characteristics of Defendant

Predictably, the Government's opposition fails to acknowledge the extraordinary amount of good Mr. Nader has done over the past four decades. Yet under § 3553(a), a person's positive aspects must be considered along with the bad.

As discussed in great detail in Mr. Nader's sentencing memorandum and his First Motion, Mr. Nader has made significant contributions to the United States, as well as in diplomatic and humanitarian endeavors in the Middle East. *See* ECF Nos. 192, 208-209. ▇

▇

### C. Respect for the Law/Just Punishment

The Court must also consider whether the sentence imposed will promote respect for the law and provide just punishment for the offense. These factors are not always best served by longer sentences. Fairness and compassion will also promote respect for the law by demonstrating that the justice system treats defendants with compassion and humanity. In light of the unprecedented threat that COVID-19 poses to incarcerated people, many courts around the country have granted compassionate release to vulnerable defendants like Mr. Nader, even when they have served less than half their sentences.[28] Thus, when considering compassionate release

---

[27] Mr. Nader also promptly satisfied his special assessment.

[28] *See, e.g.*, *United States v. Rodriguez-Acedo*, No. 19-cr-3539, ECF. No. 44 (S.D. Cal. Jul. 21, 2020) (served approximately 11 months of a 37 month sentence); *United States v. Torres*, No. 19-cr-20342-BLOOM, 2020 WL 4019038 (S.D. Fla. Jul. 14, 2020) (5 months into 24 month sentence); *United States v. Loyd*, No. CR 15-20394-1, 2020 WL 2572275 (E.D. Mich. May 21, 2020) (release after 3 years of 10 year sentence); *United States v. Brown*, No. 2:18-cr360, Dkt.

for individuals who have demonstrated susceptibility to severe illness or death from COVID-19, these factors should be weighed less heavily. *See, e.g.*, *Woodard v. United States*, No. 2:12-cr-105, 2020 WL 3528413, at *3 (E.D. Va. Jun. 26, 2020) ("retaining him in prison simply to serve a higher percentage of his sentence at the risk of increasing his exposure to a fatal viral infection does *not* serve the § 3553(a) factors . . . .") (emphasis in original).

The Court should also consider the significant punishment Mr. Nader has already received. He has been incarcerated for 19 months, which is more than 15% of his total sentence before application of any good time credits ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A full year of that time has now been spent in administrative segregation where he is only allowed out of his cell for two hours per day. Mr. Nader has known from the very early days of the pandemic that he is highly vulnerable to COVID-19 and has been living in constant fear of becoming ill or dying. Moreover, his closest family member, his beloved sister Leila, is suffering through a horrific humanitarian crisis in Lebanon, and it has been incredibly difficult for Mr. Nader to be half a world away, powerless to help, and unable to even stay in consistent contact with her.

## IV.  MR. NADER'S PROPOSED RELEASE PLAN ADEQUATELY PROTECTS THE PUBLIC

If the Court grants Mr. Nader's motion for compassionate release, he will live in a condo that he owns in Washington, D.C. Mr. Nader has no family in the area and will live alone, so

---

No. 35 (N.D. Ala. May 22, 2020) (granting compassionate release to defendant 11 months into 60 month sentence); *United States v. Ben Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125, at *2 (D. Haw. Apr. 13, 2020) (granting compassionate release to defendant less than 13 months into 60 month sentence); *United States v. Delgado*, 457 F. Supp. 3d 85, 86-87 (D. Conn. Apr. 30, 2020) (granting compassionate release to defendant 29 months into 120 month sentence); *United States v. Winston*, No. 1:13-cr-639-RDB, ECF. No. 295 (D. Md. Apr. 28, 2020) (granting compassionate release to defendant 36 months into 120 month sentence).

there is no risk of him infecting anyone within his household.[29]  ██████████

██████████████████████████████████████████████████████████████

██████

As noted in Mr. Nader's First Motion, Dr. Fred Berlin has evaluated Mr. Nader twice and concluded that he is very unlikely to reoffend based on his advanced age, his demonstrated ability in recent years to control his behavior, and his lack of any conditions that frequently lead to relapse into criminal sexual behavior, such as drug addition, alcoholism, or antisocial personality disorder.  *See* ECF Nos. 208, 209 at 30-31.  Dr. Berlin's conclusion is corroborated by extensive research about the low rates of recidivism among sexual offenders—one study found "[t]here were very few recidivists among the sexual offenders released after age 60"— only 3.8%.  R. Karl Hanson, *Recidivism and Age: Follow-Up Data from 4,673 Sex Offenders*, J. Interpersonal Violence (Oct. 2002).

Any risk that Mr. Nader would reoffend can be minimized with appropriate conditions of supervised release.  Pursuant to the conditions the Court has already imposed, Mr. Nader will be required to complete a mental health evaluation and participate in sex offender treatment, if recommended.  ECF No. 197.  He will be forbidden to have any contact with minors and must permit the installation of computer monitoring software on any computer to which he has access.  *Id*.  He will not be allowed to hold any job or volunteer position that allows him access to computers or minors, and he will be required to register as a sex offender.  *Id*.  Further conditions

---

[29] The Government urges the Court to impose a 14-day quarantine if the Court grants Mr. Nader's motion for compassionate release.  Given that Mr. Nader plans to live alone if he is released (with electronic monitoring), Mr. Nader submits that he if he tests negative for COVID-19, he then should be permitted to quarantine at home where he would have no further contact with correctional staff or be in shared spaces with other detainees.

could be added to ensure that Mr. Nader will not access child pornography, such as prohibiting him from possessing an internet-enabled phone.

Moreover, Mr. Nader's conditions of release could largely be monitored remotely and/or by phone, which would not obligate probation officers to put themselves at risk of contracting COVID-19. Frankly, if he were resentenced to supervised release with home confinement, he would be supervised with far *less* human contact required than what is presently necessary within ADC.

Mr. Nader intends to return to his home in the Middle East as soon as possible, but if the Court wishes him to remain in the United States for a period to serve a term of home confinement, any risk of flight can be eliminated with an ankle monitor and the surrender of his passport.

## CONCLUSION

Mr. Nader is an older man in poor health who is at grave risk of severe illness or death if he contracts COVID-19. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and his release would not endanger the public. The Court should grant his motion for compassionate release and reduce his sentence to time served with a lifetime of supervised release, plus a term of home detention under whatever conditions the Court deems appropriate.

Dated: January 20, 2021                                  Respectfully submitted,


                                                    */s/ Jonathan S. Jeffress*
Jonathan S. Jeffress (#42884)
Emily Anne Voshell (#92997)
Courtney Roberts Forrest (#76738)
KaiserDillon PLLC
1099 14th Street, NW, 8th Fl. West
Washington, DC 20005
Tel: (202) 640-4430
Fax: (202) 280-1034
jjeffress@kaiserdillon.com
evoshell@kaiserdillon.com
cforrest@kaiserdillon.com

John N. Nassikas III (#24077)
Andrew E. Talbot (#93801)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Tel: (202) 942-5000
Fax: (202) 942-5999
john.nassikas@arnoldporter.com
andrew.talbot@arnoldporter.com

*Attorneys for Defendant
George Aref Nader*

16

## **CERTIFICATE OF SERVICE**

     I hereby certify that on January 20, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to counsel of record.

/s/ Courtney R. Forrest\_\_
Courtney R. Forrest
